# Exhibit A

| 1.  Shipbroker | **BIMCO STANDARD BAREBOAT CHARTER** |
|---|---|
| None | **CODE NAME:"BARECON 2001"**<br><br>**PART I** |
| | 2.  Place and date<br>Athens,   24   June 2020 |
| 3.  Owners/Place of Business (Cl. 1)<br><br>**OCM MARITIME RHINE LLC**<br><br>Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96980 | 4.  Bareboat Charterers/Place of business (Cl. 1)<br><br>**KINAROS SPECIAL MARITIME ENTERPRISE  -  IMO n° 9405538**<br><br>**62, Iroon Polytechneiou, Avenue, 18535 Piraeus, Greece** |
| 5.  Vessel's name, call sign and flag (Cl. 1 and 3)<br><br>**Mv "KINAROS"      SVAO9**<br><br>**Greek flag** | |
| 6.  Type of Vessel<br><br>**OIL/CHEMICAL TANKER** | 7.  GT/NT<br><br>**29,663/14,113** |
| 8.  When/Where built<br><br>**2009/HMD South Korea** | 9.  Total DWT (abt.) in metric tons on summer freeboard<br><br>**51601** |
| 10. Classification Society (Cl. 3)<br><br>**LLOYDS REGISTER** | 11. Date of last special survey by the Vessel's classification society<br><br>**N/A** |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 3)<br><br>**N/A** | |

| 13. Port or Place of delivery (Cl. 3)<br><br>**Safe port or anchorage worldwide** | 14. Time for delivery (Cl. 4)<br><br>**See Clause 32** | 15. Cancelling date (Cl. 5)<br>**N/A** |
|---|---|---|

| 16. Port or Place of redelivery (Cl. 15)<br><br>Safe port or anchorage worldwide in Charterers' option | 17. No.  of  months'  validity  of  trading  and  class  certificates  upon redelivery (Cl. 15)<br><br>**Please refer to Clause 49** |
|---|---|
| 18. Running days' notice if other than stated in Cl. 4<br><br>**N/A** | 19. Frequency of dry-docking (Cl. 10(g))<br><br>**As per Classification requirement** |

20. Trading Limits (Cl. 6)

**Worldwide always within IWL but excluding Iraq, Iran, Cuba, Crimea region of Ukraine, Turkish-occupied Cyprus, Namibia, Syria, Yemen, Cambodia, Ethiopia, North Korea, Somalia, Venezuela and any other countries or territories sanctioned by the US, UK, UN and/ or EU and/ or the country of the vessel or countries being at war or in a warlike area (subject to Owners' consent) and such other countries as the Mortgagee may require the Vessel to avoid, provided that if Sanctions no longer apply to any country aforesaid, and the Mortgagee permits the Vessel to trade there, then the Vessel shall be permitted to trade there under this Charter**

| 21. Charter period (Cl. 2)<br><br>**5 years** | 22. Charter hire (Cl. 11)<br><br>**See Clause 34** |
|---|---|
| 23. New class and other safety requirements (state percentage of Vessel's insurance value acc. to Box 29) (Cl. 10(a)(ii))<br><br>**N/A** | |
| 24. Rate of interest payable acc. to Cl. 11(f) and, if applicable, acc. to PART IV<br><br>**Clause 35 applies** | 25. Currency and method of payment (Cl. 11)<br><br>**USD, see Clause 35** |

(continued)                      **"BARECON 2001" STANDARD BAREBOAT CHARTER**                      PART 1

| | |
|---|---|
| 26. Place of payment; also state beneficiary and bank account (Cl. 11)<br><br>**See clause 11** | 27. Bank guarantee/bond (sum and place) (Cl.24) (optional)<br><br>**N/A** |
| 28. Mortgage(s), if any (state whether 12(a) or (b) applies; if 12(b) applies state date of Financial Instrument and name of Mortgagee(s)/Place of business)(Cl. 12)<br>**Clause 12(b) applies – Mortgage may be granted in favour of a financing bank**<br>Subject to Clause 39 | 29. Insurance (hull and machinery and war risks)(state value acc. to Cl. 13(f) or, if applicable, acc. to Cl. 14(k)) (also state if Cl. 14 applies)<br><br>**See Clause 44** |
| 30. Additional insurance cover, if any, for Owners' account limited to (Cl. 13(b) or, if applicable, (Cl. 14(g))<br><br>**To be advised** | 31. Additional insurance cover, if any, for Charterers' account limited to (Cl. 13(b)) or, if applicable, (Cl.  14(g))<br><br>**To be advised** |
| 32. Latent defects (only to be filled in if period other than stated in Cl. 3)<br><br>**N/A** | 33. Brokerage commission and to whom payable (Cl. 27)<br><br>**N/A** |
| 34. Grace period (state number of clear banking days)(Cl. 28)<br><br>**See clause 28** | 35. Dispute Resolution (state 30(a), 30(b) or 30(c); if 30(c) agreed Place of Arbitration <u>must</u> be stated (Cl. 30)<br>**See clause 56** |
| 36. War cancellation (indicate countries agreed) (Cl. 26(f))<br><br>**See clause 26(f)** | |
| 37. Newbuilding Vessel (indicate with "yes or "no" whether Part III applies) (optional)<br>No | 38. Name and place of Builders (only to be filled in if Part III applies)<br>N/A |
| 39. Vessel's Yard Building No. (only to be filled in if Part III applies)<br><br>Hull          N/A | 40.      Date of Building Contract (only to be filled in if Part III applies)<br><br>N/A |
| 41. Liquidated damages and costs shall accrue to (state party acc. to Cl. 1)<br><br>a)  **N/A**<br><br>b)<br><br>c) | |
| 42.      Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies) (optional)<br>**No** | 43. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies) (optional)<br>No |
| 44. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies)<br><br>**N/A** | 45. Country of the Underlying Registry (only to be filled in if Part V applies)<br><br>**N/A** |
| 46. Number of additional clauses covering special provisions, if agreed<br>**Please refer to Rider Clauses 32 to 59 enclosed** | |

PREAMBLE – it is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II.  In the event of a conflict of conditions, the provisions of PART 1 shall prevail over those of PART II to the extent of such conflict but no further.  It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and only form part of this Charter if expressly agreed and stated in the Boxes 37, 42 and 43. If PART III and/or PART IV and/or PART V apply, it is further agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *Panagiotis Fokas* | *Elena Vandorou.* |

PART II
"BARECON 2001" Standard Bareboat Charter

**1. Definitions (See also Clause 58)**

In this Charter, the following terms shall have the meanings hereby assigned to them:

"*The Owners*" shall mean the party identified in Box 3;

"*The Charterers*" shall mean the party identified in Box 4;

"*The Vessel*" shall mean the vessel named in Box 5 and with particulars as stated in Boxes 6 to 12.

"*Financial Instrument*" means the mortgage over the Vessel as the same may be granted by the Owners to a bank or other financial institution subject to and in accordance with the terms of this Charter, ~~deed of covenant or other such financial security instrument as annexed to this Charter and stated in Box 28.~~

**2. Charter Period**

In consideration of the hire detailed in Box 22, the Owners have agreed to let and the Charterers have agreed to hire the Vessel for the period stated in Box 21 ("The Charter Period")

**3. Delivery (See Clause 32)**

*(not applicable when Part III applies, as indicated in Box 37)*

~~(a)   The Owners shall before and at the time of delivery exercise due diligence to make the Vessel seaworthy and in every respect ready in hull, machinery and equipment for service under this Charter.~~

~~The Vessel shall be delivered by the Owners and taken over by the Charterers at the port or place indicated in Box 13 in such ready safe berth as the Charterers may direct.~~

~~(b)   The Vessel shall be properly documented on delivery in accordance with the laws of the flag State indicated in Box 5 and the requirements of the classification society stated in Box 10.  The Vessel upon delivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 12.~~

~~(c)   The delivery of the Vessel by the Owners and the taking over of the Vessel by the charterers shall constitute a full performance by the Owners of all the Owners' obligations under this Clause 3, and thereafter the Charterers shall not be entitled to make or assert any claim the Owners on account of any conditions, representations or warranties expressed or implied with respect to the Vessel but the Owners shall be liable for the cost of but not the time for repairs or renewals occasioned by latent defects in the Vessel, her machinery or appurtenances, existing at the time of delivery under this Charter, provided such defects have manifested themselves within twelve (12) months after delivery unless otherwise provided in Box 32.~~

**4. Time for Delivery (see Clause 32)**

*(not applicable when Part III applies, as indicated in Box 37).*

~~The Vessel shall not be delivered before the date indicated in Box 14 without the Charterers' consent and the Owners shall exercise due diligence to deliver the Vessel not later than the date indicated in Box 15.~~

~~Unless otherwise agreed in Box 18, the Owners shall give the Charterers not less than thirty (30) running days' preliminary and not less than fourteen (14) running days' definite notice of the date on which the Vessel is expected to be ready for delivery.~~

~~The Owners shall keep the Charterers closely advised of possible changes in the Vessel's position.~~

**5. Cancelling (see Clause 32(a))**

*(not applicable when Part III applies, as indicated in Box 37)*

~~(a)   Should the Vessel not be delivered latest by the cancelling date indicated in Box 15, the Charterers shall have the option of cancelling this Charter by giving the Owners notice of cancellation within thirty-six (36) running hours after the cancelling date stated in Box 15, failing which this Charter shall remain in full force and effect.~~

~~(b)   If it appears that the Vessel will be delayed beyond the cancelling, the Owners may, as soon as they are in a position to state with reasonable certainty the day on which the Vessel should be ready, give notice thereof to the Charterers asking whether they will exercise their option of cancelling, and the option must then be declared within one hundred and sixty eight (168) running hours of the receipt by the Charterers of such notice or within thirty six (36) running hours after the cancelling date, whichever is the earlier.  If the Charterers do not then exercise their option of cancelling, the seventh day after the readiness date stated in the Owners' notice shall be substituted for the cancelling date indicated in Box 15 for the purpose of this Clause 5.~~

~~(c)   Cancellation under this Clause 5 shall be without prejudice to any claim the Charterers may otherwise have on the Owners under this Charter.~~

**6. Trading Restrictions**

The Vessel shall be employed in lawful trades for the carriage of suitable lawful merchandise within the trading limits indicated in Box 20.

The Charterers undertake not to employ the Vessel or suffer the Vessel to be employed otherwise than in conformity with the terms of the contracts of insurance (including any warranties expressed or implied therein) without first obtaining the consent of the insurers to such employment and complying with such requirements as to extra premium or otherwise as the insurers may prescribe.

The Charterers also undertake not to employ the Vessel or suffer her employment in any trade or business which is forbidden by the law of any country to which the Vessel may sail or is otherwise illicit or in carrying illicit or prohibited goods or in any manner whatsoever which may render her liable to condemnation, destruction, seizure or confiscation. Notwithstanding any other provisions contained in this Charter it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter.  This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purposes provided the Owners' prior approval has been obtained to loading thereof.

**7. Surveys on Redelivery (see also clause 49)**

*(not applicable when Part III applies, as indicated in Box 37)*

The Owners and Charterers shall each appoint surveyors for the purpose of determining and agreeing in writing the condition of the Vessel at the time of delivery and redelivery hereunder, unless the Vessel is acquired by the Charterers. ~~The Owners shall bear all expenses of the On-hire Survey including loss of time, if any, and the Charterers shall bear all expenses of the Off-hire Survey including loss of time, if any, at the daily equivalent to the rate of hire or pro rata thereof.~~

**8. Inspection**

The Owners **and/ or Mortgagee** shall have the right at any time after giving reasonable notice to the Charterers to inspect or survey the Vessel or instruct a duly authorised surveyor to carry out such survey on their behalf:-

(a)   to ascertain the condition of the Vessel and satisfy themselves that the Vessel is being properly repaired and maintained. The costs and fees to be paid in accordance with Clause 36(g)(i) by the Charterers ~~Owners unless the Vessel is found to require repairs or maintenance in order to achieve the condition so provided;~~

(b)   in dry-dock if the Charterers have not dry-docked her in accordance with Clause 10(g). The costs and fees for such inspection or survey shall be paid by the Charterers; and

(c)   for any other commercial reason they consider necessary (acting reasonably) (provided it does not unduly interfere with the commercial operation of the Vessel). The costs and fees for such inspection and

PART II
"BARECON 2001" Standard Bareboat Charter

157 survey shall be paid in accordance with Clause
158 36(g)(i) by the Owners.
159 All time used in respect of inspection, survey or
160 repairs shall be for the Charterers' account and form
161 part of the Charter Period.
162 The Charterers shall also permit the Owners and/ or
163 Mortgagee to inspect the Vessel's log books
164 whenever requested and shall whenever required by
165 the Owners furnish them with full information
166 regarding any casualties or other accidents or
167 damage to the Vessel.
168

169 **9.  Inventories, Oil and Stores**
170 A complete inventory of the Vessel's entire equipment,
171 outfit including spare parts, appliances and of all
172 consumable stores on board the Vessel shall be made by
173 the Charterers in conjunction with the Owners on delivery
174 and again on redelivery of the Vessel. The Charterers
175 shall at the time of delivery take over  i) all bunkers,
176 lubricating oil, unbroached provisions, paints, ropes and
177 other consumable stores  in the said Vessel and ii) all
178 spare parts belonging to the Vessel (as listed in the
179 inventory) in each case at no extra cost. The Owners shall
180 at the time of redelivery take over all bunkers, lubricating
181 oil, unbroached provisions, paints, ropes and other
182 consumable stores in the Vessel at no extra cost.
183

184 **10. Maintenance and Operation**
185 (a)  (i) Maintenance and Repairs
186 During the Charter Period the Vessel shall be in the
187 full possession and at the absolute disposal for all
188 purposes of the Charterers and under their complete
189 control in every respect.   The Charterers shall
190 maintain the Vessel, her machinery, boilers,
191 appurtenances and spare parts in a good state of
192 repair, in efficient operating condition and in
193 accordance with good commercial maintenance
194 practice and, except as provided for in Clause 14(I),
195 if applicable, at their own expense they shall at all
196 times keep the Vessel's Class fully up to date with the
197 Classification Society indicated in Box 10 and
198 maintain all other necessary certificates in force at all
199 times.
200 (ii) New Class and other Safety Requirements
201 In the event of any improvement, structural changes
202 or new equipment becoming necessary for the
203 continued operation of the Vessel by reason of new
204 class requirements or by compulsory legislation **then**
205 **the Charterers shall promptly comply with the**
206 **same and the cost of compliance shall be for the**
207 **Charterers' account. Any alteration should not**
208 **diminish or reduce the market value of the Vessel**
209 **and if it does then the Owners may elect on**
210 **redelivery to keep the alteration, free of charge, or**
211 **require the Charterers to remove the alteration at**
212 **the Charterers' expense.** costing (excluding the
213 Charterers' loss of time) more than the percentage
214 stated in Box 23, or if Box 23 is left blank, 5 per cent
215 of the Vessel's insurance value as stated in Box 29,
216 then the extent, if any, to which the rate of hire shall
217 be varied and the ratio in which the cost of compliance
218 shall be shared between the parties concerned in
219 order to achieve a reasonable distribution thereof as
220 between the Owners and the Charterers having
221 regard, inter alia, to the length of the period remaining
222 under this Charter shall, in the absence of agreement,
223 be referred to the dispute resolution method agreed in
224 Clause 30.
225 (iii) Financial Security
226 The Charterers shall maintain financial security or
227 responsibility in respect of third party liabilities as
228 required by any government, including federal, state
229 or municipal or other division or authority thereof, to
230 enable the Vessel, without penalty or charge, lawfully
231 to enter, remain at, or leave any port, place, territorial
232 or contiguous waters of any country, state or
233 municipality in performance of this Charter without
234 any delay. This obligation shall apply whether or not

235 such requirements have been lawfully imposed by
236 such government or division or authority thereof.
237 The Charterers shall make and maintain all arrangements
238 by bond or otherwise as may be necessary to satisfy such
239 requirements at the Charterers' sole expense and the
240 Charterers shall indemnify the Owners against all
241 consequences whatsoever (including loss of time) for any
242 failure or inability to do so.
243
244
245 (b) Operation of the Vessel
246 The Charterers shall at their own expense and by
247 their own procurement man, victual, navigate,
248 operate, supply, fuel and, whenever required, repair
249 the Vessel during the Charter Period and they shall
250 pay all charges and expenses of every kind and
251 nature whatsoever incidental to their use and
252 operation of the Vessel under this Charter, including
253 annual flag State fees and any foreign general
254 municipality and/or state taxes. The Master, officers
255 and crew of the Vessel shall be the servants of the
256 Charterers for all purposes whatsoever, even if for
257 any reason appointed by the Owners.
258 Charterers shall comply with the regulations
259 regarding officers and crew in force in the country of
260 the Vessel's flag or any other applicable law.
261 (c) The Charterers shall keep the Owners and the
262 mMortgagee(s) advised of the intended employment,
263 planned dry-docking and major repairs of the Vessel,
264 as reasonably required.
265 (d) Flag and Name of Vessel
266 During the Charter Period, the Charterers shall have
267 the liberty to paint the Vessel in their own colours,
268 install and display their funnel insignia and fly their
269 own house flag. The Charterers shall also have the
270 liberty, with the Owners' consent, which shall not be
271 unreasonably withheld, to change the flag and/or the
272 name of the Vessel during the Charter Period all at
273 the sole cost of the Charterers. Painting and re-
274 painting, instalment and re-instalment, registration
275 and re-registration, if required by the Owners, shall
276 be at the Charterers' expense and time.
277 (e) Changes to the Vessel
278 Subject to Clause 10(a)(ii), the Charterers shall make
279 no structural changes in the Vessel or changes in the
280 machinery, boilers, appurtenances or spare parts
281 thereof without in each instance first securing the
282 Owners' approval thereof (such approval not to be
283 unreasonably withheld or delayed). If the Owners so
284 agree, the Charterers shall, if the Owners so require,
285 restore the Vessel to its former condition before the
286 termination of this Charter **at Charterers' sole**
287 **expense provided that such termination is not**
288 **attributable to the fault of the Owners or any**
289 **insolvency,     bankruptcy,     winding     up,**
290 **reorganization,  arrangement,  readjustment  of**
291 **debt, dissolution or other similar proceedings by**
292 **or against the Owners. The obligation to restore**
293 **shall not apply where the Charterers exercise the**
294 **Purchase Option under clause 48.** .
295 (f) Use of the Vessel's Outfit, Equipment and
296 Appliances
297 The Charterers shall have the use of all outfit,
298 equipment, and appliances on board the Vessel at
299 the time of delivery, provided the same or their
300 substantial equivalent shall be returned to the
301 Owners on redelivery in the same good order and
302 condition as when received, ordinary wear and tear
303 excepted. The Charterers shall from time to time
304 during the Charter Period replace such items of
305 equipment as shall be so damaged or worn as to be
306 unfit for use. The Charterers are to procure that all
307 repairs to or replacement of any damaged, worn or
308 lost parts or equipment be effected in such manner
309 (both as regards workmanship and quality of
310 materials) as not to diminish the value of the Vessel.
311 The Charterers have the right to fit additional
312 equipment at their expense and risk but the
313 Charterers shall remove such equipment at the end

P.19.6541.00 28747049 v5
P.19.6541.00 28909371 v2

PART II
"BARECON 2001" Standard Bareboat Charter

314 of the period if requested by the Owner. Any
315 equipment including radio equipment on hire on the
316 Vessel at time of delivery shall be kept and
317 maintained by the Charterers and the Charterers
318 shall assume the obligations and liabilities of the
319 Owners under any lease contracts in connection
320 therewith and shall reimburse the Owners for all
321 expenses incurred in connection therewith, also for
322 any new equipment required in order to comply with
323 radio regulations.

324 (g) **Periodical Dry-Docking**
325 The Charterers shall dry-dock the Vessel and clean
326 and paint her underwater parts whenever the same
327 may be necessary, but not less than once during the
328 period stated in Box 19 or, if Box 19 has been left
329 blank, every sixty (60) calendar months after delivery
330 or such other period as may be required by the
331 Classification Society or flag State.
332

333 **11. Hire** **See Clauses 34 and 35**
334 (a) The Charterers shall pay hire due to the Owners
335 punctually in accordance with the terms of this
336 Charter in respect of which time shall be of the
337 essence.
338 (b) ~~The Charterers shall pay to the Owners for the hire~~
339 ~~of the Vessel a lump sum in the amount indicated in~~
340 ~~Box 22 which shall be payable not later than every~~
341 ~~thirty (30) running days in advance, the first lump~~
342 ~~sum being payable on the date and hour of the~~
343 ~~Vessel's delivery to the Charterers.~~ Hire shall be paid
344 continuously throughout the Charter Period.
345 (c) Payment of hire shall be made in cash without
346 discount in the currency and in the manner indicated
347 in Box 25 and at the place mentioned in Box 26.
348 (d) Final payment of hire, if for a period of less than thirty
349 (30) running days, shall be calculated proportionally
350 according to the number of days and hours remaining
351 before redelivery and advance payment to be
352 effected accordingly.
353 ~~(e) Should the Vessel be lost or missing, hire shall~~
354 ~~cease from the date and time when she was lost or~~
355 ~~last heard of. The date upon which the Vessel is to~~
356 ~~be treated as lost or missing shall be ten (10) days~~
357 ~~after the Vessel was last reported or when the Vessel~~
358 ~~is posted as missing by Lloyd's, whichever occurs~~
359 ~~first. Any hire paid in advance to be adjusted~~
360 ~~accordingly.~~
361 (f) Any delay in payment of hire shall entitle the Owners
362 to interest at the rate per annum as agreed in Box 24.
363 ~~If Box 24 has not been filled in, the three months~~
364 ~~interbank offered rate in London (LIBOR or its~~
365 ~~successor) for the currency stated in Box 25, as~~
366 ~~quoted by the British Bankers' Association (BBA) on~~
367 ~~the date when the hire fell due, increased by 2 per~~
368 ~~cent., shall apply.~~
369 (g) Payment of interest due under sub-clause 11(f) shall
370 be made within seven (7) running days of the date of
371 the Owners' invoice specifying the amount payable
372 or, in the absence of an invoice, at the time of the
373 next hire payment date.
374

375 **12. Mortgage**
376 (only to apply if Box 28 has been appropriately filled in)
377 *(a) ~~The Owners warrant that they have not effected any~~
378 ~~mortgage(s) of the Vessel and that they shall not~~
379 ~~effect any mortgage(s) without the prior consent of~~
380 ~~the Charterers, which shall not be unreasonably~~
381 ~~withheld.~~
382 *(b) ~~The Vessel chartered under this Charter is financed~~
383 ~~by a mortgage according to the Financial Instrument.~~
384 ~~The Charterers undertake, upon the request of the~~
385 ~~Owners or the mortgagee(s) to comply, and provide~~
386 ~~such information and documents to enable the~~
387 ~~Owners to comply, with all such instructions or~~
388 ~~directions in regard to the employment, insurances,~~
389 ~~operation, repairs and maintenance of the Vessel as~~
390 ~~laid down in the Financial Instrument or as may be~~
391 ~~directed from time to time during the currency of the~~
392 ~~Charter by the mortgagee(s) in conformity with the~~

393 ~~Financial Instrument. The Owners shall provide to~~
394 ~~the Charterers a copy of each Financial Instrument~~
395 ~~and the Charterers confirm that, for this purpose,~~
396 ~~they shall be deemed to have acquainted themselves~~
397 ~~with all relevant terms, conditions and provisions of~~
398 ~~the Financial Instrument within seven (7) business~~
399 ~~days of receipt thereof and agree to acknowledge~~
400 ~~this in writing in any form that may be required by the~~
401 ~~mortgagee(s) and that they shall not agree to any~~
402 ~~amendment of the mortgage(s) referred to in Box 28~~
403 ~~or effect any other mortgage(s) without the prior~~
404 ~~consent of the Charterers, which shall not be~~
405 ~~unreasonably withheld.~~
406 *(Optional, Clauses 12(a) and 12(b) are alternatives;
407 indicate alternative agreed in Box 28).
408
409
410

411 **13. Insurance and Repairs**
412 (a) During the Charter Period the Vessel shall be kept
413 insured by the Charterers at their expense for no less
414 than the Minimum Insured Value (as defined in
415 Clause 59) against hull and machinery, war and
416 Protection and Indemnity risks (and any risks against
417 which it is compulsory to insure for the operation of
418 the Vessel, including maintaining financial security in
419 accordance with sub-clause 10(a)(iii)) in such form
420 as the Owners shall in writing approve, which
421 approval shall not be un-reasonably withheld. Such
422 insurances shall be arranged by the Charterers to
423 protect the interests of both the Owners and the
424 Charterers and the mortgagee(s) (if any), and the
425 Charterers shall be at liberty to protect under such
426 insurances the interests of any managers they may
427 appoint. Insurance policies shall cover the Owners
428 and the Charterers according to their respective
429 interests. Subject to the provisions of the Financial
430 Instrument, if any, and the approval of the Owners
431 and the insurers, the Charterers shall effect all
432 insured repairs and shall undertake settlement and
433 reimbursement from the insurers of all costs in
434 connection with such repairs as well as insured
435 charges, expenses and liabilities to the extent of
436 coverage under the insurances herein provided for.
437 The Charterers also to remain responsible for and to
438 effect repairs and settlement of costs and expenses
439 incurred thereby in respect of all other repairs not
440 covered by the insurances and/or not exceeding any
441 possible franchise(s) or deductibles provided for in
442 the insurances.
443 All time used for repairs under the provisions of sub
444 clause 13(a) ~~and for repairs of latent defects~~
445 ~~according to Clause 3(c) above,~~ including any
446 deviation, shall be for the Charterers' account.
447 (b) ~~If the conditions of the above insurances permit~~
448 ~~additional insurance to be placed by the parties, such~~
449 ~~cover shall be limited to the amount for each party set~~
450 ~~out in Box 30 and Box 31,~~ respectively. ~~The Owners~~
451 ~~or~~ the Charterers ~~as the case may be~~ shall
452 immediately furnish the ~~other party~~ Owners with
453 particulars of any additional insurance effected,
454 including copies of any cover notes or policies and
455 the written consent of the insurers of any such
456 required insurance in any case where the consent of
457 such insurers is necessary.
458 (c) The Charterers shall upon the request of the
459 Owners, provide information and promptly execute
460 such documents as may be required to enable the
461 Owners to comply with the insurance provisions of
462 the Financial Instrument.
463 (d) Subject to the provisions of the Financial Instrument
464 **and this Charter,** if any, should the Vessel become
465 an actual, constructive, compromised or agreed
466 loss under the insurances required under sub-clause
467 13(a), all insurance payments for such loss shall be
468 paid to the Owners who shall distribute the moneys
469 between the Owners and Charterers according to
470 their respective interests. The Charterers undertake
471 to notify the Owners and the mortgagee(s), if any, of

PART II
"BARECON 2001" Standard Bareboat Charter

~~any occurrences in consequence of which the Vessel is likely to become a total loss as defined in this Clause.~~

(e) ~~The Owners shall upon the request of the Charterers, promptly execute such documents as may be required to enable the Charterers to abandon the Vessel to insurers and claim a constructive total loss.~~

(f) ~~For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 13(a), the value of the Vessel is the sum indicated in Box 29.~~

14. **Insurance, Repairs and Classification**
*(Optional, only to apply if expressly agreed and stated in Box 29, in which event Clause 13 shall be considered deleted).*

(a) ~~During the Charter Period the Vessel shall be kept insured by the Owners at their expense against hull and machinery and war risks under the form of policy or policies attached hereto. The Owners and/or insurers shall not have any right of recovery or subrogation against the Charterers on account of loss of or any damage to the Vessel or her machinery or appurtenances covered by such insurance, or on account of payments made to discharge claims against or liabilities of the Vessel or the Owners covered by such insurance. Insurance policies shall cover the Owners and the Charterers according to their respective interests.~~

(b) ~~During the Charter Period the Vessel shall be kept insured by the Charterers at their expense against Protection and Indemnity risks (and any risks against which it is compulsory to insure for the operation of the Vessel, including maintaining financial security in accordance with sub-clause 10(a)(iii)) in such form as the Owners shall in writing approve which approval shall not be unreasonably withheld.~~

(c) ~~In the event that any act or negligence of the Charterers shall vitiate any of the insurance herein provided, the Charterers shall pay to the Owners all losses and indemnify the Owners against all claims and demands which would otherwise have been covered by such insurance.~~

(d) ~~The Charterers shall, subject to the approval of the Owners or Owners' Underwriters, effect all insured repairs, and the Charterers shall undertake settlement of all miscellaneous expenses in connection with such repairs as well as all insured charges, expenses and liabilities, to the extent of coverage under the insurances provided for under the provisions of sub-clause 14(a). The Charterers to be secured reimbursement through the Owners' Underwriters for such expenditures upon presentation of accounts.~~

(e) ~~The Charterers to remain responsible for and to effect repairs and settlement of costs and expenses incurred thereby in respect of all other repairs not covered by the insurances and/or not exceeding any possible franchise(s) or deductibles provided for in the insurances.~~

(f) ~~All time used for repairs under the provisions of sub-clauses 14(d) and 14(e) and for repairs of latent defects according to Clause 3 above, including any deviation, shall be for the Charterers' account and shall form part of the Charter Period.~~
~~The Owners shall not be responsible for any expenses as are incident to the use and operation of the Vessel for such time as may be required to make such repairs.~~

(g) ~~If the conditions of the above insurances permit additional insurance to be placed by the parties such cover shall be limited to the amount for each party set out in Box 30 and Box 31, respectively. The Owners or the Charterers as the case may be shall immediately furnish the other party with particulars of any additional insurance effected, including copies of any cover notes or policies and the written consent of the insurers of any such required insurance in any~~

~~case where the consent of such insurers is necessary.~~

(h) ~~Should the Vessel become an actual, constructive, compromised or agreed total loss under the insurances required under sub-clause 14(a), all insurance payments for such loss shall be paid to the Owners, who shall distribute the moneys between themselves and the Charterers according to their respective interests.~~

(i) ~~If the Vessel becomes an actual, constructive, compromised or agreed total loss under the insurances arranged by the Owners in accordance with sub-clause 14(a), this Charter shall terminate as of the date of such loss.~~

(j) ~~The Charterers shall, upon the request of the Owners, promptly execute such documents as may be required to enable the Owners to abandon the Vessel to the insurers and claim a constructive total loss.~~

(k) ~~For the purpose of insurance coverage against hull and machinery and war risks under the provisions of sub-clause 14(a), the value of the Vessel is the sum indicated in Box 29.~~

~~Notwithstanding anything contained in sub-clause 10(a), it is agreed that under the provisions of Clause 14, if applicable, the Owners shall keep the Vessel's Class fully up to date with the Classification Society indicated in Box 10 and maintain all other necessary certificates in force at all times.~~

15. **Redelivery (see also clause 49)**
At the expiration of the Charter Period the Vessel shall be redelivered by the Charterers to the Owners at a safe and ice-free port or place as indicated in Box 16, in such ready safe berth within the last trading limits of the Charterer as the Charterer may specify.  The Charterers shall give the Owners not less than thirty (30) running days' preliminary notice of expected date, range of ports of redelivery or port or place of redelivery and not less than fourteen (14) running days' definite notice of expected date and port or place of redelivery. Any changes thereafter in the Vessel's position shall be notified immediately to the Owners.
The Charterers warrant that they will not permit the Vessel to commence a voyage (including any preceding ballast voyage) which cannot reasonably be expected to be completed in time to allow redelivery of the Vessel within the Charter Period. Notwithstanding the above, should the Charterers fail to redeliver the Vessel within the Charter Period, the Charterers shall pay the daily equivalent to the rate of hire stated in Box 22 plus 10 per cent. or to the market rate, whichever is the higher, for the number of days by which the Charter Period is exceeded. All other terms, conditions and provisions of this Charter shall continue to apply.
Subject to the provisions of Clause 10, the Vessel shall be redelivered to the Owners in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted.
The Vessel upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed in Box 17.

16. **Non-Lien**
The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by their agents, which might have priority over the title and interest of the Owners **and/ or the Mortgagee** in the Vessel. The Charterers further agree to fasten to the Vessel in a conspicuous place and to keep so fastened during the Charter Period a notice reading as follows:
'This Vessel is the property of (name of Owners) **and is under mortgage to [                    ]**. It is under charter to (name of Charterers) and by the terms of the Charter Party **and the mortgage** neither the Charterers nor the Master have any right, power or authority to create, incur or permit to be imposed on the Vessel any lien whatsoever."

17. **Indemnity**
(a)   The Charterers shall indemnify the Owners against any loss, damage or expense incurred by the

PART II
"BARECON 2001" Standard Bareboat Charter

Owners arising out of or in relation to the operation of the Vessel by the Charterers, and against any lien of whatsoever nature **and/ or arrest** arising out of an event occurring during the Charter Period provided such arrest is not due to the default of the Owner's obligations under the Mortgage or the Finance Instrument or arising from any insolvency, bankruptcy, winding up, reorganization, arrangement, readjustment of debt, dissolution or other similar proceedings by or against the Owners. If the Vessel be arrested or otherwise detained by reason of claims or liens arising out of her operation hereunder by the Charterers, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

Without prejudice to the generality of the foregoing, the Charterers agree to indemnify the Owners against all consequences or liabilities arising from the Master, officers or agents signing Bills of Lading or other documents.

(b)   If the Vessel be arrested or otherwise detained by reason of a claim or claims against the Owners, the Owners shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released, including the provision of bail.

In such circumstances the Owners shall indemnify the Charterers against any loss, damage or expense incurred by the Charterers (including hire paid under this Charter) as a direct consequence of such arrest or detention.

**18. Lien**

The Owners to have a lien upon all cargoes, sub-hires and sub-freights belonging or due to the Charterers or any sub-charterers and any Bill of Lading freight for all claims under this Charter,~~and the Charterers to have a lien on the Vessel for all moneys paid in advance and not earned.~~

**19. Salvage**

All salvage and towage performed by the Vessel shall be for the Charterers' benefit and the cost of repairing damage occasioned thereby shall be borne by the Charterers.

**20. Wreck Removal**

In the event of the Vessel becoming a wreck or obstruction to navigation the Charterers shall indemnify the Owners against any sums whatsoever which the Owners shall become liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

**21. General Average**

The Owners shall not contribute to General Average.

**22. Assignment, Sub-Charter and sale**

(a)   The Charterers shall not assign this Charter nor sub-charter the Vessel on a bareboat basis except in accordance with Clause 36(o) and subject to such terms and conditions as the Owners shall approve.

(b)   The Owners shall not sell the Vessel during the currency of this Charter except after the occurrence of an event of default which is continuing and in any case in accordance with Clause 40.

**23. Contracts of Carriage**

*(a)   The Charterers are to procure that all documents issued during the Charter Period evidencing the terms and conditions agreed in respect of carriage of goods shall **be Charterers' Bills of Lading and** contain a paramount clause incorporating any legislation relating to carrier's liability for cargo compulsorily applicable in the trade; if no such legislation exists, the documents shall incorporate the Hague-Visby Rules. The documents shall also contain the New Jason Clause and the Both-to-Blame Collision Clause.

*(b)   ~~The Charterers are to procure that all passenger tickets issued during the Charter Period for the carriage of passengers and their luggage under this Charter shall contain a paramount clause incorporating any legislation relating to carrier's liability for passengers and their luggage compulsorily applicable in the trade; if no such legislation exists, the passenger tickets shall incorporate the Athens Convention Relating to the Carriage of Passengers and their Luggage by Sea, 1974, and any protocol thereto.~~

*Delete                                              as applicable.

**24. Bank Guarantee**

*(Optional, only to apply if Box 27 filled in)*

~~The Charterers undertake to furnish, before delivery of the Vessel, a first class bank guarantee or bond in the sum and at the place as indicated in Box 27 as guarantee for full performance of their obligations under this Charter.~~

**25. Requisition/Acquisition**

(a)   In the event of the Requisition for Hire of the Vessel by any governmental or other competent authority (hereinafter referred to as "Requisition for Hire") irrespective of the date during the Charter Period when "Requisition for Hire" may occur and irrespective of the length thereof and whether or not it be for an indefinite or a limited period of time, and irrespective of whether it may or will remain in force for the remainder of the Charter Period, this Charter shall not be deemed thereby or thereupon to be frustrated or otherwise terminated and the Charterers shall continue to pay the stipulated hire in the manner provided by this Charter until the time when the Charter would have terminated pursuant to any of the provisions hereof always provided however that in the event of "Requisition for Hire" any Requisition Hire or compensation received or receivable by the Owners shall be payable to the Charterers during the remainder of the Charter Period or the period of the "Requisition for Hire" whichever be the shorter.

(b)   ~~In the event of the Owners being deprived of their ownership in the Vessel by any Compulsory Acquisition of the Vessel or requisition for title by any governmental or other competent authority (hereinafter referred to as "Compulsory Acquisition"), then, irrespective of the date during the Charter Period when "Compulsory Acquisition" may occur, this Charter shall be deemed terminated as of the date of such "Compulsory Acquisition". In such event Charter Hire to be considered as earned and to be paid up to the date and time of such "Compulsory Acquisition".~~

**26. War**

(a)   For the purpose of this Clause, the words 'War Risks' shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)   The Vessel, unless the written consent of the Owners be first obtained, shall not continue to or go through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it reasonably appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the

PART II
"BARECON 2001" Standard Bareboat Charter

reasonable judgement of the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, the Owners shall have the right to require the Vessel to leave such area.

(c) The Vessel shall not load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) If the insurers of the war risks insurance, when Clause 14 is applicable, should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such insurers as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(e) The Charterers shall have the liberty:
(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
(ii) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(iii) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

(f) In the event of outbreak of war (whether there be a declaration of war or not) ~~(i) between any two or more of the following countries: the United States of America; Russia; the United Kingdom; France; and the People's Republic of China, (ii) between any two or more of the countries stated in Box 36, both the Owners and the Charterers shall have the right to cancel this Charter, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 15, if the Vessel has cargo on board after discharge thereof at destination, or if debarred under this Clause from reaching or entering it at a near, open and safe port as directed by the Owners, or if the Vessel has no cargo on board, at the port at which the Vessel then is or if at sea at a near, open and safe port as directed by the Owners. In all cases~~ hire shall continue to be paid in accordance with Clause**s** 11, **34 and 35** and except as aforesaid all other provisions of this Charter shall apply until redelivery.

**27. Commission**
~~The Owners to pay a commission at the rate indicated in Box 33 to the Brokers named in Box 33 on any hire paid under the Charter. If no rate is indicated in Box 33, the commission to be paid by the Owners shall cover the actual expenses of the Brokers and a reasonable fee for their work.~~

~~If the full hire is not paid owing to breach of the Charter by either of the parties the party liable therefor shall indemnify the Brokers against their loss of commission. Should the parties agree to cancel the Charter, the Owners shall indemnify the Brokers against any loss of commission but in such case the commission shall not exceed the brokerage on one year's hire.~~

**28. Termination. see also Clause 45**
(a) Charterers' Default
The Owners shall be entitled to withdraw the Vessel from the service of the Charterers and terminate the Charter with immediate effect by written notice to the Charterers if:
(i) the Charterers fail to pay hire in accordance with**the provisions of this Charter** ~~Clause 11. However, where there is a failure to make punctual payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Owners shall give the Charterers written notice of the number of clear banking days stated in Box 34 (as recognised at the agreed place of payment) in which to rectify the failure, and when so rectified within such number of days following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay hire within the number of days stated in Box 34 of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw the Vessel from the service of the Charterers and terminate the Charter without further notice;~~
(ii) the Charterers fail to comply with the requirements of:
(1) Clause 6 (Trading Restrictions)
(2) Clause 13(a) (Insurance and Repairs)
provided that the Owners shall have the option, by written notice to the Charterers, to give the Charterers a specified number of days grace within which to rectify the failure without prejudice to the Owners' right to withdraw and terminate under this Clause if the Charterers fail to comply with such notice;
(iii) the Charterers fail to rectify any failure to comply with the requirements of sub-clause 10(a)(i) (Maintenance and Repairs) as soon as practically possible after the Owners have requested them in writing so to do and in any event so that the Vessel's insurance cover is not prejudiced.

(b) Owners' Default
If there occurs an arrest, detention or seizure of the Vessel due to the sole fault of the Owners to the extent that the Charterers are deprived of the use of the Vessel for a period of fourteen (14) running days after written notice thereof has been given by the Charterers to the Owners, the Charterers shall be entitled to terminate this Charter with immediate effect by written notice to the Owners.

(c) Loss of Vessel
~~This Charter shall be deemed to be terminated if the Vessel becomes a total loss or is declared as a constructive or compromise or arranged total loss. For the purpose of this sub-clause, the Vessel shall not be deemed to be lost unless she has either become an actual total loss or agreement has been reached with her underwriters in respect of her constructive, compromised or arranged total loss or if such agreement with her underwriters is not reached it is adjudged by a competent tribunal that a constructive loss of the Vessel has occurred.~~

(d) ~~Either party shall be entitled to terminate this Charter with immediate effect by written notice to the other party in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of the other party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed, or if it~~

944 suspends payment, ceases to carry on business or
945 makes any special arrangement or composition with
946 its creditors.
947 (e)   The termination of this Charter shall be without
948 prejudice to all rights accrued due between the
949 parties prior to the date of termination and to any
950 claim that either party might have.
951

**29. Repossession**
953 In the event of the termination of this Charter in accordance
954 with the applicable provisions of this Charter Clause 28, the
955 Owners shall have the right to repossess the Vessel from
956 the Charterers at her current or next port of call or at sea,
957 or at a port or place convenient to them without hindrance
958 or interference by the Charterers, courts or local authorities.
959 Pending physical repossession of the Vessel in accordance
960 with this Clause 29, the Charterers shall hold the Vessel as
961 gratuitous bailee only to the Owners and continue to
962 maintain, class and insure the vessel as required by the
963 terms of this Charter notwithstanding the termination of
964 the chartering of the Vessel. The Owners shall arrange for
965 an authorised representative to board the Vessel as soon
966 as reasonably practicable following the termination of the
967 Charter. The Vessel shall be deemed to be repossessed by
968 the Owners from the Charterers upon the boarding of the
969 Vessel by the Owners' representative. All arrangements and
970 expenses relating to the settling of wages, disembarkation
971 and repatriation of the Charterers' Master, officers and crew
972 shall be the sole responsibility of the Charterers.
973

**30. Dispute Resolution  See Clause 56**
975 *(a)   This Contract shall be governed by and construed in
976 accordance with English law and any dispute arising
977 out of or in connection with this Contract shall be
978 referred to arbitration in London in accordance with
979 the Arbitration Act 1996 or any statutory modification
980 or re-enactment thereof save to the extent necessary
981 to give effect to the provisions of this Clause. The
982 arbitration shall be conducted in accordance with the
983 London Maritime Arbitrators Association (LMAA)
984 Terms current at the time when the arbitration
985 proceedings are commenced. The reference shall be
986 to three arbitrators. A party wishing to refer a dispute
987 to arbitration shall appoint its arbitrator and send
988 notice of such appointment in writing to the other
989 party requiring the other party to appoint its own
990 arbitrator within 14 calendar days of that notice and
991 stating that it will appoint its arbitrator as sole
992 arbitrator unless the other party appoints its own
993 arbitrator and gives notice that it has done so within
994 the 14 days specified. If the other party does not
995 appoint its own arbitrator and give notice that it has
996 done so within the 14 days specified, the party
997 referring a dispute to arbitration may, without the
998 requirement of any further prior notice to the other
999 party, appoint its arbitrator as sole arbitrator and
1000 advise the other party accordingly. The award of a
1001 sole arbitrator shall be binding on both parties as if
1002 he had been appointed by agreement. Nothing
1003 herein shall prevent the parties agreeing in writing to
1004 vary these provisions to provide for the appointment
1005 of a sole arbitrator. In cases where neither the claim
1006 nor any counterclaim exceeds the sum of US$50,000
1007 (or such other sum as the parties may agree) the
1008 arbitration shall be conducted in accordance with the
1009 LMAA Small Claims Procedure current at the time
1010 when the arbitration proceedings are commenced.
1011 *(b)   This Contract shall be governed by and construed in
1012 accordance with Title 9 of the United States Code
1013 and the Maritime Law of the United States and any
1014 dispute arising out of or in connection with this
1015 Contract shall be referred to three persons at New
1016 York, one to be appointed by each of the parties
1017 hereto, and the third by the two so chosen; their
1018 decision or that of any two of them shall be final, and
1019 for the purposes of enforcing any award, judgement
1020 may be entered on an award by any court of
1021 competent jurisdiction. The proceedings shall be

1022 conducted in accordance with the rules of the Society
1023 of Maritime Arbitrators, Inc.
1024 In cases where neither the claim nor any
1025 counterclaim exceeds the sum of US$50,000 (or
1026 such other sum as the parties may agree) the
1027 arbitration shall be conducted in accordance with the
1028 Shortened Arbitration Procedure of the Society of
1029 Maritime Arbitrators, Inc. current at the time when the
1030 arbitration proceedings are commenced.
1031 *(c)   This Contract shall be governed by and construed in
1032 accordance with the laws of the place mutually
1033 agreed by the parties and any dispute arising out of
1034 or in connection with this Contract shall be referred
1035 to arbitration at a mutually agreed place, subject to
1036 the procedures applicable there.
1037 *(d)   Notwithstanding (a), (b) or (c) above, the parties may
1038 agree at any time to refer to mediation any difference
1039 and/or dispute arising out of or in connection with this
1040 Contract.
1041 In the case of a dispute in respect of which arbitration
1042 has been commenced under (a), (b) or (c) above, the
1043 following shall apply:-
1044 (i)   Either Party may at any time and from time to
1045 time elect to refer the dispute or part of the
1046 dispute to mediation by service on the other
1047 party of a written notice (the "Mediation
1048 Notice") calling on the other party to agree to
1049 mediation.
1050 (ii)   The other party shall thereupon within 14
1051 calendar days of receipt of the Mediation
1052 Notice confirm that they agree to mediation, in
1053 which case the parties shall thereafter agree a
1054 mediator within a further 14 calendar days,
1055 failing which on the application of either party
1056 a mediator will be appointed promptly by the
1057 Arbitration Tribunal ("the Tribunal") or such
1058 person as the Tribunal may designate for that
1059 purpose. The mediation shall be conducted in
1060 such place and in accordance with such
1061 procedure and on such terms as the parties
1062 may agree or, in the event of disagreement, as
1063 may be set by the mediator.
1064 (iii)   If the other party does not agree to mediate,
1065 that fact may be brought to the attention of the
1066 Tribunal and may be taken into account by the
1067 Tribunal when allocating the costs of the
1068 arbitration as between the parties.
1069 (iv)   The mediation shall not affect the right of either
1070 party to seek such relief or take such steps as
1071 it considers necessary to protect its interest.
1072 (v)   Either party may advise the Tribunal that they
1073 have agreed to mediation. The arbitration
1074 procedure shall continue during the conduct of
1075 the mediation but the Tribunal may take the
1076 mediation timetable into account when setting
1077 the timetable for steps in the arbitration.
1078 (vi)   Unless otherwise agreed or specified in the
1079 mediation terms, each party shall bear its own
1080 costs incurred in the mediation and the parties
1081 shall share equally the mediator's costs and
1082 expenses.
1083 The mediation process shall be without prejudice and
1084 confidential and no information or documents disclosed
1085 during it shall be revealed to the Tribunal except to the
1086 extent that they are disclosable under the law and procedure
1087 governing the arbitration.(Note: The parties should be
1088 aware that the mediation process may not necessarily
1089 interrupt time limits.)
1090 (e)   If Box 35 in Part I is not appropriately filled in, sub-
1091 clause 30(a) of this Clause shall apply. Sub-clause
1092 30(d) shall apply in all cases.
1093 * Sub-clauses 30(a), 30(b) and 30(c) are alternatives;
1094 indicate alternative agreed in Box 35.
1095

**31. Notices**
1097 (a)   Any notice to be given by either party to the other
1098 party shall be in writing and may be sent by fax, telex,
1099 registered or recorded mail or by personal service.

PART II
"BARECON 2001" Standard Bareboat Charter

| | | |
|---|---|---|
| 1100 | (b) | The address of the Parties for service of such |
| 1101 | | communication shall be as stated in Boxes 3 and 4 |
| 1102 | | respectively |

"BARECON 2001" Standard Bareboat Charter

PART III
PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
*(Optional, only to apply if expressly agreed and stated in Box 37)*

**1.  Specifications and Building Contract**

(a)   The Vessel shall be constructed in accordance with the Building Contract (hereafter called "the Building Contract") as annexed to this Charter, made between the Builders and the Owners and in accordance with the specifications and plans annexed thereto, such Building Contract, specifications and plans having been counter-signed as approved by the Charterers.

(b)   No change shall be made in the Building Contract or in the specifications or plans of the Vessel as approved by the Charterers as aforesaid, without the Charterers' consent.

(c)   The Charterers shall have the right to send their representative to the Builders' Yard to inspect the Vessel during the course of her construction to satisfy themselves that construction is in accordance with such approved specifications and plans as referred to under sub-clause (a) of this Clause.

(d)   The Vessel shall be built in accordance with the Building Contract and shall be of the description set out therein. Subject to the provisions of sub-clause 2(c)(ii) hereunder, the Charterers shall be bound to accept the Vessel from the Owners, completed and constructed in accordance with the Building Contract, on the date of delivery by the Builders. The Charterers undertake that having accepted the Vessel they will not thereafter raise any claims against the Owners in respect of the Vessel's performance or specification or defects, if any. Nevertheless, in respect of any repairs, replacements or defects which appear within the first 12 months from delivery by the Builders, the Owners shall endeavour to compel the Builders to repair, replace or remedy any defects or to recover from the Builders any expenditure incurred in carrying out such repairs, replacements or remedies. However, the Owners' liability to the Charterers shall be limited to the extent the Owners have a valid claim against the Builders under the guarantee clause of the Building Contract (a copy whereof has been supplied to the Charterers). The Charterer shall be bound to accept such sums as the Owners are reasonably able to recover under this Clause and shall make no further claim on the Owners for the difference between the amount(s) so recovered and the actual expenditure on repairs, replacement or remedying defects or for any loss of time incurred.

Any liquidated damages for physical defects or deficiencies shall accrue to the amount of the party stated in Box 41(a) or if not filled in shall be shared equally between the parties. The costs of pursuing a claim or claims against the Builders under this Clause (including any liability to the Builders) shall be borne by the party stated in Box 41(b) or if not filled in shall be shared equally between the parties.

**2.  Time and Place of Delivery**

(a)   Subject to the Vessel having completed her acceptance trials including trials of cargo equipment in accordance with the Building Contract and specifications to the satisfaction of the Charterers, the Owners shall give and the Charterers shall take delivery of the Vessel afloat when ready for delivery and properly documented at the Builders' Yard or some other safe and readily accessible dock, wharf or place as may be agreed between the parties hereto and the Builders. Under the Building Contract the Builders have estimated that the Vessel will be ready for delivery to the Owners as therein provided by the delivery date for the purpose of this Charter shall be the date when the Vessel is in fact ready for delivery by the Builders after completion of trials whether that be before or after as indicated in the Building Contract. The Charterers shall not be entitled to refuse acceptance of delivery of the Vessel and upon and after such acceptance subject to Clause 1(d), the Charterers shall not be entitled to make any claim against the Owners in respect of any conditions, representations or warranties, whether express or implied as to the seaworthiness of the Vessel or in respect of delay in delivery.

(b)   If for any reason other than a default by the Owners under the Building Contract, the Builders become entitled under that Contract not to deliver the Vessel to the Owners, the Owner shall upon giving to the Charterers written notice of Builders becoming so entitled, be excused from giving delivery of the Vessel to the Charterers and upon receipt of such notice by the Charterers this Charter shall cease to have effect.

(c)   If for any reason the Owners become entitled under the Building Contract to reject the Vessel the Owners shall, before exercising such right of rejection, consult the Charterers and thereupon

(i)    If the Charterers do not wish to take delivery of the Vessel they shall inform the Owners within seven (7) running days by notice in writing and upon receipt by the Owners of such notice this Charter shall cease to have effect; or

(ii)   If the Charterers wish to take delivery of the Vessel they may by notice in writing within seven (7) running days require the Owners to negotiate with the Builders as to the terms on which delivery should be taken and/or refrain from exercising their right to rejection and upon receipt of such notice the Owners shall commence such negotiations and/or take delivery of the Vessel from the Builders and deliver her to the Charterers.

(iii)  In no circumstances shall the Charterers be entitled to reject the Vessel unless the Owners are able to reject the Vessel from the Builders;

(iv)   if this Charter terminates under sub-clause (b) or (c) of this Clause, the Owners shall thereafter not be liable to the Charterers for any claim under or arising out of this Charter or its termination.

(d)   Any liquidated damages for delay in delivery under the Building Contract and any costs incurred in pursuing a claim therefor shall accrue to the account of the party stated in Box 41(c) or if not filled in shall be shared equally between the parties.

**3.  Guarantee Works**

If not otherwise agreed, the Owners authorise the Charterers to arrange for the guarantee works to be performed in accordance with the building contract terms, and hire to continue during the period of guarantee works. The Charterers have to advise the Owners about the performance to the extent the Owners may request.

**4.  Name of Vessel**

The name of the Vessel shall be mutually agreed between the Owners and the Charterers and the

"BARECON 2001" Standard Bareboat Charter

### PART III
### PROVISIONS TO APPLY FOR NEWBUILDING VESSELS ONLY
(*Optional, only to apply if expressly agreed and stated in Box 37*)

147  Vessel shall be painted in the colours, display the
148  funnel insignia and fly the house flag as required by the
149  Charterers.
150
151  **5.   Survey on Redelivery**
152  The Owners and the Charterers shall appoint surveyors
153  for the purpose of determining and agreeing in writing
154  the condition of the Vessel at the time of re-delivery.
155  Without prejudice to Clause 15 (Part II), the Charterers
156  shall bear all survey expenses and all other costs, if
157  any, including the cost of docking and undocking, if
158  required, as well as all repair costs incurred.   The
159  Charterers shall also bear all loss of time spent in
160  connection with any docking and undocking as well as
161  repairs, which shall be paid at the date of hire per day
162  or pro rata.
163
164

"BARECON 2001" Standard Bareboat Charter

PART IV
HIRE/PURCHASE AGREEMENT
(*Optional, only to apply if expressly agreed and stated in Box 42*)

| | |
|---|---|
| 1 | On expiration of this Charter and provided the |
| 2 | Charterers have fulfilled their obligations |
| 3 | according to Part I and II as well as Part III, if |
| 4 | applicable, it is agreed, that on payment of the final |
| 5 | payment of hire as per Clause 11 the Charterers |
| 6 | have purchased the Vessel with everything |
| 7 | belonging to her and the Vessel is fully paid for. |
| 8 | |
| 9 | *In the following paragraphs the Owners are* |
| 10 | *referred to as the Sellers and the Charterers as the* |
| 11 | *Buyers.* |
| 12 | |
| 13 | The Vessel shall be delivered by the Sellers and |
| 14 | taken over by the Buyers on expiration of the |
| 15 | Charter. |
| 16 | |
| 17 | The Sellers guarantee that the Vessel, at the time |
| 18 | of delivery, is free from all encumbrances and |
| 19 | maritime liens or any debts whatsoever other than |
| 20 | those arising from anything done or not done by |
| 21 | the Buyers or any existing mortgage agreed not to |
| 22 | be paid off by the time of delivery. Should any |
| 23 | claims, which have been incurred prior to the time |
| 24 | of delivery be made against the Vessel, the Sellers |
| 25 | hereby undertake to indemnify the Buyers against |
| 26 | all consequences of such claims to the extent it |
| 27 | can be proved that the Sellers are responsible for |
| 28 | such claims. Any taxes, notarial, consular and |
| 29 | other charges and expenses connected with the |
| 30 | purchase and registration under Buyers' flag, shall |
| 31 | be for Buyers' account. Any taxes, consular and |
| 32 | other charges and expenses connected with |
| 33 | closing of the Sellers' register, shall be for Sellers' |
| 34 | account. |
| 35 | |
| 36 | In exchange for payment of the last month's hire |
| 37 | instalment the Sellers shall furnish the Buyers with |
| 38 | a Bill of Sale duly attested and legalized, together |
| 39 | with a certificate setting out the registered |
| 40 | encumbrances, if any. On delivery of the Vessel |
| 41 | the Sellers shall provide for deletion of the Vessel |
| 42 | from the Ship's Register and deliver a certificate of |
| 43 | deletion to the Buyers. |
| 44 | |
| 45 | The Sellers shall, at the time of delivery, hand to |
| 46 | the Buyers all classification certificates (for hull, |
| 47 | engines, anchors, chains etc), as well as all plans |
| 48 | which may be in Sellers' possession |
| 49 | |
| 50 | The Wireless Installation and Nautical |
| 51 | Instruments, unless on hire, shall be included in |
| 52 | the sale without any extra payment. |
| 53 | |
| 54 | The Vessel with everything belonging to her shall |
| 55 | be at Sellers' risk and expense until she is |
| 56 | delivered to the Buyers, subject to the conditions |
| 57 | of this Contract and the Vessel with everything |
| 58 | belonging to her shall be delivered and taken over |
| 59 | as she is at the time of delivery, after which the |
| 60 | Sellers shall have no responsibility for possible |
| 61 | faults or deficiencies of any description. |
| 62 | |
| 63 | The Buyers undertake to pay for the repatriation of |
| 64 | the Master, officers and other personnel if |
| 65 | appointed by the Sellers to the port where the |
| 66 | Vessel entered the Bareboat Charter as per |
| 67 | Clause 3 (Part II) or to pay the equivalent cost for |
| 68 | their journey to any other place. |

**1. Definitions**

For the purpose of this PART V, the following terms shall have the meanings hereby assigned to them:

"The Bareboat Charter Registry" shall mean the registry of the State whose flag the Vessel will fly and in which the Charterers are registered as the bareboat charterers during the period of the Bareboat Charter.

"The Underlying Registry" shall mean the registry of the State in which the Owners of the Vessel are registered as Owners and to which jurisdiction and control of the Vessel will revert upon termination of the Bareboat Charter Registration.

**2. Mortgage**

The Vessel chartered under this Charter is financed by a mortgage and the provisions of Clause 12(b) (Part II) shall apply.

**3. Termination of Charter by Default**

If the Vessel chartered under this Charter is registered in a Bareboat Charter Registry as stated in Box 44, and if the Owners shall default in the payment of any amounts due under the mortgage(s) specified in Box 28, the Charterers  shall, if so required by the mortgagee, direct the Owners to re-register the Vessel in the Underlying Registry as shown in Box 45.

In the event of the Vessel being deleted from the Bareboat Charter Registry as stated in Box 44, due to a default by the Owners in the payment of any amounts due under the mortgage(s), the Charterers shall have the right to terminate this Charter forthwith and without prejudice to any other claim they may have against the Owners under this Charter

32.

**Rider Clauses**
**to**
**Bareboat Charter Party**
**between**

**OCM MARITIME RHINE LLC**
**(the "Owners")**

**and**

**KINAROS SPECIAL MARITIME ENTERPRISE**
**(the "Charterers")**

**in respect of**

**mv "KINAROS"**

**32      MOA AND TIME FOR DELIVERY**

The Owners' obligations to charter the Vessel to the Charterers hereunder are conditional upon delivery of the Vessel to the Owners by the Charterers as seller pursuant to the MOA.

Subject to the Vessel being delivered to, and taken over by, the Owners pursuant to the MOA, the Charterers shall be deemed to have taken delivery of the Vessel under this Charter simultaneously with delivery  of the Vessel by the Charterers to the Owners pursuant to the MOA and at the port or place of delivery under the MOA.

The date of delivery for the purpose of this Charter shall be the date (the "**Delivery Date**") when the Vessel is in fact delivered by the Charterers to the Owners pursuant to the MOA and the Owners shall be under no responsibility for any delay whatsoever in delivery of the Vessel to the Charterers under this Charter.

The Charterers undertake that in the event the Vessel is not delivered and accepted under the MOA for any reason which is not attributable to any default on the part of the Owners on or before 30 June 2020, the Charterers will promptly upon the Owners' written demand reimburse the Owners in full for any reasonable cost or disbursement reasonably incurred by the Owners in respect of the contemplated transaction.

Without prejudice to any other provisions of this Charter, the Owners and the Charterers shall on the Delivery Date sign a Protocol of Delivery and Acceptance evidencing delivery of the Vessel hereunder.

It is understood and agreed that regardless of the actual physical condition of the Vessel at the time of delivery hereunder, for redelivery purposes the condition of the Vessel at the time of delivery hereunder shall be deemed to satisfy the condition set out in Clause 49.

(a)     If the MOA is cancelled, then this Charter shall be cancelled forthwith without any liability on the Owners towards the Charterers.  The Charterers' indemnities set out in this Clause 32 and Clause 38 shall survive such cancelation.

1

(b)  (i)  The Charterers have no rights whatsoever to refuse to accept delivery of the Vessel once the Vessel is delivered to the Owners under the MOA and subject to Clause 32(b)(iii) hereof, the Charterers acknowledge and agree that the Owners make no condition, term, representation or warranty, express or implied (and whether statutory or otherwise) as to title (except for legal title in the name of the Owners), seaworthiness, merchantability, condition, design, operation, performance, capacity or fitness for use of the Vessel or as to the eligibility of the Vessel for any particular trade or operation or any other condition, term, representation or warranty whatsoever, express or implied, with respect to the Vessel all of which shall at all times be the sole responsibility of the Charterers.

Delivery to the Charterers or (as the case may be) deemed delivery of the Vessel under this Charter shall be conclusive proof that, for the purpose of the obligations and liabilities of the Owners hereunder or in connection herewith, the Vessel is at that time seaworthy, in accordance with the provisions of this Charter, in good working order and repair and without defect or inherent vice whether or not discoverable by the Charterers and free and clear of any Security whatsoever, (other than any such arising from or in connection with the use or operation of the Vessel by the Charterers or any permitted sub-charterers).

(ii)  The Charterers agree that the Owners shall be under no liability to supply any replacement vessel or any piece or part thereof during any period when the Vessel is unusable and shall not be liable to the Charterers or any other person as a result of the Vessel being unusable, and if any latent defect should occur, same to be repaired by the Charterers at their cost and time.

(iii)  The Charterers hereby waive all their rights in respect of any condition, term, representation, or warranty express or implied (and whether statutory or otherwise) on the part of the Owners and all their claims against the Owners howsoever and whensoever the same may arise at any time in respect of the Vessel or the Owners' title thereto or rights therein or arising out of the operation or performance of the Vessel and the chartering thereof under this Charter (including in respect of the seaworthiness or otherwise of the Vessel) and, in particular and without prejudice to the generality of the foregoing, the Owners shall be under no liability whatsoever and howsoever arising in respect of any losses, costs, charges, expenses, fees, payments, liabilities, penalties, fines, damages or other sanctions of a monetary nature in respect of the injury, death, loss, damage or delay of or to or in connection with any person (which expression includes, but is not limited to, states, governments, municipalities and local authorities) or property whatsoever, whether on board the Vessel or elsewhere, irrespective of whether or when or where such injury, death, loss, damage or delay shall arise or of whether it shall arise as a result of the Vessel not being seaworthy or otherwise or of whether or not the Vessel or any part thereof is in the possession or under the control of the Charterers.

## 33    CONDITIONS PRECEDENT

Notwithstanding anything to the contrary in this Charter, the obligations of the Owners to charter the Vessel to the Charterers under this Charter are subject to and conditional upon the following conditions being fulfilled as at the Delivery Date:

(a)  no Event of Default having occurred and continuing unremedied, and no other event having occurred and continuing unremedied, which with the giving of notice and/or lapse of time would, if not remedied, constitute an Event of Default;

(b)   each of the representations and warranties contained in Clause 42 (*Representations and warranties*) of this Charter being true and correct in all material respects on the Delivery Date by reference to the facts and circumstances then existing;

(c)   all conditions to the MOA having been satisfied and the Owners having received all documents required to be delivered under the MOA, save for any such requirements as may then have been waived by the Owners;

(d)   no Total Loss or event which, with the lapse of time or any other condition or both, would constitute a Total Loss shall have occurred in respect of the Vessel;

(e)   the Owners having received the following (and the Owners may at their absolute discretion waive any of the conditions set out in this Clause 33(e)):

   (i)    the MOA duly signed by, and binding on, the Charterers as sellers;

   (ii)   certified copy of (i) the Certificate of Incorporation and (ii) the Articles of Incorporation and by-laws and (iii) an up to date certificate of goodstanding of the Charterers;

   (iii)  minutes of a meeting of the directors and shareholders of the Charterers and the Corporate Guarantor approving the entry into the Relevant Documents to which they are respectively party and of the entry into all other documents contemplated thereby;

   (iv)   a power of attorney of the Charterers and the Corporate Guarantor under which any documents are to be executed or transactions undertaken by the Charterers or the Corporate Guarantor;

   (v)    the Relevant Documents duly executed by the parties thereto, together with all documents required to be delivered pursuant thereto;

   (vi)   a protocol of delivery and acceptance in respect of this Charter to be signed at documentary closing between the Owners and the Charterers;

   (vii)  evidence that the Vessel, while in the ownership of the Charterers, is free of registered encumbrances other than two mortgages in favour of two different mortgagees, together with a letter of undertaking in a form acceptable to the Owners from each such mortgagee, undertaking to discharge such mortgage to which they are party immediately on or before receipt by the first mortgagee of the purchase price under the MOA;

   (viii) copies of all insurance policies and certificates of entry for the Vessel in compliance with the terms of this Charter, showing the Owners as a co-assured;

   (ix)   evidence that no payments required to be made by the Charterers under this Charter are or would be subject to any withholding as referred to in Clause 35(c);

   (x)    evidence acceptable to the Owners that the Outstanding Principal does not exceed 80% of the Market Value of the Vessel;

   (xi)   evidence that any process agent appointed under any of the Relevant Documents has accepted its appointment;

(xii) at the Charterers' expense, a favourable opinion in respect of insurances on the Vessel from BankServe Insurance Services Ltd;

(xiii) a copy of any other authorisation or other document, opinion or assurance which are necessary or desirable in connection with the entry into and performance of the transactions contemplated by any Relevant Document or for the validity and enforceability of any Relevant Document;

(xiv) written confirmation from the Charterers that no Authorisations are required by the Charterers in relation to any Relevant Document or the matters contemplated thereby;

(xv) details of the immediate and ultimate legal and beneficial ownership of the Charterers and the Corporate Guarantor;

(xvi) written confirmation from the Owners that they have found to be acceptable the technical condition of the Vessel based on her class records;

(xvii) favourable legal opinions from lawyers appointed by the Owners on such matters concerning the laws of the Approved Flag and the Transaction Obligors as the Owners may reasonably require;

(xviii) a stipulation (the "**Stipulation**") between Corporate Guarantor[, certain holders of First Priority Ship Mortgage Notes due in January 2015 issued by EHI and certain of its affiliates, and Owners, in form attached hereto as Exhibit A, confirming that, among other things, transfer to title in the Vessel to the Owners shall not be challenged by the parties to the Stipulation in any Chapter 11 or similar proceedings in the United States in respect of the Corporate Guarantor or any of its affiliates together with evidence that the conditions precedent thereto have been fully complied with;

(xix) evidence that the Vessel has the Approved Classification with an Approved Classification Society, free of overdue recommendations and conditions, together with on-line access to the Vessel's classification records;

(xx) any other information which the Owners may request to enable them to assess the condition of the Vessel.

All the above documents to be in form and substance acceptable to the Owners.

## 34    CHARTER HIRE

(a)    The Charterers shall, from the Delivery Date until the end of the Charter Period, pay charter hire ("**Charter Hire**") monthly in advance to the Owners on each Hire Payment Date, in an amount equal to the aggregate of (i) the Monthly Fixed Hire and (ii) the Variable Hire for that period.

(b)    The first Hire Payment Date shall fall on the Delivery Date and the second Hire Payment Date shall fall on the date falling a month after the Delivery Date unless either Collateral Vessel has been delivered to its Collateral Charterer prior to the Delivery Date, in which case such second Hire Payment Date shall be either (i) simultaneously with the next Hire Payment Date (as defined in the Collateral Charterparty of the first delivered Collateral Vessel) or, (ii) if such date falls less than 20 days after the Delivery Date, simultaneously with the next but one Hire Payment Date (as defined in that Collateral Charterparty) and thereafter each Hire Payment Date shall fall on the date which numerically corresponds to the Delivery Date (and if there is no such date in the

next calendar month, then on the last Banking Day of that calendar month) at intervals of one (1) month for the duration of the Charter Period.

(c)   Each payment of Fixed Hire shall be deemed to have been applied on receipt by the Owners towards reducing the Outstanding Principal

(d)   **Additional hire.** The Charterers shall also pay to the Owners (in addition to the Monthly Fixed Hire) an upfront payment deemed to be earned on the Delivery Date of $285,500 which shall be paid (i) in 11 instalments of $14,870 each payable simultaneously with the 2nd to 12th (inclusive) payments of Monthly Fixed Hire hereunder, (ii) an instalment of $14,868 payable simultaneously with the 13th payment of Monthly Fixed Hire hereunder and (iii) an instalment of $107,062 payable simultaneously with the 37th payment of Monthly Fixed Hire hereunder, provided that if this Charter terminates early, any unpaid amounts under this Clause shall fall due and payable upon such termination.

(e)   Subject to sub-clause (f) below, the Charterers' obligation to pay Charter Hire and other payments is on a "hell and high water" basis in accordance with this Charter and any other amounts payable by the Charterers under any other documents material to the Vessel's operation (including but not limited to any management, employment or agency agreements which, together with this Charter, constitute the "**Operative Documents**") shall be absolute and unconditional irrespective of any matter or contingency, including but not limited to:

1.   any set-off, counterclaim, recoupment, defence or other right which any party may have against the other or any other party to any Operative Documents for any reason whatsoever;

2.   the occurrence of a Total Loss or any other occurrence including the loss, destruction, confiscation, seizure, damage to the Vessel, or any libel, attachment, levy, detention, sequestration or taking into custody of the Vessel or the restriction, prevention of or interference with or  interruption or cessation in or prohibition of the use of, or any requisition for hire or use of, possession or enjoyment of the Vessel by the Charterers for any reason whatsoever;

3.   any unavailability of the Vessel, including any lack or invalidity of title or any other defect in the title, seaworthiness, condition, design, merchantability, fitness for use or purpose, or lack of crew, injury of any crew, or the ineligibility of the Vessel for any particular use or trade, or for registration or documentation under the laws of any relevant jurisdiction;

4.   any failure or delay on the part of any party, whether with or without fault on its part, in performing or complying with any of the terms of the Operative Documents;

5.   any insolvency, bankruptcy, winding-up, reorganisation, reconstruction, arrangement, readjustment of debt, dissolution or similar proceedings by or against any of the Owners or the Approved Manager or any other party to the Operative Documents;

6.   any other cause which would, but for this Clause 34 (*Charter Hire*), have the effect of terminating or affecting the obligations of the Charterers under any of the Operative Documents whether in whole or in part;

7.   any invalidity, unenforceability or lack of due authorisation of, or other defect in, any of the Operative Documents or for any particular trade for the Vessel;

8.   any change, extension, indulgence or other act or omission in respect of any indebtedness or obligation of the Charterers, or any sale, exchange, release or surrender of, or other dealing in, any security for any such indebtedness or obligation,

whether or not the Charterers shall have notice or knowledge or any of the foregoing, except if the Vessel is arrested, detained or seized due to the sole fault of the Owners or any affiliate or agent of the Owners.

(f)   It shall be the intention of the parties that the obligations of the Charterers under this Clause 34 (*Charter Hire*) shall survive any frustration of any of the Operative Documents save for frustration attributable to the arrest, detention or seizure of the Vessel due to the sole fault of the Owners or any affiliate or agent of the Owners and the Charterers hereby waive any and all rights which they may now have or which at any time hereafter may be conferred upon them, by statute or otherwise, to terminate or cancel the demise of the Vessel due to the occurrence of any act of frustration not attributable to the arrest, detention or seizure of the Vessel due to the sole fault of the Owners or any affiliate or agent of the Owners, the terms of this Charter prevailing over any relevant statute or law, to the extent permitted by such statute or law. Except as provided for in this Charter, the Charterers shall not seek to recover all or any part of the Charter Hire or any other payments made by the Charterers hereunder from the Owners due to reasons other than those attributable to the arrest, detention or seizure of the Vessel due to the sole fault of the Owners or any affiliate or agent of the Owners. The Charterers shall not have any right to terminate this Charter or to be released, relieved, or discharged from any obligation or liability under this Charter by any circumstances whatsoever including but not limited to the circumstances set out in Clause 34 (e) (1) to (8) above save pursuant to the arrest, detention or seizure of the Vessel due to the sole fault of the Owners or any affiliate or agent of the Owners.

(g)   **Increase of Monthly Fixed Hire - Trigger Amount.**

The Owners may (without any obligation to do so) 15 days after each Hire Payment Date obtain (i) the Market Value of the Vessel (the "**Original Valuation**") and (ii) (after her delivery under, and while she is subject to, the Collateral Charter) the Market Value (as defined in the relevant Collateral Charter) of each Collateral Vessel and shall within 1 Banking Day notify the Charterers thereof.

The cost of obtaining the same will be borne by the Owners.

Within five (5) days of such notification the Charterers may request further valuations of the Vessel and/or a Collateral Vessel, whereupon the Charterers at their cost shall obtain a valuation of the relevant one or more of the Vessel and/or the Collateral Vessels from any Approved Valuer.

The Original Valuation and the valuation of the Collateral Vessel or, if the Charterers obtain further valuations from an Approved Valuer, the average of the two such valuations, shall constitute the Market Value of the Vessel and each Collateral Vessel.

Thereafter, the Owners shall notify the Charterers of (a) the Aggregate Market Values, (b) the Trigger Amount and (c) any increase in the next due Monthly Fixed Hire in accordance with the following paragraph, which notification shall be binding on the Charterers and the Owners.

If:

(i) the aggregate of the Outstanding Principal and the Collateral Outstanding Principal (in respect of each Collateral Vessel which is subject to a Collateral Charter) less

(ii) the aggregate of the next two scheduled Monthly Fixed Hire payment due under this Charter and the next two scheduled Collateral Monthly Fixed Hire payment due under such Collateral Charter(s)

exceeds the aggregate of the Trigger Amount, the Monthly Fixed Hire falling due on the second Hire Payment date ("the Due Date") after the date of such valuation and the Monthly Fixed Hire (as defined in the relevant Collateral Charter(s)) falling due on the Due Date shall be increased by an aggregate amount necessary so that the Aggregate Outstanding Principal less that increased Aggregate Monthly Fixed Hire payment is equal to the Trigger Amount (the **"Increased Amount"**).

provided that if the Market Value:

(i) increases before the Due Date the Owners shall recalculate the amount payable on the Due Date on the basis of such second valuation, and the Charterers shall pay such reduced amount;

(ii) reduces before the Due Date the Charterers shall pay on the Due Date the Increased Amount and the Owners shall calculate of a further Increased Amount is due, in which case the terms of this Clause 34(g) shall apply to that further Increased Amount.

In the event of an increase of a Monthly Fixed Hire payment following any increased payment under this Clause 34(g), the next following payments in respect of Fixed Hire due under Clause 34(a) shall be reduced in order of maturity up to the amount of the increase payable under this Clause 34(g), unless, in accordance with this Clause 34(g) the Charterers are required to make an additional payment, in which case the Charterers must make that payment.

No premium payment pursuant to Clause 34(i) will accrue on any increased Monthly Fixed Hire under this Clause.

(h) Except as otherwise expressly provided in this Charter, all amounts of Variable Hire and any interest payable under this Charter shall be calculated on the basis of a year of three hundred and sixty (360) days or, where the amount is payable in a currency other than Dollars, such period as is customary for such currency, and the actual number of days elapsed.

(i) **Prepayment.** The Charterers may on any Hire Payment Date make a prepayment of Charter Hire on account of the total amount due under this Charter on the following terms, but not otherwise:

(i) they shall have given the Owners at least 3 Banking Days written notice of their intention to do so;

(ii) once notice is given, it shall be binding;

(iii) the aggregate amount of any prepayments made under this Clause may not exceed $2,000,000; and

(iv) such prepayment shall reduce the Outstanding Principal without affecting the payments of Monthly Fixed Hire.

(j) Any certificate or determination of the Owners of a rate or an amount payable under the Relevant Documents shall specify in reasonable detail the basis of computation of the relevant

rate or amount and shall, in the absence of manifest error, be conclusive and binding on the Charterers.

**35     PAYMENTS/LIBOR**

(a)    Notwithstanding anything to the contrary contained in this Charter, the Charter Hire and other payments to be made by the Charterers hereunder (whether by way of hire or otherwise) shall be made as follows;

     (i)    not later than 11.00 a.m. (London time) on the date on which the relevant payment is due under the terms of this Charter; and

     (ii)    in dollars in funds with the same day value to the Owners' account number as advised by the Owners in a separate letter to the Charterers (the "**Owners' Earnings Account**") prior to delivery of the Vessel hereunder (or such other bank or banks as may from time to time be notified by the Owners to the Charterers by not less than ten (10) Banking Days' prior written notice) for the account of the Owners under reference to the Vessel's name.

(b)    If any day for the making of any payment hereunder shall not be a Banking Day the due date for payment of the same shall be the immediately preceding Banking Day.

(c)    All payments hereunder shall be made net of all bank charges, commissions or royalties (unless otherwise agreed) and without any set-off or counterclaim whatsoever and free and clear of any withholding or deduction for, or on account of, any present or future income, freight, stamp and other taxes, levies, imposts, duties, fees, charges, restrictions or conditions of any nature and all bank charges (other than those of the bank which holds the Owners' Earnings Account) shall be for the account of the Charterers save for any charges and/or corporate income and/or other taxes imposed upon the Owners. If the Charterers are required by any authority in any country to make any withholding or deduction from any such payment, the Charterers shall make such deduction and pay such taxes to the appropriate taxation authority or government, and the sum due from the Charterers in respect of such payment will be increased to the extent necessary to ensure that, after the making of such withholding or deduction the Owners receive a net sum equal to the amount which they would have received had no such deduction or withholding been required to be made. The Charterers will promptly deliver to the Owners any receipts, certificates or other proof evidencing the amounts (if any) paid or payable, in respect of any such deduction or withholding as aforesaid.

(d)    In the event of failure by the Charterers to pay on the due date for payment thereof, or in the case of a sum payable on demand, the date of demand therefor, any hire or other amount payable by them under this Charter, the Charterers will pay to the Owners interest on such amount from the date of such failure to the date of actual payment (both before and after any relevant judgment or winding-up of the Charterers) at the rate to be the aggregate of (i) the Margin, (ii) two per cent (2%) per annum and (iii) LIBOR for dollar deposits of one month's duration computed from the relevant due date. Interest payable by the Charterers as aforesaid shall be payable on demand.

(e)    Any interest payable under this Charter shall accrue from day to day and shall be calculated on the actual number of days elapsed and a three hundred and sixty (360) day year.

(f)    Unavailability of LIBOR

In respect of the calculation of LIBOR for the purposes of determining the Variable Hire, if at any relevant time:

(i) no Screen Rate is quoted; and

(ii) two or more of the Reference Banks do not, before 1:00 p.m. (London time) on the relevant Quotation Day, provide the Reference Bank Rate in order to fix LIBOR,

the Owners shall promptly notify the Charterers stating the circumstances falling within this Clause 35(f) which have caused its notice to be given, following which the Owner shall determine an alternative LIBOR rate (the "**Alternative LIBOR Rate**") in consultation with the Charterers within thirty (30) days after the date on which the Owners serves such notice (the "**Negotiation Period**").  Any Alternative LIBOR Rate or alternative basis on which LIBOR is to be calculated which is agreed during the Negotiation Period shall take effect in accordance with the terms agreed, and if an Alternative LIBOR Rate or alternative basis on which LIBOR is to be calculated is not agreed within the Negotiation Period, LIBOR for the relevant Interest Period will be such rate as certified by the Owners, acting reasonably.

(g)     If LIBOR ceases to be available and is replaced generally by another source of, or formula for, calculating the cost of funds to a lender (such as SOFR) then such alternative shall apply at the election of the Owners to this Charter in place of LIBOR, and the Charterers shall enter into and execute such documents as the Owners may request in relation thereto.

## 36     MAINTENANCE, OPERATIONS AND OTHER VESSEL UNDERTAKINGS

**(a)     General**

With respect to the Vessel, the undertakings in this Clause 36 (*Maintenance and Operations and other Vessel Undertakings*) remain in force on and from the Delivery Date and throughout the rest of the Charter Period except as the Owners may otherwise permit.

**(b)     Vessel's name and registration**

The Charterers shall:

(i)     keep the Vessel registered in the Owners' name under the Approved Flag from time to time at its port of registration;

(ii)     not do or allow to be done anything as a result of which such registration might be suspended, cancelled or imperilled; and

(iii)     not change the name of the Vessel, unless with the prior consent of the Owners (of which such consent shall not be unreasonably withheld or delayed).

**(c)     Repair and classification**

The Charterers shall, at their own cost, keep, maintain, service and repair the Vessel, her machinery and all equipment, throughout the Charter Period, in a good, seaworthy and safe condition and state of repair:

(iv)     consistent with good commercial maintenance practice;

(v)     so as to comply within any relevant time limits with all recommendations made following any port inspection of the Vessel;

(vi)     so as to comply with all laws and regulations of the Approved Flag and of any

country where the Vessel may trade; and

(vii)   so as to maintain the Approved Classification free of overdue recommendations and conditions (resulting from port inspections).

**(d)   Modifications**

(i)   Except if required by the Approved Classification Society, including, but not limited to, the BWTS, or otherwise without the prior written approval of the Owners (such approval shall not be unreasonably withheld or delayed), the Charterers shall not make any modification of, or repairs to, the Vessel or equipment installed on it whose cost exceeds $500,000

and if the cost of any such modification or repairs (including but not limited to the BWTS cost) either (i) exceeds $500,000 or (ii) is not covered by insurance, the Charterers shall on request provide to the Owners evidence acceptable to the Owners that the Charterers have freely available funds sufficient to pay for such repairs promptly upon such payment becoming due.

(ii)   If the Charterers shall pay any expenses, necessary or useful, whether or not such payment is for goods or services which are likely to preserve or increase the value of the Vessel or its equipment or appurtenances, the Charterers shall not have any right to any recovery or indemnification from the Owners therefor, and the Charterers hereby irrevocably waive the benefit of any law which would otherwise entitle the Charterers to such recovery or indemnification. Even though the value of the Vessel is increased by the alteration of the Vessel by the Charterers pursuant to the foregoing provisions, the amount of the Charter Hire or any other amount payable by the Charterers hereunder shall not be increased or decreased thereby.

**(e)   Removal and installation of parts**

(i)   Subject to paragraph (ii) below, without approval of the Owners, the Charterers shall not remove any material part of the Vessel, or any item of equipment installed on the Vessel unless:

a.   the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed;

b.   the replacement part or item is free from any Security in favour of any person other than a Mortgagee; and

c.   the replacement part or item becomes, on installation on the Vessel, the property of the Owners.

(ii)   The Charterers shall renew and replace or cause to be renewed and replaced all parts, machinery and equipment as and when they shall be worn out, damaged or lost by other parts, machinery and equipment of a similar nature.

(iii)   The Owners and/or the Charterers may install equipment owned by a third party if the equipment can be removed without any risk of damage to the Vessel.

**(f)   Surveys**

The Charterers shall submit the Vessel regularly to all periodic or other surveys which may be required for classification purposes and, if so required by the Owners, provide the Owners, with copies of all survey reports.

**(g)**     **Inspection**

The Charterers shall:

    (i)    permit the Owners (by surveyors or other persons appointed by it for that purpose) to board the Vessel at all reasonable times in co-ordination with the Charterers without interfering with the trading and/or operations of the Vessel to inspect her or to satisfy themselves about (inter alia, but not limited to) proposed or executed repairs and shall afford all proper facilities for such inspections and shall make available to the Owners or their surveyor on request all records (on board or on shore) relating to the Vessel. Fees and expenses incurred in relation to the appointment of the surveyor or surveyors and the preparation and issue of all technical reports pursuant to this Clause 36(g) shall be for the account of the Charterers (i) in respect of any inspection prior to the Delivery Date and (ii) one inspection in each period of 12 months, commencing on the Delivery Date and otherwise, the Owners; and

    (ii)    following such inspection, implement any maintenance recommendations made by the Owners acting reasonably having regard to good commercial ship maintenance practice and in case of dispute with the Owners in that regard, the Owners shall appoint, at the expense of the Charterers, an independent surveyor, whose upgrading/improved maintenance recommendations shall be binding on the Charterers.

**(h)**     **Prevention of and release from arrest**

    (i) The Charterers shall promptly discharge:

        a.    all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against the Vessel, her Earnings or her Insurances;

        b.    all Taxes, dues and other amounts charged in respect of the Vessel, her Earnings or her Insurances; and

        c.    all other outgoings whatsoever in respect of the Vessel, her Earnings or her Insurances.

    (ii)    The Charterers shall immediately and, forthwith upon receiving notice of the arrest of the Vessel or of its detention in exercise or purported exercise of any lien or claim, procure its release by providing bail or otherwise as the circumstances may require.

**(i)**     **Compliance with laws etc.**

The Charterers shall:

    (i)    comply, or procure compliance with all laws or regulations:

        a.    relating to its business generally; and

b. relating to the Vessel, its ownership, employment, operation, management and registration,

including, but not limited, the ISM Code, the ISPS Code, all Environmental Laws, all Sanctions and the laws of the Approved Flag;

(ii) obtain, comply with and do all that is necessary to maintain in full force and effect any Environmental Approvals;

(iii) without limiting paragraphs (i) above, not employ the Vessel nor allow its employment, operation or management in any manner contrary to any law or regulation including but not limited to the ISM Code, the ISPS Code, all Environmental Laws and all Sanctions; and

(iv) not appoint any manager or agent to manage the Vessel unless such party undertakes to procure that any agreement entered into relating to the management, employment or operation of the Vessel contains a clause in which the counterparty undertakes to comply with all Sanctions.

**(j)   ISPS Code**

Without limiting paragraph (i) of Clause 36(i) (*Compliance with laws etc.*), the Charterers shall:

(i) procure that the Vessel and the company responsible for the Vessel's compliance with the ISPS Code comply with the ISPS Code;

(ii) maintain an ISSC for the Vessel; and

(iii) notify the Owners immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC.

**(k)   Trading in war zones**

In the event of hostilities in any part of the world (whether war is declared or not), the Charterers shall not cause or permit the Vessel to enter or trade to any zone which is declared an area of peril by the Joint War Risks Committee or is declared a war zone any government or by the Vessel's war risks insurers unless:

(i) the prior written consent of the Owners has been given; and

(ii) the Owners and/or the Charterers (as the case may be) have (at Charterer's expense) effected any special, additional or modified insurance cover which the Owners may require.

**(l)   Tracking**

(i) The Charterers shall (or shall procure that the Approved Manager shall) allow any Mortgagee and/or the Owners (or its agents), at any time and from time to time, to access all information pertaining to the Vessel and to monitor and/or track the position of the Vessel using third party services.

(ii) All costs incurred by any Mortgagee and/or the Owners (and any of their authorised agents) under Clause 36(l)(i) (*Tracking*) above shall, prior to an Event of Default, be

for the account of such Mortgagee and/or the Owners and, following an Event of Default, be for the sole account of the Charterers.

**(m)**   **Provision of information**

Without prejudice to Clause 37 (*Information Undertakings*), the Charterers shall promptly provide the Owners with any information regarding the following, upon request in respect of items (i), (ii) and (vi) below, and upon the same occurring in respect of items (iii), (iv) and (v):

    (i)      the Vessel, its employment, position and engagements

    (ii)     her Earnings and payments and amounts due to its master and crew;

    (iii)    any expenditure incurred, or likely to be incurred, in connection with the operation, maintenance or repair of the Vessel and any payments made by it in respect of the Vessel;

    (iv)    any maintenance or repair of the Vessel being planned or deemed necessary or being required on an emergency basis;

    (v)     any towages and salvages;

    (vi)    its compliance, the Approved Manager's compliance and the compliance of the Vessel with the ISM Code and the ISPS Code; and

    (vii)   4-monthly lube oil analyses and engine running hours reports in respect of the Vessel,

and, upon the Owners' request, provide copies of the Vessel's current Safety Management Certificate and any relevant Document of Compliance.

**(n)**   **Notification of certain events**

Upon the Charterers becoming aware of any of the following events:

    (i)      any casualty to the Vessel which is or is likely to be or to become a Major Casualty;

    (ii)     any occurrence as a result of which the Vessel has become or is, by the passing of time or otherwise, likely to become a Total Loss;

    (iii)    any requisition of the Vessel for hire;

    (iv)    any requirement or recommendation made in relation to the Vessel by any insurer or classification society or by any competent authority which is not immediately complied with;

    (v)     any arrest or detention of the Vessel, any exercise or purported exercise of any lien on the Vessel or her Earnings or any requisition of the Vessel for hire;

    (vi)    any intended dry docking of the Vessel;

    (vii)   any Environmental Claim made against the Charterers or in connection with the Vessel, or any Environmental Incident;

(viii)    any claim for breach of the ISM Code or the ISPS Code being made against the Charterers, the Approved Manager or otherwise in connection with the Vessel; or

(ix)    any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with,

the Charterers shall promptly notify the Owners thereof by email and the Charterers shall keep the Owners advised in writing on a regular basis and in such detail as the Owners shall require as to the Charterers', the Approved Manager's or any other person's response to any of those events or matters.

**(o)**    **Sub-chartering – time charters**

The Charterers may:

(A)    without the prior written consent of the Owners enter into any time or consecutive voyage charters in respect of the Vessel for a term which does not exceed (and which may not, by virtue of any optional extensions, exceed) 120 days;

(B)    without the prior written consent of the Owners enter into any time or consecutive voyage charters in respect of the Vessel which fulfils the Sub-letting Criteria for a term which exceeds (or by virtue of any optional extensions may exceed) 120 days but which does not exceed (and which may not, by virtue of any optional extensions, exceed) 12 months; and

(C)    other than as described in paragraphs (A) or (B) above, only enter into any time or consecutive voyage charters in respect of the Vessel with the prior written consent of the Owners, which consent shall not be unreasonably withheld, delayed or conditioned (it being acknowledged that if the proposed charter does not fulfil the Sub-letting Criteria, it is reasonable to reject the same),

Where "**Sub-letting Criteria**" means that any such proposed sub-charter must:

(X) be on terms that EITHER

(A)    the aggregate charter hire receivable thereunder for the period of such charter exceeds the aggregate of (i) the Monthly Fixed Hire for the period of such charter, (ii) the Variable Hire for the period of such charter and (iii) the Anticipated Opex for the period of such charter;

OR

(B)    if the aggregate net charter hire payable thereunder is less than the aggregate of the Monthly Fixed Hire and the Variable Hire for the period of the charter and the Anticipated Opex for the period of the charter (i) the Owners have consented thereto and (ii) if the Owners require, the Charterers have paid the aggregate amount of such shortfall into a bank account which is pledged to the Owners in a manner acceptable to the Owners and which amount the Owners may, in their discretion, apply in prepayment pro rata, or payment, as it falls due, of charter hire under Clause 32(a) during the period of that charter;

AND

(Y) be to a charterer that:

    (A)    is not located in a country that at the relevant time is sanctioned by any OECD member state or a Sanctions Authority; and

    (B)    would not otherwise make this financing/charter unlawful for the Owners and/or its US-based investor.

**(p)**    **Restrictions on sub-chartering, appointment of managers etc.**

the Charterers shall not without the prior written consent of the Owners not to be unreasonably withheld or delayed:

    (i)    enter into a charter in relation to the Vessel which exceeds, or which by virtue of any optional extensions may exceed, 12 months;

    (ii)    sub-let the Vessel on demise charter for any period, and if the Owners do consent thereto, then the same must be (i) on such terms as the Owners may reasonably require and (ii) on terms that, if the Owners require an assignment by such sub-charterer in favour of the Owners of such sub-charter's interest in the insurances of the Vessel, such sub-charterer must execute such assignment;

    (iii)    enter into any charter in relation to the Vessel under which more than three (3) months' hire (or the equivalent) is payable in advance;

    (iv)    enter into any charter in relation to the Vessel with a Restricted Person;

    (v)    charter the Vessel otherwise than on bona fide arm's length terms at the time when the Vessel is fixed;

    (vi)    enter into any charter (or any other type of employment) in relation to the Vessel with a charterer that is subject to Sanctions or which would in any other way have an actual or potential negative impact on the market or trading value of the Vessel, including but not limited to trading with countries subject to Sanctions or carrying contraband or any other unlawful cargo or any cargo that is subject to Sanctions;

    (vii)    enter into any charter (or any other type of employment) in relation to the Vessel which would make this financing/Charter unlawful for the Owners and/or its US-based investor;

    (viii)    appoint a manager of the Vessel other than the Approved Manager, or agree to any alteration to the terms of the Approved Manager's appointment;

    (ix)    make any changes relating to the classification or classification society of the Vessel;

    (x)    deactivate or lay up the Vessel without the consent of the Owners; or

    (xi)    put the Vessel into the possession of any person for the purpose of work being done upon her unless (i) the Charterers have provided to the Owners a budget in form and substance acceptable to the Owners and (ii) have provided evidence to the Owners that there is otherwise available to them sufficient funds to pay all of the expected costs of such works as they fall due.

**(q) Trade debt/operating expenses**

The Charterers shall pay all debt relating to the operation and trading of the Vessel (including payment of crew and insurance premia) (i) when due and in any case within 45 days after the goods or services relating to that debt were provided (unless (aa) longer payment terms have been agreed in writing by the relevant creditor or (bb) the Owners otherwise agree, in which case the Charterers must pay in accordance with those terms or that agreement) and (ii) the aggregate thereof shall not exceed $750,000, provided that debt (i) in respect of bunkers which is not overdue and (ii) or arising pursuant to Clause 36(c) and/or (d) which is not overdue shall be excluded for the purposes of this clause.

**(r) Sub-Charter Assignment**

The Charterers shall, at the request of the Owners, execute in favour of the Owners a Charterparty Assignment and notice of assignment of any charter entered into by it which exceeds, or is capable through the exercise of options, of exceeding 360 days, and shall deliver to the Owners such other documents equivalent to those referred to at paragraphs (e)(ii) and (iii) of Clause 33 as the Owners may require.

**(s) Sanctions**. The Charterers shall:

(i)    not be, and shall procure that no Transaction Obligor or any affiliate of any of them, or any director, officer, agent, employee or person acting on behalf of the foregoing is, a Restricted Person and does not act directly or indirectly on behalf of a Restricted Person or have a course of dealings with a Restricted Person;

(ii)   and shall procure that each Transaction Obligor and each affiliate of any of them shall not use any revenue or benefit derived from any activity or dealing with a Restricted Person in discharging any obligation due or owing to the Owners;

(iii)  and shall procure that each Transaction Obligor and each affiliate of any of them shall not take any action, make any omission that is a breach of Sanctions; and/or causes (or will cause) a breach of Sanctions by the Owners;

(iv)   procure that no proceeds from any activity or dealing with a Restricted Person are credited to any bank account held with the Owners in its name or in the name of any affiliate of any of them;

(v)    take, and shall procure that each Transaction Obligor and each affiliate of any of them has taken, reasonable measures to ensure compliance with Sanctions;

(vi)   and shall procure that each Transaction Obligor and each affiliate of any of them shall, to the extent permitted by law promptly upon becoming aware of them, supply to the Owners details of any claim, action, suit, proceedings or investigation against it with respect to Sanctions by any Sanctions Authority;

(vii)  shall procure that no Transaction Obligor and no affiliate of any of them shall engage in any transactions or dealings with any Restricted Person; and

(viii) not accept, obtain or receive any goods or services from any Restricted Person, except to the extent relating to any warranties and/or guarantees given and/or liabilities incurred in respect of an activity or dealing with a Restricted Person by the Charterers, any other Transaction Obligor or any affiliate of any of them in accordance with this Charter;

(ix)    not use, or permit to be used, the Vessel (aa) by or for the benefit of a Restricted Person, (bb) in trading in any manner contrary to Sanctions, (cc) in trading in any manner which would trigger the operation of any sanctions limitation or exclusion clause (or similar) in the Insurances, (dd) in trade outside International Navigating Limits (INL) and outside regions where trading will prejudice the ship's Insurances cover, (ee) in trade in Crimea, Cuba, Iran, North Korea, Syria and Venezuela and such other countries as the Mortgagee may require the Vessel to avoid, provided that if Sanctions no longer apply to any country aforesaid, and the Mortgagee permits the Vessel to trade there, then the Vessel shall be permitted to trade there under this Charter; and

(x)    ensure that the Vessel enters only areas which have not been declared contaminated by radioactivity by the competent official authorities.

**(t)**    **Class records**

It shall arrange for the Owners to have access electronically to the class records of the Vessel by either (i) arranging for the relevant Classification Society to give the Owners (or their nominee) direct access to such class records or (ii) designating the Owners (or their nominee) as a user or administrator of the Charterers' electronic accounts with the relevant Classification Society.

**(u)**    **Notice of Mortgage**

If there is any Mortgage registered against the Vessel the Charterers shall carry on board the Vessel a certified copy of such Mortgage and place and maintain in a conspicuous place in the navigation room and the master's cabin of the Vessel a framed printed notice stating that the Vessel is mortgaged by the Owners to the relevant Mortgagee.

**(v)**    **Sharing of Earnings**

The Charterers shall not enter into any agreement or arrangement for the sharing of any Earnings.

**(w)**    **Notification of compliance**

The Charterers shall promptly provide the Owners from time to time with evidence (in such form as the Owners reasonably require) that the Charterers are complying with this Clause 36 (*Maintenance and Operation and other Vessel Undertakings*).

**(x)**    **Detention/off-hire**

If the Vessel is detained for any reason and/or is otherwise off-hire to any sub-charterers to whom the Charterers have sub-chartered the Vessel due to a technical failure of the Vessel or the Approved Manager for more than 15 days in any twelve month period, then the Owners may request the Charterers to carry out specified maintenance or other works on the Vessel in response to such technical failure and the Charterers must comply with such requests as soon as feasible, but in any case within 120 days of the same being made.

**(y)**    **Delivery Inspection**

(i)    The Charterers shall prior to the Delivery Date make available the Vessel to the Owners and/or an independent marine surveyor (such as (but not limited to) Idwal, Seatec, Aalmar) instructed by the Owners or any Mortgagee of the Vessel, to inspect the Vessel;

(ii)      if the condition of the Vessel is pursuant thereto found not to be in all respects satisfactory to the Owners or (as the case may be) the Mortgagee, then the Charterers shall carry out all works necessary to ensure that the condition of the Vessel is in all respects satisfactory to the Owners or (as the case may be) the Mortgagee (the "**Required Works**") by no later than the date falling 3 months (or such longer period as the Owners may agree) after the date on which such survey was completed, provided that if the Owners and the Charterers disagree on the Required Works, they shall refer the matter to a class surveyor from the Approved Classification Society, whose decision shall be final and binding on the parties hereto; and

(iii)      if the Required Works have not been completed in accordance with Clause 36(y)(ii) on or before the date falling 6 months after the date on which such survey was completed the Charterers shall on that date exercise the Purchase Option and pay the Purchase Option Price to the Owners therefor in accordance with Clause 48 (but without the need to give any notice).

**(z)      Cargo**

The Charterers shall ensure that the Vessel does not carry any cargo which (i) was not intended to be carried by it in accordance with her specifications and/or (ii) the Approved Classification Society has recommended the Vessel does not carry.

**(aa)    Nuclear materials**

The Charterers shall not permit the Vessel to carry any nuclear material or any nuclear waste.

## 37      INFORMATION UNDERTAKINGS

**(a)      General**

The undertakings in this Clause 37 (*Information Undertakings*) remain in force throughout the Charter Period unless the Owners may otherwise permit.

**(b)      Financial statements**

The Charterers shall supply to the Owners:

(i)      as soon as they become available, but in any event within 180 days after the end of each of its financial years, the audited consolidated accounts, prepared by a firm of accountants acceptable to the Owners, of the Corporate Guarantor (covering also the Charterers) for that financial year (commencing with the financial year ending 31 December 2020);

(ii)      as soon as they become available, but in any event within 90 days after the end of each of their financial half year the unaudited accounts of the Charterers for that financial half year (commencing with the financial half year ending 31 December 2020);

(iii)      on the Owners' request, a report in a form acceptable to the Owners on all trade and operating debt of the Charterers in relation to the Vessel incurred and/or paid during the preceding quarter including details (if requested by the Owners, of counterparties, amounts, invoice dates, due dates (if any)) of all trade and operating debt incurred and/or paid by the Charterers during that quarter and all Earnings received and receivable during or in respect of that month, and, on the request of the Owners, copies of all supporting documents;

(iv)  promptly after each request by the Owners, such further financial information about the Charterers, the Corporate Guarantor, the Approved Manager and/or the Vessel including, but not limited to, bank accounts, charter arrangements, operations, commitments, Financial Indebtedness, financial condition, operating expenses and loan repayments profiles, as the Owners may reasonably request or as it may require to provide to its financing bank, investors or regulatory authorities.

**(c)  Requirements as to financial statements**

All accounts delivered under Clause 37(b) will:

(v)  be prepared in accordance with all applicable laws and with US GAAP consistently applied by any locally recognised firm of accountants approved in writing by the Owners;

(vi)  give a true and fair view of the state of affairs of the relevant person at the date of those accounts and of its profit for the period to which those accounts relate; and

(vii)  fully disclose or provide for all significant liabilities of the relevant person.

**(d)  Information: miscellaneous**

The Charterers shall supply to the Owners:

(i)  On the written request by Owners, all documents dispatched by it to its shareholders (or any class of them) or its creditors generally at the same time as they are dispatched;

(ii)  promptly upon becoming aware of them, the details of any litigation, arbitration or investigations (including proceedings or investigations relating to any actual breach of the ISM Code or of the ISPS Code) for claims in excess of (i) in respect of the Charterers and/or the Collateral Charterers and/or the Approved Manager, US$500,000 and (ii) in respect of the Corporate Guarantor, US$10,000,000, which are current or pending against a Transaction Obligor;

(iii)  promptly upon becoming aware of them, the details of (aa) any litigation, arbitration or administrative proceedings or investigations relating to claims of over US$1,000,000 and (bb) any proceedings or investigations relating to any alleged or actual breach of the ISM Code or of the ISPS Code, which, in each case, are current, very likely or pending against any Transaction Obligor;

(iv)  promptly, its constitutional documents where these have been amended or varied;

(v)  promptly, such further information and/or documents regarding:

a.  the Vessel, goods transported on the Vessel, its Earnings or its Insurances;

b.  compliance of the Charterers with the terms of the Relevant Documents to which it is a party;

c.  the financial condition, business and operations of the Charterers,

as the Owners may reasonably request;

(vi)    promptly, such further information and/or documents as the Owners may request to provide to its investors or financiers so as to enable any Finance Party to comply with any laws applicable to it or as may be required by any regulatory authority;

(vii)    upon the Owners' request, provide to the Owners and/or any bank providing financing to the Owners in respect of the Vessel, such information and documentation as the Owners and/or that bank may require in order to satisfy its "Know Your Customer" procedures in relation to the Charterers and/or the Corporate Guarantor, including, but not limited to, information on the source of equity.

**(e)**    **Bank accounts.**

Upon the written request of the Owners the Charterers shall provide true copies of bank statements of the Charterers for such period as the Owners may require.

**(f)**    **Notification of Event of Default**

The Charterers shall, notify the Owners (i) of any Event of Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless the Charterers are aware that a notification has already been provided by another Transaction Obligor); and (ii) promptly upon becoming aware of the same, of any breach of any Sanctions applicable to the Vessel, any Transaction Obligor or any party to any agreement relating to the Vessel.

## 38    INDEMNITY

(a)    The Charterers agree, from time to time on demand, to indemnify and keep indemnified:

(i)    the Owners against any documented costs, charges or expenses which the Charterers have agreed to pay under this Charter and which shall be claimed or assessed against or paid in by the Owners, including, but not limited to, the costs of calculating the Market Value of the Vessel for the purposes of the Leverage Ratio once annually after the Delivery Date;

(ii)    the Owners against all Losses suffered or incurred by the Owners arising directly or indirectly out of the design, manufacture, delivery, non-delivery, purchase, importation, registration, chartering, sub-chartering, possession, control, use, operation, condition, maintenance, repair, replacement, refurbishment, conversion, upgrade, modification, overhaul, insurance, sale or other disposal, return or storage or of loss of or damage to the Vessel or otherwise in connection with the Vessel, including any and all claims in tort or in contract by any sub-charterer of the Vessel or by the holders of any bills of lading issued by the Charterers, provided always that the indemnity in respect of Losses contained in this sub-clause (ii) shall not extend to any Losses of the Owners as a consequence of the value of the Vessel at the end of the Charter Period unless such Losses shall have resulted from any breach by the Charterers of the terms of this Charter;

(iii)    the Owners against all Losses suffered or incurred by the Owners in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of the Vessel, or in securing the release of the Vessel therefrom including, without limitation, any Losses incurred in discharging any liens over the Vessel, unless this is caused due to the sole fault of the Owners;

(iv)   the Owners against all Taxes imposed on or payable by the Owners which are directly or indirectly connected to the delivery of the Vessel under the MOA and/or this Charter including, without limitation, any Taxes imposed on or payable by the Owners to any authorities as a result of the Vessel being in the waters within the jurisdiction of those authorities on the Delivery Date;

(v)    the Owners against all Taxes, imposed on or payable by the Owners which are directly or indirectly connected to the ownership, operation, trading, and/or manning of the Vessel and/or receipt of hire from the Charterers (except any Tax on the overall profits or, if applicable, capital gains of the Owners imposed in the Marshall Islands or elsewhere);

(vi)   the Owners against any Losses incurred by the Owners arising from any Environmental Claim or as a result of any pollution caused by the Vessel including, without limitation, any oil, liquid, gas or other substance spilling or emanating or threatening to spill or emanate from the Vessel;

(vii)  the Owners against any Losses incurred or suffered by the Owners as a result of or in connection with any Event of Default (whether or not the same results in a termination of the chartering of the Vessel under Clause 45 (*Event of Default*) and 46 (*Owners' Rights*));

(viii) the Owners against all Losses of whatsoever kind and nature, imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in respect of the insurances over the Vessel or to incidents covered by such insurances;

(ix)   the Owners against any costs, charges or expenses which are directly or indirectly connected to the discharging or reassigning any of the Security created pursuant to the Relevant Documents; and

(x)    the Owners against (aa) failure by the Charterers to comply with Clause 42(jj) (*Sanctions*), (bb) Charterers conducting any business in any prohibited jurisdiction on the Sanctions List and (cc) Charterers dealing either directly or indirectly with any Restricted Persons, all as determined by the rules relating to international sanctions.

(b)   If as a result of a judgment against the Charterers or the liquidation of the Charterers under any applicable law or for any other reason, any payment to be made by the Charterers under or in connection with this Charter is made or is recovered in a currency other than the currency (the "**currency of obligation**") in which it is payable pursuant to this Charter then, to the extent that the payment (when converted into the currency of obligation at the rate of exchange on the date of payment or, in the case of a liquidation, the latest date for the determination of liabilities permitted by the applicable law) falls short of the amount to be paid by the Charterers under this Charter, the Charterers shall as a separate and independent obligation, fully indemnify the Owners, from time to time on demand, against the amount of the shortfall; and for the purposes of this sub-clause "rate of exchange" means the actual rate at which the Owners are able on the relevant date to purchase the currency of obligation in New York with that other currency.

(c)   The Owners may from time to time enter into certain loan agreements and/or financing agreements (before and hereinafter referred to as the "**Loan Agreements**"), and the Charterers shall fully indemnify the Owners, from time to time on demand, for any Losses incurred by the Owners under or in connection with any such Loan Agreement (including, without limitation, break costs, unwind costs, late funding costs, prepayment fees and legal fees, and hereinafter

called together "**Funding Break Costs**") due to (i) the delayed delivery of the Vessel under the MOA for any reason other than a default by the Owners under the MOA or (ii) non-delivery of the Vessel under the MOA for any reason, other than a default by the Owners under the MOA (and in such circumstances, this indemnity shall also cover the bank fees) or (iii) any early termination of the chartering of the Vessel under this Charter pursuant to Clauses 45 and 46, or (iv) a Total Loss or (v) the Charterers exercise of the Purchase Option according to Clause 48. If the Charterers are considering exercising the Purchase Option, they may request the Owners to inform them of the potential loss or gain that such exercise could trigger in terms of break fees, prepayment fees and unwind costs under any Loan Agreement prior to declaring the Purchase Option. Notwithstanding the foregoing, the Charterers will not be responsible for Losses incurred by the Owners from interest rate derivate transactions over and above that required to hedge up to the maximum amount of interest accruing in respect of the loans under the Loan Agreement.

Notwithstanding the aforementioned indemnity:

(i)     in relation to exercise of the Purchase Option, the Charterers shall not be liable for any Funding Break Costs if either (aa) the Purchase Option Price is paid to the Owners on a Hire Payment Date or (bb) the Charterers have given the Owners at least thirty (30) days' notice of the expected Completion Date, and the Completion Date occurs within 3 Banking Days of that notified Completion Date; and

(ii)    the Charterers shall not be liable to pay any break costs, unwind costs or prepayment payments in respect of this Charter in relation to the exercise of the Purchase Option and fulfilment of the Purchase Obligation.

(d)     Without prejudice to the foregoing provisions of this Clause 38 (*Indemnity*), all reasonable and necessary costs and expenses, including disbursements, arising in connection with the preparation and execution of this Charter and the Relevant Documents and the arrangements contemplated hereby and the registration of the Vessel in the name of the Owners under the Approved Flag (excluding registration of any Mortgage) or in connection with the maintenance of such registration (including annual tonnage tax fees) shall be borne by the Charterers provided that if the Charterers do not take delivery of the Vessel under this Charter, the Charterers shall indemnify the Owners under this Clause only for costs and expenses related to the Vessel's initial inspection, costs of any initial insurance opinions and legal fees in connection with the preparation and negotiation of this Charter, and all other costs and expenses incurred however shall be borne by the party which incurred the same.

(e)     Upon any termination of the chartering of the Vessel pursuant to Clauses 45 (*Event of Default*) and 46 (*Owners' Rights*)) the Charterers shall fully indemnify the Owners, from time to time on demand, from and against all Losses of whatsoever kind and nature imposed on, incurred or suffered by, or asserted against the Owners in any way relating to or arising in connection therewith including, without limitation, in relation to recovering possession of, and in moving (inclusive of pilotage and towage fees), navigating, storing (inclusive of port fees), insuring and maintaining the Vessel until she is at the designated port of the Owners as referred to in Clause 46(b) and in carrying out any works, drydocking, surveys, repairs or modifications as referred to in Clauses 46(b) and 46(c).

(f)     The indemnities contained in this Clause 38 (*Indemnity*), and each other indemnity contained in this Charter, shall survive any termination or other ending of this Charter and any breach of, or repudiation or alleged repudiation by the Charterers or the Owners of this Charter.

**39      MORTGAGES**

(a)   The Charterers agree that the Owners shall be entitled, on or at any time after the Delivery Date, to grant to any reputable bank or financial institution (and for these purposes each of Joh. Berenberg, Gossler & CO. KG, BeGo Alternative Assets Fund S.A., SICAV-FIS - BeGo Shipping Debt Fund are hereby deemed acceptable) (each a "**Mortgagee**" and as further described at Clause 59 (*Definitions*)) (i) one or more mortgages on the Vessel (each a "**Mortgage**") securing an amount of up to the Outstanding Principal and (ii) one or more assignment(s) of this Charter, the earnings generated by this Charter, the insurances over the Vessel and all other rights of the Owners under the Relevant Documents (inclusive of the property assigned, pledged or charged thereunder), all as security for any loan or hedging facilities arranged by the Owners under any Loan Agreement) in relation to the finance or re-finance of the acquisition cost of the Vessel.

(b)   The Charterers agree that the Owners shall be entitled, on or at any time after the Delivery Date, to grant, whether or not a Mortgage is executed, mortgages (together, the "**Collateral Mortgages**") over the Vessel and collateral assignments of (inter alia) the insurances over the Vessel in favour of:

  (i)   Oaktree Maritime Finance I, LLC of the Cayman Islands (the "**First Lender**") as security for the borrower's obligations under a loan agreement made or to be made between the First Lender as lender and (inter alia) the Owners as borrowers; and

  (ii)   Alpha Bank A.E., Hamburg Commercial Bank AG, Unicredit Bank AG and Citibank N.A. (together, the "**Second Lenders**") as security for the obligations of Kimolos II Special Maritime Enterprise, Fourni Special Maritime Enterprise, Kastos Special Maritime Enterprise and Kinaros Special Maritime Enterprise (the "**Second Borrowers**") as joint and several borrowers under a loan agreement (the "**Charterers' Loan Agreement**") to be made between (i) the Second Borrowers, (ii) the Second Lenders, (iii) Citibank Europe plc, Europe Branch and (iv) Citibank N.A., London Branch  as security trustee, in respect of a secured loan facility of up to US$5,125,000.

(c)   The Owners right to grant a Mortgage over the Vessel under this Clause 39 shall be subject to such Mortgage (i) being enforceable by the Mortgagee only if there has occurred and is continuing an Event of Default and (ii) if there has occurred no Event of Default which is continuing, not impairing in any way the Charterers' right or ability to exercise the Purchase Option. The Owners undertake to procure that each Mortgagee shall execute in favour of the Charterers a quiet enjoyment letter in a market standard form.

(d)   The Charterers agree with the Owners to sign (i) an assignment of its interest in the Insurances if required by the Mortgagee and (ii) an acknowledgement to and agree to be bound by any notices of any assignment of this Charter, the earnings generated by this Charter and the insurances over the Vessel in relation to any assignment executed in favour of a Mortgagee for the purposes described in Clause 39(a), subject to the Mortgagee issuing a quiet enjoyment letter under paragraph (b) above.

**40      SALE /DISPOSAL OF VESSEL**

(a)   The Owners may, at any time after the occurrence of an Event of Default which is continuing, and (if the Charterers did not exercise the Purchase Option during the Charter Period or failed to fulfil the Purchase Obligation) after the Charter Period, transfer the ownership of the Vessel to any third party.

(b)   The Charterers agree and undertake to enter into all necessary documents as the Owners shall reasonably require to complete or perfect the transfer of the Vessel (with the benefit and burden of this Charter) pursuant to Clause 40(a) above, any costs or expenses whatsoever arising in relation thereto to be borne by the Owners.

(c)   Following any sale of the Vessel under this Clause 40, the Owners shall, provided that no Event of Default (as defined in the Collateral Charters) has occurred which is continuing, pay to the Charterers the Net Amount, provided that if at the time that the Owners would otherwise pay the Net Amount to the Charterers there has occurred and is continuing an Event of Default (as therein defined) under either Collateral Charter, then the Net Amount shall first be applied in payment of any amount payable by the Charterers under any Collateral Guarantee (as defined in the Collateral Charters) to which it is a party.

Where "**Net Amount**" means the aggregate of (i) net sale proceeds and (ii) the net trading profit received by the Owners following termination of this Charter less:

   (i)     all Outstanding Principal at that time, to be paid to the Owners;

   (ii)    any losses incurred by the Owners in operating the Vessel during the period up to the sale;

   (iii)   interest on the Outstanding Principal from the date it fell due until the date of receipt by the Owners of such sale proceeds, at a rate determined in accordance with Clause 35(d);

   (iv)    the aggregate of any additional hire payable under Clause 34(d) which would have been payable by the Charterers to the Owners but for such sale of the Vessel;

   (v)     all costs incurred by the Owners in terminating this Charter, taking possession of the Vessel; and

   (vi)    all costs incurred by the Owners in or in relation to such sale of the Vessel.

## 41   THE VESSEL'S FLAG

(a)   The Vessel shall upon the Delivery Date be registered in the name of the Owners under the Approved Flag. Any request by the Charterers of a change in the Vessel's flag shall require the prior written consent of the Owners (not to be unreasonably withheld or delayed) and any Mortgagee. All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement) related to the change in the Vessel's flag shall in such case be for the Charterers' account.

(b)   Should Owners require any change in the Vessel's flag, the prior written consent of the Charterers shall be obtained (such consent not to be unreasonably withheld). All costs (including, without limitation, all costs and expense related to changing the Vessel's ownership structure, if required by the flag state or to maintain the equivalent Tax treatment arising from the Owners' ownership of the Vessel and all costs and expenses in restructuring any loan or hedging facilities provided under any Loan Agreement) related to change in the Vessel's flag shall in such case be for the Owners' account.

(c)     Notwithstanding the aforementioned, the Owners shall be entitled to change the Vessel's flag without the prior written consent to the Charterers at any time during which an Event of Default is continuing and all costs (including those referred to above) related to the change in the Vessel's flag shall be for the account of the Charterers.

## 42     REPRESENTATIONS AND WARRANTIES

The Charterers acknowledge that the Owners have entered into this Charter in full reliance on the representations and warranties by the Charterers set out in this Clause 42 (*Representations and Warranties*).

**(a)     General**

The Charterers make the representations and warranties set out in this Clause 42 (*Representations and Warranties*) to the Owners on the date of this Charter.

**(b)     Status**

  (i)     It is a limited liability company, duly incorporated and validly existing in good standing under the law of its jurisdiction of incorporation.

  (ii)    It has the power to own its assets and carry on its business as it is being conducted.

**(c)     Binding obligations**

The obligations expressed to be assumed by it in each Relevant Document to which it is a party are legal, valid, binding and enforceable obligations.

**(d)     Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, each Relevant Document to which it is a party do not and will not conflict with:

  (iii)   any law or regulation applicable to it;

  (iv)    the constitutional documents of the Charterers; or

  (v)     any agreement or instrument binding upon it or its assets or constitute a default or termination event (however described) under any such agreement or instrument.

**(e)     Power and authority**

  (i)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, each Relevant Document to which it is or will be a party and the transactions contemplated by those Relevant Documents.

  (ii)    No limit on its powers will be exceeded as a result of the borrowing, granting of security or giving of guarantees or indemnities contemplated by the Relevant Documents to which it is a party.

**(f)     Validity and admissibility in evidence**

All Authorisations required or desirable:

> (i)      to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Relevant Documents to which it is a party; and
>
> (ii)     to make the Relevant Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

**(g)**    **Governing law and enforcement**

> (i)      The choice of governing law of each Relevant Document to which it is a party will be recognised and enforced in its Relevant Jurisdictions.
>
> (ii)     Any judgment obtained in relation to a Relevant Document to which it is a party in the jurisdiction of the governing law of that Relevant Document will be recognised and enforced in its Relevant Jurisdictions.

**(h)**    **Insolvency**

No:

> (ii)     corporate action, legal proceeding or other procedure or step described in Clause 45(g) (*Insolvency Proceedings*); or
>
> (ii)     creditors' process described in Clause 45(h) (*Creditors' process*),

has been taken or, to its knowledge, threatened in relation to the Charterers; and none of the circumstances described in Clause 45(f) (*Insolvency*) applies to the Charterers.

**(i)**    **No filing or stamp taxes**

Under the laws of its Relevant Jurisdictions it is not necessary that the Relevant Documents to which it is a party be registered, filed, recorded, notarised or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Relevant Documents to which it is a party or the transactions contemplated by those Relevant Documents.

**(j)**    **Deduction of Tax**

It is not required to make any tax deduction from any payment it may make under any Relevant Document to which it is a party.

**(k)**    **No default**

No event or circumstance is outstanding which constitutes a material default or a termination event (however described) under any other agreement or instrument which is binding on it or to which its assets are subject which would have a material adverse effect on its ability to perform its obligations under this Charter.

**(l)**    **No misleading information**

> (ii)     Any factual information provided by the Charterers for the purposes of this Charter

was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(iii)   Nothing has occurred or been omitted from any such information and no information has been given or withheld that results in any such information being untrue or misleading in any material respect.

**(m)   Financial statements**

(i)   Any financial statements (of the Corporate Guarantor or otherwise) provided by the Charterers to the Owners prior to the date of this Charter, and their most recent financial statements delivered pursuant to Clause 37(b):

(A)   have been prepared in accordance with Clause 37(c); and

(B)   give a true and fair view of (if audited) or fairly represent (if unaudited) its financial condition as at the end of the relevant financial year and operations during the relevant financial year.

(ii)   Since the date of the most recent financial statements delivered pursuant to Clause 37(b), there has been no material adverse change in its business, assets or financial condition.

**(n)   Pari passu ranking**

Its payment obligations under the Relevant Documents to which it is a party rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

**(o)   No proceedings pending or threatened**

No litigation, arbitration or administrative proceedings or investigations (including proceedings or investigations relating to any alleged or actual breach of the ISM Code or of the ISPS Code) of or before any court, arbitral body or agency have (to the best of its knowledge and belief (having made due and careful enquiry)) which could have a Material Adverse Effect on the Charterers been started or threatened against it.

**(p)   Validity and completeness of the Relevant Documents**

(i) Each of the Relevant Documents to which the Charterers is a party constitutes legal, valid, binding and enforceable obligations of the Charterers.

(ii)   The copies of the Relevant Documents delivered to the Owners before the date of this Charter are true and complete copies.

**(q)   No rebates etc.**

To the knowledge of the Charterers, there is no agreement or understanding to allow or pay any rebate, premium, inducement, commission, discount or other benefit or payment (however described) to the Owners, the Charterers or a third party in connection with the purchase by the Owners of the Vessel, other than as disclosed to the Owners in writing on or before the date of this Charter.

**(r)**   **No breach of laws**

It has not breached any law or regulation applicable to it.

**(s)**   **No Material Adverse Effect**

Nothing has occurred which could or would have a Material Adverse Effect on the ability of the Charterers to perform their obligations under and in accordance with this Charter.

**(t)**   **No Charter**

The Vessel is not subject to any charter other than this Charter or otherwise in accordance with the terms of this Charter.

**(u)**   **Government/regulatory approvals**

All applicable governmental and regulatory licenses, permits, approvals, authorization, filings, etc which may be required for any Transaction Obligor to comply with its obligations under the Relevant Documents have been obtained, and are in full force and effect.

**(v)**   **Compliance with Environmental Laws**

All Environmental Laws relating to the ownership, operation and management of the Vessel and the business of the Charterers (as now conducted and as reasonably anticipated to be conducted in the future) and the terms of all Environmental Approvals have been complied with.

**(w)**   **No Environmental Claim**

No Environmental Claim has been made against the Charterers or the Approved Manager.

**(x)**   **No Environmental Incident**

No Environmental Incident has occurred and no person has claimed that an Environmental Incident has occurred.

**(y)**   **ISM and ISPS Code compliance**

All requirements of the ISM Code and the ISPS Code as they relate to the Owners, the Charterers, the Approved Manager and the Vessel have been complied with.

**(z)**   **Taxes paid**

(i) It is not materially overdue in the filing of any Tax returns and it is not overdue in the payment of any amount in respect of Tax.

(ii)   No claims or investigations are being, or are reasonably likely to be, made or conducted against it with respect to Taxes.

**(aa)**   **Financial Indebtedness**

It does not have any Financial Indebtedness outstanding other than as permitted by this Charter and under the Charterers' Loan Agreement.

**(bb)**   **Overseas companies**

It has not delivered particulars, whether in its name stated in the Relevant Documents or any other name, of any UK Establishment to the Registrar of Companies as required under the Overseas Companies Regulations 2009 (SI 2009/1801) or, if it has so registered, it has provided to the Owners sufficient details to enable an accurate search against it to be undertaken by the Owners at the Companies Registry.

**(cc)    Good title to assets**

It has good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

**(dd)    Ownership**

(i)   With effect on and from the Delivery Date, it will be the sole legal and beneficial owner of the Vessel's Earnings and her Insurances.

(ii)  With effect on and from the date of its creation or intended creation, it will be the sole legal and beneficial owner of any asset that is the subject of any Transaction Security created or intended to be created by it.

(iii) Its constitutional documents do not and could not restrict or inhibit any enforcement of the security conferred by the Relevant Documents.

**(ee)    Centre of main interests and establishments**

For the purposes of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings (the "**Regulation**"), its centre of main interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

**(ff)    Place of business**

It does not have a place of business in the United States of America or any country on the Sanctions List.

**(gg)    Event of Default**

There has not occurred any Event of Default which is continuing;

**(hh)    Sanctions**

The Charterers:

(i)   are not, and no director or officer of the Charterers is, a Restricted Person;

(ii)  are not owned or controlled by or acting directly or indirectly on behalf of or for the benefit of, a Restricted Person; and

(iii) do not own or control a Restricted Person.

**(ii)    US Tax Obligor**

It is not a US Tax Obligor.

**(jj)   Politically exposed persons.**

(i) Other than in relation to any fund which owns, controls or manages any shares of the Charterers or the Corporate Guarantor, whether directly or indirectly (an **"Investing Fund"** which includes any investment entity or account managed by such fund), no person who owns or controls any shares of the Charterers or the Corporate Guarantor, whether directly or indirectly, is an active or retired member of any government or parliament and (ii) no active politician (member of national or state government or parliament) controls any Investing Fund.

**(kk)   Repeating Representations**

The representations and warranties contained in this Clause 42 (*Representations and Warranties*), shall be deemed to be repeated by the Charterers as of the Delivery Date and on each Hire Payment Date as if made with reference to the facts and circumstances existing on each such date, and the rights of the Transaction Obligor in respect hereof shall survive delivery of the Vessel hereunder.

## 43      UNDERTAKINGS

**(a)   General**

The undertakings in this Clause 43 (*Undertakings*) remain in force throughout the Charter Period except as the Owners may otherwise permit.

**(b)   Authorisations**

The Charterers will, promptly:

    (i)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

    (ii)    supply certified copies to the Owners of,

any Authorisation required under any law or regulation of a Relevant Jurisdiction or the state of the Approved Flag at any time of the Vessel to enable it to:

    (aa)    perform its obligations under the Relevant Documents to which it is a party; and

    (bb)    ensure the legality, validity, enforceability or admissibility in evidence in any Relevant Jurisdiction or in the state of the Approved Flag at any time of the Vessel or any Relevant Document to which it is a party.

**(c)   Compliance with laws**

The Charterers will comply in all respects with all laws and regulations to which it may be subject.

**(d)   Environmental compliance**

The Charterers will:

    (i) comply with all Environmental Laws;

(ii) obtain, maintain and ensure compliance with all requisite Environmental Approvals;

(iii) implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or is reasonably likely to have a Material Adverse Effect.

**(e)     Environmental claims**

The Charterers shall, promptly upon becoming aware of the same, inform the Owners in writing of:

(i) any Environmental Claim against the Charterers which is current or pending or threatened; and

(ii) any facts or circumstances which are reasonably likely to result in any Environmental Claim being commenced or threatened against the Charterers,

where the claim, if determined against the Charterers, has or is reasonably likely to have a Material Adverse Effect.

**(f)     Taxation**

(i) The Charterers shall, pay and discharge all Taxes imposed upon them or their assets within the time period allowed without incurring penalties unless and only to the extent that:

(aa)  such payment is being contested in good faith;

(bb)  adequate reserves are maintained for those Taxes and the costs required to contest them have been disclosed in its latest financial statements delivered to the Owners; and

(cc)  such payment can be lawfully withheld, and

(dd)  failure to pay those Taxes does not have a Material Adverse Effect.

(ii)     The Charterers shall not change its residence for Tax purposes without the prior written consent of the Owners (not to be unreasonably withheld).

**(g)     Overseas companies**

The Charterers shall promptly inform the Owners if it delivers to the Registrar particulars required under the Overseas Companies Regulations 2009 (SI 2009/1801) of any UK Establishment and it shall comply with any directions given to it by the Owners regarding the recording of any Transaction Security on the register which it is required to maintain under The Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009.

**(h)     Pari passu ranking**

The Charterers shall ensure that at all times any unsecured and unsubordinated claims of the Owners against it under the Relevant Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**(i)**    **Title**

The Charterers shall hold the legal title to, and own the entire beneficial interest in:

(i)    with effect from the relevant Delivery Date, the Earnings and the Insurances;

(ii)    with effect on and from its creation or intended creation, any other assets the subject of any Transaction Security created or intended to be created by the Charterers.

**(j)**    **Negative pledge**

The Charterers shall not create or permit to subsist any Security over the Vessel or (other than Permitted Security) over any of its assets which are the subject of the Security created or intended to be created by the Relevant Documents to which it is a party.

**(k)**    **Disposals**

The Charterers shall not enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of the Vessel, her Earnings, Insurances, any Requisition Compensation or this Charter unless the Charterers have exercised the Purchase Option on or before the time of entering into such transaction(s) or the Owners otherwise agree.

**(l)**    **Merger**

Except with the prior written consent of the Owners, the Charterers shall not enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction.

**(m)**    **Unlawfulness, invalidity and ranking; Security imperilled**

The Charterers shall not do (or fail to do) or cause or permit another person to do (or omit to do) anything which is likely to:

(i)    make it unlawful for any Transaction Obligor to perform any of its obligations under the Relevant Documents;

(ii)    cause any obligation of a Transaction Obligor under the Relevant Documents to cease to be legal, valid, binding or enforceable;

(iii)    cause any Relevant Document to cease to be in full force and effect;

(iv)    cause any Transaction Security to rank after, or lose its priority to, any other Security; and

(v)    imperil or jeopardise the Transaction Security.

**(n)**    **Constitutional documents**

The Charterers shall not allow any amendment or variation to its constitutional documents unless such amendment or variation would clearly be immaterial to the Charter and the other Relevant Documents.

**(o) Change of Ownership Structure**

32

The Charterers shall not, without the prior written consent of the Owners (which shall not be unreasonably withheld) (i) change or permit any change in the owning structure or control of the Charterers and will maintain the Charterers in the same ownership as at the date hereof, and controlled by the Corporate Guarantor (ii) change or permit any change in the owning structure or control of the Corporate Guarantor so that the shares owned and controlled by the 3 families disclosed to the Owners prior to the date of this Charter (and accepted by the Owners for the purposes of this Clause) as the principal shareholders of and in the Corporate Guarantor fall below 50% of the issued shares except, in each case, control the Charterers and/or the Corporate Guarantor may be vested, as a result of any share transfer or restructuring, in:

    (i)      a company listed in a public stock exchange in New York or Western Europe; or

    (ii)     any entity incorporated and existing in (or beneficially owned and controlled by persons incorporated or operating in) an OECD country (other than Turkey) or Singapore and whose parent companies and ultimate beneficial shareholders are either (aa) institutional investors or (bb) if not an institutional investor, has not (and none of its directors and shareholders have) been convicted of fraud in any jurisdiction, which entity has good experience in owning, operating or managing tankers or similar vessels

provided that (i) any entity which acquires the Corporate Guarantor must (aa) not have undergone a financial restructuring, or (bb) been the guarantor of any obligor which has rescheduled any payments in respect of its Financial Indebtedness or discussed with its creditors the possibility of doing so, each within the three years preceding such proposed assumption of control and (cc) have an equity to Total Assets ratio at least as good as that of the Corporate Guarantor.

**(p)**    **COFR**

The Charterers shall send to the Owners a copy of the Certificate of Financial Responsibility issued pursuant to the United States Oil Pollution Act 1990 if the Vessel is to operate in waters which require compliance with the United States Oil Pollution Act 1990, or copies of such certificates or other documentation evidencing compliance by Charterers with similar requirements under any other jurisdiction where the Vessel may operate.

**(q)**    **Conduct of Business**

The Charterers shall carry on and conduct their business in a proper and efficient manner, keep in existence all its material rights and privileges and maintain its books and records in a proper and efficient manner.

**(r)**    **Change of business**

The Charterers shall not, without the prior written consent of the Owners, engage in any business other than the operation, chartering and management of the Vessel.

**(s)**    **Owners' title**

The Charterers shall not suffer, nor permit to continue, any liens or other Security on the Vessel, which might have priority over the title and interest of the Owners in the Vessel save for Permitted Security.

**(t)**    **Amendment or Enforcement of Relevant Documents**

The Charterers shall not, without the prior written consent of the Owners, agree to any amendment or supplement to, or waive or fail to enforce or rescind or terminate any Relevant Document to which the Charterers are a party in their capacity as charterers of the Vessel or otherwise.

**(u) Negative undertakings**. The Charterers will not:

    (i)    carry on any business other than the chartering and operation of the Vessel;

    (ii)    permit the Corporate Guarantor to pay any dividend, repay loans or make any other form of distribution or effect any form of redemption, purchase or return of share capital unless no Event of Default has occurred which is continuing or will result from such payment;

    (iii)    without the prior written consent of the Owners provide any form of credit or financial assistance to any person or enter into any transaction with or involving any person on terms which are, in any respect, less favourable to it than those which it could obtain in a bargain made at arms' length;

    (iv)    issue, allot or grant any person a right to any shares in its capital or repurchase or reduce its issued share capital;

    (v)    enter into any form of amalgamation, merger or de-merger or any form of reconstruction or reorganisation; or

    (vi)    incur any Financial Indebtedness other than in the ordinary course of owning and operating the Vessel or as otherwise contemplated by this Charter or under the Charterers' Loan Agreement.

## 44    INSURANCES, TOTAL LOSS AND COMPULSORY ACQUISITION

**(a)    General**

With respect to the Vessel, the undertakings in this Clause 44 (*Insurances, Total Loss and Compulsory Acquisition*) remain in force on and from the Delivery Date and throughout the rest of the Charter Period except as the Owners may otherwise permit.

**(b)    Maintenance of obligatory insurances**

The Charterers shall keep the Vessel insured at its expense in the name of the Owners as primary insured and the Charterers as co-insured against:

    (i)    hull and machinery plus freight interest and hull interest and increased value and any other usual marine risks (including excess risks);

    (ii)    war risks (including the London Blocking and Trapping addendum or its equivalent);

    (iii)    protection and indemnity risks (including liability for oil pollution for an amount of no less than $1,000,000,000 and excess war risk P&I cover) on standard Club Rules, covered by a Protection and Indemnity association which is a member of the International Group of Protection and Indemnity Associations (or, if the International Group ceases to exist, any other leading protection and indemnity

association or other leading provider of protection and indemnity insurance) (including, without limitation, the proportion (if any) of any collision liability not covered under the terms of the hull cover);

(iv)    freight, demurrage and defence; and

(v)    any other risks against which the Owners consider, having regard to practices of first-class shipping companies and other circumstances prevailing at the relevant time, it would be reasonable for the Charterers to insure and which are specified by the Owners by notice to the Charterers.

(c)    **Terms of obligatory insurances**

With respect to the Vessel, the Charterers shall effect such insurances:

(i) in dollars;

(ii) in the case of hull and machinery and usual marine risks and war risks, in an amount on an agreed value basis at least the greater of:

(aa)  one hundred and twenty five per cent (125%) of the Outstanding Principal; and

(bb)  the Market Value of the Vessel,

in such amount as certified by the Owners from time to time;

(iii)    in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market but such amount shall not be less than $1,000,000,000;

(iv)    in the case of protection and indemnity risks, in respect of the full tonnage of the Vessel;

(v)    in the case of the hull and machinery insurance, on the basis that the deductible is not higher than the Major Casualty figure;

(vi)    with such deductibles as the Owners shall agree;

(vii)    in the case where the Vessel is insured on a fleet policy, on the basis that the Vessel insured on that fleet policy is deemed to be insured on an individual basis;

(viii)    on approved terms; and

(ix)    through Approved Brokers and with approved insurance companies and/or underwriters (each at least investment grade rated) or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations.

(d)    **Further protections for Finance Parties**

In addition to the terms set out in Clause 44(c) (*Terms of obligatory insurances*), the Charterers shall procure that the obligatory insurances shall:

(i)      subject always to paragraph 44(c)(ii), name the Owners, the Charterers and the Approved Manager as the joint named insureds unless the interest of every other named insured is limited:

      (aa)  in respect of any obligatory insurances for hull and machinery and war risks;

      1.    to any provable out-of-pocket expenses that it has incurred and which form part of any recoverable claim on underwriters; and

      2.    to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against it); and

      (bb)  in respect of any obligatory insurances for protection and indemnity risks, to any recoveries it is entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against it;

and every other named insured has undertaken in writing to any Mortgagee (in such form as it requires) that any deductible shall be apportioned between the Owners, the Charterers and every other named insured in proportion to the gross claims made or paid by each of them and that it shall do all things necessary and provide all documents, evidence and information to enable such Mortgagee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(ii)    whenever the Owners require, name (or be amended to name) any Mortgagee as additional named insured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against such Mortgagee, but without such Mortgagee being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(iii)   name any Mortgagee as loss payee with such directions for payment as the Owners may specify;

(iv)   provide that all payments by or on behalf of the insurers under the obligatory insurances to a Mortgagee shall be made without set off, counterclaim or deductions or condition whatsoever;

(v)    provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by a Mortgagee or any other Finance Party; and

(vi)   provide that any Mortgagee may make proof of loss if the Owners fail to do so.

(e)    **Renewal of obligatory insurances**

The Charterers shall:

(i) at least fourteen (14) days before the expiry of any obligatory insurance:

    (aa) notify the Owners of the Approved Brokers (or other insurers) and any protection and indemnity or war risks association through or with which the Charterers propose to renew that obligatory insurance and of the proposed terms of renewal; and

(bb)  obtain the Owners' approval to the matters referred to in sub-paragraph (A) of paragraph (i) above;

(ii)    at least ten (10) days before the expiry of any obligatory insurance, renew that obligatory insurance in accordance with the Owners' approval pursuant to paragraph (i) above; and

(iii)   procure that the Approved Brokers and/or the approved war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Owners in writing of the terms and conditions of the renewal.

(f)   **Copies of policies; letters of undertaking**

The Charterers shall ensure that the Approved Brokers provide the Owners with:

(i) pro forma copies of all policies relating to the obligatory insurances which they are to effect or renew; and

(ii)    a letter or letters or undertaking in a form reasonably required by the Owners and/or any Mortgagee and including undertakings by the Approved Brokers that:

a.   they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment complying with the provisions of Clause 44(d) (*Further protections for Finance Parties*);

b.   they will hold such policies, and the benefit of such insurances, to the order of any Mortgagee in accordance with such loss payable clause;

c.   they will advise the Owners immediately of any material change to the terms of the obligatory insurances;

d.   they will, if they have not received notice of renewal instructions from the Owners or the Charterers or its agents, notify the Owners not less than fourteen (14) days before the expiry of the obligatory insurances;

e.   if they receive instructions to renew the obligatory insurances, they will promptly notify the Owners of the terms of the instructions;

f.   they will not set off against any sum recoverable in respect of a claim relating to the Vessel under such obligatory insurances any premiums or other amounts due to them or any other person whether in respect of the Vessel or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts; and

g.   they will arrange for a separate policy to be issued in respect of the Vessel forthwith upon being so requested by the Owners.

(g)   **Copies of certificates of entry**

The Charterers shall ensure that any protection and indemnity and/or war risks associations in which the Vessel is entered provide the Owners with:

(iii)    a certified copy of the certificate of entry for the Vessel;

(iv)    a letter or letters of undertaking in such form as may be reasonably required by the Owners; and

(v)    a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to the Vessel.

(h)    **Deposit of original policies**

The Charterers shall ensure that all policies relating to obligatory insurances are deposited with the Approved Brokers through which the insurances are effected or renewed.

(i)    **Payment of premiums**

The Charterers shall punctually pay all premiums or other sums payable in respect of the obligatory insurances and produce all relevant receipts when so required by the Owners and/or any Mortgagee.

(j)    **Guarantees**

The Charterers shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

(k)    **Compliance with terms of insurances**

(i)    The Charterers shall not do nor omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part.

(ii)    Without limiting paragraph (i) above, the Charterers shall:

a.    take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in sub-paragraph (C) of Clause 44(f)(ii) (*Copies of policies; letters of undertaking*)) ensure that the obligatory insurances are not made subject to any exclusions or association are promptly issued and remain in full force and effect qualifications to which the Owners have not given its prior approval;

b.    not make any changes relating to the classification or classification society or manager or operator of the Vessel approved by the underwriters of the obligatory insurances;

c.    if applicable, make (and promptly supply copies to the Owners of) all quarterly or other voyage declarations which may be required by the protection and indemnity risks association in which the Vessel is entered to maintain cover for trading to the United States of America and Exclusive Economic Zone (as defined in the United States Oil Pollution Act 1990 or any other applicable legislation); and

      d.    not employ the Vessel, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

## (l)    Alteration to terms of insurances

The Charterers shall not, without the prior written consent of the Owners, make or agree to any alteration to the terms of any obligatory insurance or waive any right relating to any obligatory insurance.

## (m)    Settlement of claims

With respect to the Vessel, the Charterers shall:

      (i)    settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a Major Casualty only with the prior written consent of the Owners; and

      (ii)    do all things necessary and provide all documents, evidence and information to enable the Owners and/or any Mortgagee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

## (n)    Provision of copies of communications

Following (i) the Owners' written request and (ii) the occurrence of an Event of Default, the Charterers shall provide the Owners, at the time of, or shortly after, each such communication, with copies of all written communications between the Charterers and:

      (i)    the Approved Brokers;

      (ii)    the approved protection and indemnity and/or war risks associations; and

      (iii)    the approved insurance companies and/or underwriters,

which relate directly or indirectly to:

    a.    the Charterers' obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

    b.    any credit arrangements made between the Charterers and any of the persons referred to in paragraphs (i) or (ii) above relating wholly or partly to the effecting or maintenance of the obligatory insurances.

## (o)    Provision of information

The Charterers shall promptly provide the Owners (or any persons which it may designate) with any information which the Owners (or any such designated person) request for the purpose of:

      (i)    obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected with respect to the Vessel (which report shall be prepared at the Owners' expense except as provided in Clause 44(q) (*Dispute*)); and/or

(ii)        dealing with or considering any matters relating to any such insurances.

(p)    **Deductibles.** In case of dispute the Owners and Charterers are unable to agree the level of deductibles for the insurances hereunder, the Charterers may agree with insurers a deductible higher than that required by the Owners if it provides evidence to the Owners that it has available to it blocked cash equal to the amount of such excess.

(q)    **Total Loss: Payment of Charter Hire**

In the event that the Vessel becomes a Total Loss the Charterers shall continue to pay Charter Hire until payment of the insurance proceeds in respect of the Total Loss in an amount no less than the then Minimum Insured Value is made in full and received by the Owners. The Charterers shall be entitled to receive from the Owners all insurance proceeds in respect of the Total Loss received by the Owners in excess of the aggregate of the Outstanding Principal, the Indemnity Sum, any other payments and costs payable under this Charter and any interest accrued thereon pursuant to this Charter, provided that no Event of Default (as defined in the Collateral Charters) has occurred which is continuing, in which case the excess shall first be applied in payment of any amount due and payable by the Charterers under any Collateral Guarantee (as defined in the Collateral Charters) to which it is a party.

If payment of all insurance proceeds in respect of the Total Loss in the amount specified above in this Clause 44(q) (*Total Loss: Payment of Charter Hire*) has not been made within one hundred and fifty (150) days of a Total Loss (or such longer period as the Owners may, acting reasonably, agree in writing upon the Charterers' request), the Charterers shall pay to the Owners, on demand, an amount equivalent to the then Minimum Insured Value less, if applicable, the amount of any insurance proceeds actually paid to the Owners at that stage in respect of the Total Loss (such payment being the "**Charterers' Insurance Proceeds Payment**").

The Charterers' obligation to pay the Charterers' Insurance Proceeds Payment is without prejudice to the Charterers' obligations to pay any Indemnity Sum and any interest accrued under this Charter. After the day the Charterers have paid the Charterers' Insurance Proceeds Payment to the Owners and any Indemnity Sum and any interest accrued and any other payments required to be made under this Charter, the Charterers shall be under no further obligation to pay Charter Hire and, subject to the prior consent of any Mortgagee if required under any Loan Agreement, the Owners shall assign any interest it has in all the insurances in respect of the Vessel to the Charterers and shall notify the relevant insurers of such assignment.

(r)    **Innocent owner's insurance**

The Charterers shall reimburse the Owners on demand for all costs, premiums and expenses the Owners may incur in connection with:

(i)        an innocent owner's insurance in relation to the Vessel's hull insurances; and

(ii)        a contingency insurance against third party liabilities for an innocent owner,

or any other similar owner's insurance.

**45        EVENTS OF DEFAULT**

Each of the following events shall be an "Event of Default" for the purposes of this Charter, provided that any Event of Default under Sub-Clauses (e), (f) and (g) below which may occur in

relation to the Corporate Guarantor on or prior to the earlier of (i) 30 September 2020 and (ii) the date on which there becomes effective (the "**Effective Date**") a binding agreement (the "**Agreement**") by the Corporate Guarantor and the holders of the First Preferred Ship Mortgage Notes due 2022 issued by the Corporate Guarantor under an indenture dated July 2, 2018 (the "**First Preferred Ship Mortgage Notes**") under or as a result of any restructuring of the First Preferred Ship Mortgage Notes (including any prepackaged Chapter 11 filing), shall, if not remedied or waived by the Owners, be deemed either (i) not to have occurred until the earlier of 30 September 2020 and the date on which it is apparent that no Agreement will be entered into or, as the case may be, become binding on the parties thereto or (ii) remedied or cured in the event the Agreement becomes binding on the parties thereto on or before 30 September 2020:

**(a)    Non-payment**

The Charterers do not pay on the due date any amount payable pursuant to this Charter at the place and in the currency in which it is expressed to be payable unless such non-payment is remedied within 5 Banking Days **provided that** such 5 Banking Day remedy period shall apply not (i) more than 3 times during the Charter Period and (ii) in respect of 2 consecutive payments.

**(b)    Specific obligations**

A breach occurs of Clause 36(r)(*Sanctions*), 43(i) (*Title*), Clause 43(j) (*Negative pledge*), Clause 43(m) (*Unlawfulness, invalidity and ranking; Security imperilled*), Clause 44(b) (*Maintenance of obligatory insurances*), Clause 44(c) (*Terms of obligatory insurances*) or Clause 44(e) (*Renewal of obligatory insurances*) and

(i) if such breach is in the Owner's opinion capable of remedy, it is not remedied within 3 days or, in respect of Clause 44(b) (*Maintenance of obligatory insurances*), Clause 44(c) (*Terms of obligatory insurances*) or Clause 44(e) (*Renewal of obligatory insurances*) five (5) days, of the Owner's request that the relevant Transaction Obligor remedy such breach; or

(ii) If such breach is in the Owner's reasonable opinion not capable of remedy an Event of Default shall be deemed to have occurred upon the occurrence of such breach.

**(c)    Other obligations**

The Charterers or (with effect from the date falling 12 months after the date of this Charter) any other Transaction Obligor does not comply with any provision of any Relevant Document (other than those referred to in Clause 45(a) (*Non-Payment*) and Clause 45(b) (*Specific obligations*)) to which it is a party, and:

(i) if such breach is in the Owners' opinion capable of remedy, it is not remedied within fifteen (15) days of the Owners' request that the relevant Transaction Obligor remedy such breach; or

(ii) if such breach is in the Owners' reasonable opinion not capable of remedy

an Event of Default shall be deemed to have occurred upon the occurrence of such breach. ; or

(iii) if such breach is in respect of an Approved Manager and would, in the Owners'opinion, be cured or remedied by the appointment of a new manager of the Vessel within the terms of the definition of "Approved Manager", such new Approved Manager has not been appointed by the Charterers within thirty (30) days of the Owners'notice to the Charterers of such Event of Default; or

**(d)    Misrepresentation**

Any representation or statement made or deemed to be made by the Charterers in this Charter or any other document delivered by or on behalf of the Charterers under or in connection with any Relevant Document is or proves to have been incorrect or misleading when made or deemed to be made, and:

(i) if such misrepresentation is in the Owners' opinion capable of remedy, it is not remedied within ten (10) days of the Owners' request that the relevant Transaction Obligor remedy such breach; or

(ii) if such misrepresentation is in the Owners' reasonable opinion not capable of remedy

an Event of Default shall be deemed to have occurred upon the date of such misrepresentation.

**(e)    Cross default**

(i)    Any Financial Indebtedness of any Transaction Obligor  is not paid when due nor within any originally applicable grace period.

(ii)   Any Financial Indebtedness of any Transaction Obligor is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(iii)  Any commitment for any Financial Indebtedness any Transaction Obligor is cancelled or suspended by a creditor of any Transaction Obligor as a result of an event of default (however described).

(iv)   Any creditor of any Transaction Obligor declares any Financial Indebtedness of such Transaction Obligor due and payable prior to its specified maturity as a result of an event of default (however described)

provided that

(A)    no Event of Default will occur under this Clause 45(e) in relation to the Corporate Guarantor if the aggregate amount of such due and payable Financial Indebtedness or cancelled commitment for Financial Indebtedness is less than the Threshold Amount; and

(B)    if the aggregate amount of such due and payable Financial Indebtedness or cancelled commitment for Financial Indebtedness in relation to the Corporate Guarantor exceeds the amount stated in paragraph (A) above, no Event of Default will occur under this Clause 45(e) if such Financial Indebtedness of the Corporate Guarantor referred to in paragraphs (i) to (iv) of this Clause 45 (e) is paid within 30 days of the due date.

**(f)    Insolvency**

(i) any Transaction Obligor:

a.    is unable or admits inability to pay its debts as they fall due;

b.    is deemed to, or is declared to, be unable to pay its debts under applicable law; or

c.    suspends making payments on any of its debts;

(ii)     The value of the assets of any Transaction Obligor is less than its liabilities (taking into account contingent and prospective liabilities).

(iii)    A moratorium is declared in respect of any indebtedness of any Transaction Obligor without the consent of the Owners, which in the case of the Corporate Guarantor might have a Material Adverse Effect on its ability to perform its obligations under the Corporate Guarantee.

**(g)    Insolvency proceedings**

(i) Any corporate action, legal proceedings or other procedure or step is taken in relation to:

a.   the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Transaction Obligor which has not been approved by the Owners;

b.   a composition, compromise, assignment or arrangement with any creditor of any Transaction Obligor which has not been approved by the Owners;

c.   the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any Transaction Obligor or any of its assets which has not been approved by the Owners; or

d.   enforcement of any Security over any assets of any Transaction Obligor, which in the case of the Corporate Guarantor is for a debt of more than the Threshold Amount

or any analogous procedure or step is taken in any jurisdiction.

(ii)     Paragraph (i) above shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 30 days (or such longer period as the Owners may agree) of commencement.

**(h)    Creditors' process**

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of any Transaction Obligor and is not discharged within 60 days (or such longer period as may be agreed by the Owners), which in the case of the Corporate Guarantor is for a debt of more than the Threshold Amount.

**(i)    Unlawfulness, invalidity and ranking**

(i)     It is or becomes unlawful for any Transaction Obligor to perform any of its obligations under the Relevant Documents to which it is a party.

(ii)     Any obligation of any Transaction Obligor under the Relevant Documents to which it is a party is not or ceases to be legal, valid, binding or enforceable.

(iii)    Any Relevant Document ceases to be in full force and effect or to be continuing or is or purports to be determined or any Transaction Security is alleged by a party to it (other than a Finance Party) to be ineffective.

**(j)**     **Security imperilled; flag instability**

        (i)     Any Security created or intended to be created by a Relevant Document is in any way imperilled or in jeopardy.

        (ii)     The state of the Approved Flag of the Vessel is or becomes involved in hostilities or civil war or there is a seizure of power in such state by unconstitutional means, or any other event occurs in relation to the Vessel, a Mortgage or the Approved Flag and in the reasonable opinion of the Owners such event is likely to have a Material Adverse Effect.

**(k)**     **Cessation of business**

Any Transaction Obligor suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business.

**(l)**     **Expropriation**

The authority or ability of any Transaction Obligor to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any Transaction Obligor or any of its assets, which in the case of the Corporate Guarantor is (i) for a debt of more than the Threshold Amount and (ii) not discharged within 60 days (or such longer period as may be agreed by the Owners).

**(m)**     **Repudiation and rescission of agreements**

Any Transaction Obligor rescinds or purports to rescind or repudiates or purports to repudiate a Relevant Document  or any of the Transaction Security or evidences an intention to rescind or repudiate a Relevant Document.

**(n)**     **Litigation**

Any litigation, arbitration, administrative, governmental, regulatory or other investigations, proceedings or disputes are commenced or threatened in relation to any of the Relevant Documents or the transactions contemplated in any of the Relevant Documents or against any Transaction Obligor or its assets which has or is reasonably likely to have a Material Adverse Effect.

**(o)**     **Material adverse effect**

Any event or circumstance occurs which has or is reasonably likely to have a Material Adverse Effect.

**(p)**     **Arrest of Vessel**

Unless the Charterers have made an election under Clause 34(g), the Vessel is arrested, confiscated, seized, taken in execution, impounded, forfeited, detained in exercise or purported exercise of any possessory lien or other claim, which is not attributable to the sole fault of the Owners or any affiliate or agent of the Owners, and the Charterers fails to procure the release of the Vessel within a period of forty five (45) days thereafter (or such longer period as may be approved by the Owners).

**(q)    Charter termination**

This Charter is cancelled or rescinded or (except as a result of it being a Total Loss) frustrated or the Vessel is withdrawn from service under this Charter before the time this Charter was scheduled to expire, provided that such cancellation, rescission or frustration is not attributable to the sole fault of the Owners or any affiliate or agent of the Owners.

**(r)    Insurances**

If either (A) the Charterers shall fail at any time to effect or maintain any insurance required to be effected and maintained under this Charter, or any insurer shall avoid or cancel any such insurances, or the Charterers shall commit any breach of or make any misrepresentation in respect of any such insurance the result of which is to entitle the relevant insurer to avoid the policy, or otherwise to be excused or released from all or any of its liabilities thereunder to the Owners (unless the relevant insurer has expressly and irrevocably waives the breach or misrepresentation in question), or (B) any of the said insurances shall cease for any reason whatsoever to be in full force and effect prior to any replacement cover being placed.

**(s)    Change of Control**

There is any change of control of the Charterers and/or the Corporate Guarantor from that existing on the date of this Charter without the prior written consent of the Owners, which shall not be unreasonably withheld, unless the change in the owning structure or control of the Corporate Guarantor is permitted as per Clause 43(o)(ii).

**(t)    Failure to Comply**

If the Charterers do not comply with any of the undertakings set out in any acknowledgement to be given to the Owners and/or any Mortgagee pursuant to any notice of assignment served on the Charterers as referred to in Clause 39(c).

**(u)    Condition on Redelivery**

If the Vessel is not in the condition required by Clause 49 (*Redelivery*) on the intended redelivery date.

**(v)    Performance of Relevant Documents**

If any event occurs which would render performance of any Relevant Documents by any party to any such document impossible, unlawful or unenforceable by the Owners.

**(w)    No Authorisation**

If any applicable licenses, permits, approvals, authorization, filing, etc which may be required for any party to any Relevant Document to comply with its obligations under the Relevant Documents is not obtained, is revoked, suspended, withdrawn  or withheld or modified in a manner which is deemed prejudicial by the Owners or

**(x)    Collateral Charters**

There shall occur an Event of Default as defined or to be defined in either Collateral Charter.

**(y)    Fundamental Term**

The Owners and the Charterers agree that it is a fundamental term and condition of this Charter that no Event of Default shall occur during the Charter Period and that the occurrence of an Event of Default shall entitle (but not oblige) the Owners at any time during the continuation of such Event of Default to accept the repudiation by the Charterers of this Charter constituted by the occurrence of such Event of Default.

## 46    OWNERS' RIGHTS

(a)    At any time after the lapse of fifteen (15) days following the written request of the Owners to the Charterers to remedy and or rectify the occurrence of any of the circumstances described at Clause 45 (*Event of Default*) and while they are continuing, the Owners may, by notice to the Charterers, immediately or on such date as the Owners shall specify, terminate the chartering by the Charterers of the Vessel under this Charter, whereupon the Owners may at their option (but with no obligation so to do):

    (i)    declare by notice given to the Charterers the aggregate amount of (i) the then Outstanding Principal and (ii) the Indemnity Sum to be immediately due and payable whereupon the same shall become immediately due and payable and the Charterers shall be obliged to pay the actual balance of the same to the Owners together with any interest in accordance with Clause 35(d)

    **and** if, subject to the proviso to this Clause 46(a), the Charterers pay to the Owners within 6 months of the Owners' notice to terminate this Charter, the aggregate amount of (i) the then Outstanding Principal, (ii) the Indemnity Sum revised up to the date of payment, (iii) interest in accordance with Clause 35(d) and (iv) any other amount payable by the Charterers to the Owners under this Charter, the Owners shall transfer the Vessel to the Charterers free of any Mortgage, other Security, encumbrances, maritime or other lien, challenges, arrests, injunctions, debts or claims created solely by the Owners, at the Charterers' sole cost and expense, and shall in connection therewith deliver to the Charterers a protocol of delivery and acceptance and a bill of sale executed and (if required) notarized together with all such other documents necessary to effect transfer of title and registration of the Vessel in the ownership of the Charterers, in form and substance satisfactory to the Charterers; and/or;

    (ii)    take any action at law and under the Relevant Documents to collect the full amount as mentioned in Clause 46(a)(i) above; and/or

    (iii)    unless the Charterers have paid to the Owners the full amount as mentioned in Clause 46(a)(i) above, by their agent or otherwise without further legal process, re-take the Vessel (wherever she may be) irrespective of whether the Charterers or any other person is in possession of the Vessel, and for that purpose the Owners or their agents may enter any dock, pier or other premises where the Vessel is then at or at any time thereafter located and the Charterers agree that the Owners may enter upon any premises belonging to or in the occupation or under the control of the Charterers for such purpose; and/or

    (iv)    unless the Charterers have paid to the Owners the full amount as mentioned in Clause 46(a)(i), declare by notice given to the Charterers that the Vessel should be promptly re-delivered by the Charterers to the Owners whereupon the Charterers shall be obliged to cause the Vessel to be re-delivered to the Owners with all reasonable dispatch and at a safe port within permitted insurance limits designated

by the Owners; and/or

(v)     unless the Charterers have paid to the Owners the full amount as mentioned in Clause 46(a)(i), with or without re-taking possession of the Vessel and without demand or performance of other demand, advertisement or notices of any kind to the Charterers, to sell, lease or otherwise dispose of the Vessel, whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board or elsewhere, for cash or for credit, with or without warranties or representations and upon such terms and conditions as the Owners in its sole discretion may deem acceptable.  In the event that the Vessel is sold, the Owners shall pay to the Charterers any surplus from the sale proceeds after deducting the Outstanding Principal, any Variable Hire and Indemnity Sum due and payable, and any interest in accordance with Clause 35(d)

provided that while the debt secured by the Collateral Mortgage remains, the Owners rights under this Clause 46 shall be subject to their obligations under, and the rights of the second Lenders under, an intercreditor deed made or to be made between (i) the First Lender and the Second Lenders or (ii) the First Lender, the Second Lenders and the Mortgagee, including, but not limited to, a purchase option in respect of the Vessel granted or to be granted by the Owners to the Second Lenders.

(b)     If the Owners repossess the Vessel as contemplated by Clauses 29 (*Repossession*) and 46(a), the Owners shall be entitled to navigate the Vessel to a safe port within permitted insurance limits designated by the Owners and to appoint (at the Charterers' cost and expense) a class surveyor from the Vessel's Approved Classification Society for the purpose of determining the structure, state, condition and class of the Vessel at that time. If the class surveyor determines that the Vessel does not conform to the structure, state, condition and class set out in Clause 15 (*Redelivery*) and more particularly described at Clause 49 (*Redelivery*), the Owners shall be entitled to arrange (at the Charterers' cost and expense) all works, drydockings, surveys, repairs or modifications necessary to ensure compliance with Clauses 15 and 49.

(c)     If the Charterers re-deliver the Vessel as contemplated by Clause 46(a), the Owners shall be entitled to appoint (at the Charterers' cost and expense) a class surveyor from the Vessel's Approved Classification Society at the port of re-delivery for the purpose of determining the structure, state, condition and class of the Vessel at the time of re-delivery. If the class surveyor determines that the Vessel does not conform to the structure, state, condition and class set out in Clause 15 (*Redelivery*) and more particularly described at Clause 49 (*Redelivery*), the Owners shall be entitled to arrange (at the Charterers' cost and expense) all works, drydockings, surveys, repairs or modifications necessary to ensure compliance with Clauses 15 and 49.

(d)     No remedy referred to in this Clause 46 (*Owners' Rights*) is intended to be exclusive, but each shall be cumulative. Save for as expressly stated in this Clause 46 (*Owners' Rights*), the exercise or purported exercise of any one remedy shall not prevent the simultaneous or later exercise of any other remedy nor shall it prevent the later exercise of the same remedy. Any delay of exercise of any remedy shall not constitute a waiver of such remedy or any other remedy, and each remedy shall survive the termination of the chartering of the Vessel pursuant to this Clause 46 (*Owners' Rights*) and any breach of, or repudiation by the Charterers or the Owners of this Charter. No waiver, express or implied, by the Owners of any Event of Default shall in any case constitute a waiver of any subsequent Event of Default. Nothing in this Charter shall prevent the Owners from exercising any rights or powers granted by law.

(e)     To the extent permitted by applicable law, the Charterers waive all claims, damages and demands against the Owners arising out of the Owners repossession, removal, retention, use or sale of the Vessel. The Charterers agree that, if any notification of intended disposal of the Vessel is required by law, such notification shall be deemed reasonably and properly given at least five (5) days before such intended disposition.

(f)     The Owners and the Charterers each agree that the payment of the Outstanding Principal as set out at Clause 46(a)(i) above is a reasonable pre-estimate of the damages that will be suffered by the Owners arising from the termination of the chartering of the Vessel and represent liquidated damages and not a penalty.

(g)     The Owners may not sell or transfer the Vessel other than pursuant to (a) this Clause 46, (b) Clause 40(a) or (c) otherwise after the termination of this Charter.

## 47     ASSIGNMENT AND SUB-CHARTER

(a)     The Owners agree that the Charterers may sub-let the Vessel solely on the terms set out in Clause 36(o).

(b)     The Charterers agree that no sub-charter shall:

    (i)     relieve or discharge the Charterers from any of their obligations contained in this Charter or any of the other Relevant Documents to which they are a party nor any other Transaction Obligor under any of the Relevant Documents to which they are respectively a party; and

    (ii)    be of a duration which expires later than on the last date of the Charter Period unless the Charterers have exercised the Purchase Option on or before the time of entering into such time charter, voyage charter or other charter or the Owners otherwise agree.

(c)     The Charterers undertake to provide the Owners with a certified true copy of any sub-charter to be entered into in relation to the Vessel.

(d)     The Charterers may not assign their rights under this Charter without the prior written consent of the Owners other than a) in favour of the Second Lenders as security for the Charterers' obligations under the Charterers' Loan Agreement and b) (i) with the prior written consent of the Owners (which consent may not be unreasonably withheld in the case of a proposed assignment, novation or transfer to a first class party from Western Europe or the United States of America) or (ii) to a company (or its subsidiary) listed in a stock exchange in, or other institutional investor based in, the United States of America or Western Europe on giving at least 10 days prior written notice to the Owners or (iii) any entity incorporated and existing in (or beneficially owned and controlled by persons incorporated or operating in) an OECD country (other than Turkey) or Singapore and whose parent companies and ultimate beneficial shareholders are either (aa) institutional investors or (bb) if not an institutional investor, has not (and none of its directors and shareholders have) been convicted of fraud in any jurisdiction, which entity has good experience in owning, operating or managing tankers or similar vessels. For the purposes of (i) above, it is deemed reasonable for the Owners to withhold their consent to any proposed transfer, novation or assignment to parties with their ultimate beneficial owners in Russia, China or any country which is subject to Sanctions.

## 48     PURCHASE OPTION AND OBLIGATION

        Provided that (i) no Applicable Insolvency Default (as defined below) has occurred and is

continuing, (ii) the Owners have not terminated the chartering of the Vessel under Clause 46 and (iii) the Vessel has not become Total Loss, the Charterers shall be entitled to exercise an option to purchase the Vessel (such option being the "**Purchase Option**") at the purchase option price (the "**Purchase Option Price**"), being the amount in dollars specified below for the relevant date of completion of purchase:

    (i)      before the date falling 6 months after the Delivery Date: 101% of the Outstanding Principal;

    (ii)     thereafter: 100% of the Outstanding Principal; and

    (iii)    at any time, if the Vessel and/or the Collateral Vessels and/or FOURNI is to be acquired by one of the Second Lenders: 100% of the Outstanding Principal.

If the Charterers wish to exercise their Purchase Option as specified at Clause 48(i) to (iv) above, the Charterers shall give the Owners written notice thereof of not less than one (1) month before the expected date of completion of the purchase. The date of completion of the purchase shall in such a case be a Hire Payment Date as specified in that notice, but shall in no circumstances be later than the last day of the Charter Period.

Once exercised, the Purchase Option shall be irrevocable in the case of the Charterers and shall not be withdrawn by the Charterers.

If the Charterers have not exercised their Purchase Option before the Final Option Date, then they must purchase the Vessel (the "**Purchase Obligation**") for the Purchase Obligation Price. The date of completion of the purchase shall in such case be the day of the Final Option Date.

On the exercise of the Purchase Option or the Purchase Obligation the Vessel shall be sold on the terms of a memorandum of agreement in form and substance acceptable to the Charterers and the Owners.

Provided (i) the Charterers pay the Purchase Option Price (or the Purchase Obligation Price, as the case may be), the Indemnity Sum, the Charter Hire up to the date of completion of the purchase (the "**Completion Date**") and any outstanding interest under this Charter in full on or before the Completion Date, (ii) either (aa) no Event of Default under Clauses 45(f), (g) or (h) in respect of the Charterers is continuing on the Completion Date, as a result of which the Owners consider, acting reasonably having regard to the Charterers financial condition and obligations at that time, it would reasonably be expected that the sale of the Vessel to the Charterers and payment of the purchase price could be ordered by a court, administrator, receiver or other relevant person to be set aside, reversed or repaid (an "**Applicable Insolvency Default**") or (bb) if an Applicable Insolvency Default has occurred and the Charterers wish to exercise the Purchase Option prior to 30 September 2020, the Owners have waived the same in writing, (iii) the Owners have not terminated the chartering of the Vessel under Clause 46 and (iv) the Vessel has not become a Total Loss, the Owners shall be obliged to deliver to the Charterers, at the Charterers' sole cost and expense, a protocol of delivery and acceptance and a bill of sale executed and (if required) notarized in respect of the Vessel and to transfer to the Charterers the title which the Owners had in respect of the Vessel together with all such other documents necessary to effect transfer of title and registration of the Vessel to the Charterers, in form and substance satisfactory to the Charterers; the Owners will deliver the Vessel on the Completion Date free of any Mortgage, other Security, encumbrances, maritime or other lien, challenges, arrests, injunctions, debts or claims created solely by the Owners other than, if liabilities still remain under the Charterers' Loan Agreement, a mortgage therefor in favour of the Second Lenders.

With respect to such sale the Vessel shall be taken over by the Charterers, on a strictly "as is/where is" basis without recourse and, the Owners make no representation or warranty, express or implied, as to the seaworthiness, value, condition, design, merchantability or operation of the Vessel, or as to the quality of the material, equipment or workmanship in the Vessel, or as to the fitness of the Vessel for any particular use, or as to the eligibility of the Vessel for any particular trade, or as to the Vessel's freedom from any charters (other than charters to which the Owners are a party) or any other representation or warranty whatsoever, express or implied, with respect to the Vessel and under no circumstances whatsoever shall the Owners be liable or responsible to the Charterers for any actual direct or consequential damages in respect of the foregoing.

Notwithstanding the aforementioned, if on the completion date an Applicable Insolvency Default is continuing, the Owners may in their reasonable discretion determine whether or not the Owners and the Charterers should fulfill their respective obligations under the Purchase Option on the Completion Date.

The Owners have not granted the Charterers any option other than the Purchase Option set out above. Without limiting any of the Owners' other rights under this Charter, if the Purchase Option is not exercised within 30 days before the Final Option Date, the Owners have the right to enter into contracts or other agreements to sell or charter the Vessel to whomever the Owners decide so long as such sale or charter does not take effect until the expiry of the Charter Period, unless otherwise agreed by the Charterers.

If the Charterers exercise the Purchase Option with intended delivery on the last day of the Charter Period or fulfil the Purchase Obligation on the last day of the Charter Period, the Owners shall not, if the Purchase Option Price or the Purchase Obligation Price has been received by the Owners or is held in escrow under arrangements acceptable to the Owners, sell the Vessel to third parties, until the date falling 31 days after the last day of the Charter Period.

Upon completion of the sale following the Charterers' exercise of the Purchase Option or fulfilment of the Purchase Obligation and full performance thereunder, this Charter and all further rights and obligations of the parties hereunder (except for indemnities and other obligations of the Charterers that by their nature should survive the termination or expiry of this Charter as more particularly described at Clause 38(f)) shall expire.

**49      REDELIVERY**

The survey referred to in Clause 7 (*Surveys on Delivery and Redelivery*) hereof for redelivery, shall take place at the port of redelivery at or about the time of redelivery and shall be paid for by the Charterers.

(a)     Without prejudice to the provisions of Clause 15 (*Redelivery*) hereof, at the time and expense of the Charterers, the Vessel shall on redelivery to the Owners hereunder:

1.      be delivered in the same structure, state and condition as that in which she was deemed delivered hereunder, fair wear and tear not affecting class or any other international or port state licenses/certificates excepted, it being understood and agreed, however, that for the purposes of Clause 15 (*Redelivery*) and this Clause 49 (*Redelivery*) the Vessel shall regardless of her actual physical condition at the time of delivery be deemed as per the Delivery Date to have complied fully with this Charter and the MOA, be fully operational and ready in every respect to commence normal/prudent operations with any potential charterers as vessels of a similar type and with similar specifications.

2.    maintain the class with class notation as set out in Part I Box 10 (or any equivalent IACS class which the Vessel may attain pursuant to this Charter and/or which may be required or necessary or desirable for the intended trade of the Vessel), free of conditions of class or memoranda or other outstanding issues with the classification society, relevant port state authorities or any other third party, with valid, and with survey cycles up to date and port state control inspections dependent on the Vessel's actual position;

3.    be free of average damage affecting class and ready in every respect for normal/prudent operations with full inventory, spare parts and other equipment generally expected by and acceptable to potential charterers for well maintained and equipped vessels of the Vessel's type and specifications;

4.    without prejudice to Clause 49(a), shall have equivalent inventory, spare parts and other equipment to that on delivery to the Owners;

5.    have been dry-docked to the satisfaction of the Approved Classification Society;

6.    have had her underwater parts treated with ample anti-fouling to last for the ensuing period up to the next scheduled dry docking of the Vessel;

7.    be free of any cargo and passengers;

8.    be free of slops, unless they can be redelivered;

9.    be free of officers and crew (unless otherwise agreed by the Owners); and

10.   be free of any charter and any Security save for as created by the Owners.

(b)   Without prejudice to the foregoing, the Charterers shall, if requested so to do by the Owners, assign to the Owners at the redelivery all and any such rights as they may have under the Charterers' insurances for the Vessel in respect of damage to the Vessel, whether or not then known other than any rights to be reimbursed by insurers for costs previously incurred by the Charterers.

(c)   With reference to Clause 7 (*Surveys on Delivery and Redelivery*), if the appointed surveyors disagree on the condition of the Vessel, they shall refer the matter to a class surveyor of the Vessel's Approved Classification Society, whose decision shall be final and binding on the parties hereto. The Charterers shall at their time and expense make all repairs, do all work and purchase all inventory, spare parts and other equipment as may be necessary to comply with the Charterers' obligations under this Clause 49 (*Redelivery*) before redelivery (or, if required, immediately after the survey referred to at Clause 7 (*Surveys on Delivery and Redelivery*)) or shall at the Owners' sole option discharge their obligations hereunder by payment to the Owners of a sum sufficient to provide, at the current prices at the time of redelivery, for the repairs, work, inventory, spare parts and other equipment necessary to place the Vessel in the structure, state, readiness, class and condition required by this Clause 49 (*Redelivery*).

(d)   The Owners shall, during a period of one (1) months prior to the date of redelivery, be entitled, at their own risk and expense, to place no more than two (2) representatives on board the Vessel for familiarisation purposes, subject to signing of standard protection and indemnity letter and provided always that such representatives do not interfere with the operation of the Vessel.

(e)     The Owners shall reimburse the Charterers for the proportionate amount of any insurance premia paid for the period commencing on the date of redelivery. The form of the standard protection and indemnity letter is to be sought by the Charterers.

The provisions of this Clause 49 shall not apply if the Purchase Option referred to in Clause 48 has been exercised

## 50     CONFIDENTIALITY

(a)     The parties shall keep the negotiations and contents of this Charter and any information (not commonly known to public domain) that they may have received at any time in relation to the business, strategies or financial affairs of the other party in the strictest confidence. The parties may nevertheless disclose such information when required by any Mortgagee (or any of its affiliates), law, regulatory rules and regulations, governmental authorities or relevant stock exchange or to their professional advisers (including, without limitation, legal, accounting and tax advisers). This confidentiality undertaking shall survive the termination of or expiry of this Charter.

(b)     Notwithstanding the aforementioned, the Charterers hereby irrevocably directly authorise any Mortgagee, any of their co-lenders / syndicate members, or its or their assigns to give, divulge and reveal from time to time information and details relating to its accounts, this Charter, the MOA and any other Relevant Document to (i) any relevant authorities, (ii) any Mortgagee's, any facility agent's (in the context of financing in respect of the Vessel) respective head office, relevant branches, relevant affiliates, shareholders and (iii) any other party to the abovementioned documentation or any Loan Agreement between any Mortgagee and the Owners or any security document related thereto; and (iv) any other person, regarding funding, operational arrangement or other transaction in relation thereto, including without limitation, for purposes in connection with any enforcement or assignment or transfers of any of the rights and obligations of any Mortgagee and the Owners shall be held harmless by the Charterers in relation to any disclosure as referred to in this paragraph of Clause 50.

## 51     INCONSISTENCY

In case of any inconsistency between the standard terms of this Charter and Rider Clauses 32 - 59 the Rider Clauses shall prevail.

## 52     FURTHER ASSURANCE: OWNERS' REFINANCING

(a)     The Charterers shall, promptly, and in any event within the reasonable time period specified by the Owners, do all such acts (including procuring or arranging any registration, notarisation or authentication or the giving of any notice) or execute or procure execution of all such documents (including assignments, transfers, mortgages, charges, notices, instructions, acknowledgments, proxies and powers of attorney), as the Owners may specify (and in such form as the Owners may require in favour of a Mortgagee or its nominee(s)), at the cost of the Owners:

1.        to create, perfect, vest in favour of any Mortgagee or protect the priority of the Security or any right of any kind created or intended to be created under or evidenced by the Relevant Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of any Mortgagee, any Receiver or any Finance Party from time to time party to this Charter and any delegate, agent, attorney, co-

trustee or other person appointed by any Mortgagee provided by or pursuant to any Finance Documents or by law;

2.    to confer on any Mortgagee or confer on any Finance Party or other party from time to time party to this Charter and any Receiver or any delegate, agent, attorney, co-trustee or other person appointed by any Mortgagee Security over any property and assets of the Charterers located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to any Finance Documents;

3.    to facilitate or expedite the realisation and/or sale of, the transfer of title to or the grant of, any interest in or right relating to the assets which are, or are intended to be, the subject of the Transaction Security or to exercise any power specified in any Finance Document in respect of which the Security has become enforceable; and/or

4.    to enable or assist any Mortgagee to enter into any transaction to commence, defend or conduct any proceedings and/or to take any other action relating to any item of the Security Assets.

(b)    The Charterers shall take all such action as is available to them (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Owners, any Mortgagee by or pursuant to any Finance Documents.

(c)    At the same time as the Charterers deliver to the Owners any document executed by themselves pursuant to this Clause 52 (*Further Assurance: Owners' Refinancing*), the Charterers shall deliver to the Owners a certificate signed by two of the Charterers' directors or officers which shall:

(i)    set out the text of a resolution of the Charterers' directors specifically authorising the execution of the document specified by the Owners and/or any Mortgagee; and

(ii)    state that either the resolution was duly passed at a meeting of the directors validly convened and held, throughout which a quorum of directors entitled to vote on the resolution was present, or that the resolution has been signed by all the directors or officers and is valid under the Charterers' articles of association or other constitutional documents.

(d)    The Owners may seek to refinance the Vessel with financiers other than the Mortgagee in order to obtain better financing terms for themselves and if they do so they may consider, without any obligation, reducing the Margin to take into account such improved terms.

(e)    If pursuant to Clause 52(d) the Owners refinance the Vessel with a better interest rate than that payable to the Mortgagee, but do not agree to any reduction in the Margin, then the Charterers may, within 30 Banking Days of notification from the Owners that they do not agree to reduce the Margin, exercise the Purchase Option in accordance with Clause 48 at a Purchase Option Price of 100% of the Outstanding Principal, irrespective of the date of such purchase.

## 53    THIRD PARTY RIGHTS

Other than any Mortgagee or its affiliates, a person who is not a party to this Charter has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Charter.

**54     AMENDMENTS**

(a)     The Owners and the Charterers agree that if any Mortgagee requests amendments to this Charter prior to committing to financing the Vessel, the Owners and the Charterers shall negotiate in good faith with a view to making such amendments to the Charter, if mutually agreed, and the Owners shall bear the reasonable legal fees of the Charterers of making such amendments.

(b)     No variation or amendment of this Charter shall be valid unless in writing and signed on behalf of the Owners and the Charterers. Furthermore, the Owners and the Charterers each agree not to amend, vary or terminate this Charter without the prior written consent of any Mortgagee. However, the aforementioned right of any Mortgagee shall only apply for so long as they are any Mortgagee.

**55     NO LIENS**

The Charterers irrevocably and unconditionally waive in favour of the Owners all rights to any liens that may arise from time to time in their favour over the Vessel.

**56     JURISDICTION**

(a)     This Charter and any non-contractual obligations arising out of or in connection with this Charter shall in all respects be governed by and interpreted in accordance with English law.

(b)     The Charterers and Owners accept that the courts of England are the most appropriate and convenient courts to settle disputes and accordingly no party will argue to the contrary.

(c)     Nothing in this Clause 56 (*Jurisdiction*) shall limit the Charterers or Owners from taking proceedings relating to a dispute in any other courts with jurisdiction. To the extent allowed by law, the Charterers and Owners may take concurrent proceedings in any number of jurisdictions.

(d)     The Charterers irrevocably designate, appoint and empower Eletson Maritime Limited registered at 3 Crane Court, Fleet Street, London EC4A 2EJ, England to receive for them and on their behalf, service of process issued out of the English courts in any such legal action or proceedings.

(e)     The Owners irrevocably designate, appoint and empower Ince Process Agents Limited at present of Aldgate Tower, 2 Leman Street, London E1 8QN, England (attn.: Mr David Baker) to receive for them and on their behalf, service of process issued out of the English courts in any such legal action or proceedings.

**57     NOTICES**

(a)     Any communication to be made under or in connection with this Charter shall be in English made in writing and, unless otherwise stated, may be made by email or letter.

(b)     The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each party to this Charter for any communication or document to be made or delivered under or in connection with this Charter are:

1.     in the case of the Charterers to c/o Eletson Holdings Inc., 118 Kolokotroni Street, 185 35 Piraeus, Greece (email address: finance@eletson.com) marked for the attention of Peter Kanellos; and

2.　　in the case of the Owners, c/o Oceanbulk USA, 358 5ᵗʰ Avenue, Suite 1207, New York, NY 10001, United States of America (email address: kbucca@oceanbulk.gr) marked for the attention of Kira Bucca,

or any substitute address, email address, department or officer as each party to this Charter may specifically notify to the other parties to this Charter by not less than five (5) Banking Days' notice.

(c)　　Any communication or document made or delivered by one party to this Charter to another under or in connection this Charter will only be effective:

　　(i)　　if by way of email address, when received in legible form; or

　　(ii)　　if by way of letter, when it has been left at the relevant address or three (3) Banking Days after being deposited in the post postage prepaid in an envelope addressed to it at that address if it is being sent to an address in the same country as the sender (or upon receipt if it is being sent internationally by post) or four (4) Banking Days after being handed to a reputable international courier service in an envelope addressed to it at that address if it is being sent internationally,

and, if a particular department or officer is specified as part of its address details provided under Clause 57(b), if addressed to that department or officer.

## 58　　COUNTERPARTS

This Charter may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute one and the same agreement which may be sufficiently evidenced by one counterpart.

## 59　　DEFINITIONS

In this Charter, unless the context otherwise requires, the following expressions shall have the following meanings:

"**affiliate**" means in respect of any company, and company which is a direct or indirect subsidiary thereof, a company ("**Parent Company**") of which it is a direct or indirect subsidiary and any other company which is owned or controlled directly or indirectly by any Parent Company;

"**Aggregate Outstanding Principal**" means at any time the aggregate of the Outstanding Principal and the Collateral Outstanding Principal;

"**Aggregate Market Value**" means, at any relevant time, the aggregate of (i) the Market Value and (ii) the "Market Value" as defined in the Collateral Charter in respect of each Collateral Vessel which is subject to a Collateral Charter;

"**Aggregate Monthly Fixed Hire**" means at any time the aggregate of the Monthly Fixed Hire and the Collateral Monthly Fixed Hire;

"**Anticipated Opex**" means, in respect of any charter period, the amount certified by the chief financial officer of the Charterers and agreed by the Owners as being the aggregate operating and voyage expenses, agency fees, management, general and administrative expenses, repair and maintenance costs, in respect of the Vessel for that charter period;

**"Approved Broker"** means any firm or firms of insurance brokers appointed by the Charterers and as may from time to time be approved in writing by the Owners;

**"Approved Classification"** means, as at the date of this Charter, the Approved Classification Society or the equivalent classification with another Approved Classification Society;

**"Approved Classification Society"** means, as at the date of this Charter, any classification society which is a member of the International Association of Classification Societies acceptable to the Owners (such acceptance not to be unreasonably withheld, and if granted, to be given in writing);

**"Approved Flag"** means the flag of Greece, Liberia or the Marshall Islands as may be requested by the Charterers;

**"Approved Manager"** means Eletson Corporation of Monrovia, Liberia having established an office in Greece according to the Greek Mandatory Law 89/67 as amended at 118 Kolokotroni Street, 185 35 Piraeus, Greece, Piraeus, Greece or such other company as the Charterers may nominate and the Owners may approve (which approval may not be unreasonably withheld if such nominated company is experienced in the management of tankers) from time to time as the commercial technical and/or operational manager of the Vessel;

**"Approved Valuer"** means each of (i) H. Clarkson & Co. Ltd. of St Magnus House, 3 Lower Thames Street, London EC3R 6HE, England, (ii) Fearnleys of P.O. Box 1158 Sentrum, 0107 Oslo, Norway, (iii) Braemar ACM Shipbroking Ltd, One Strand, Trafalgar Square, London WC2N 5HR, (iv) Barry Rogliano Salles of 11 Boulevard Jean Mermoz, 92200 Neuilly-sur-Seine, France, (v) Arrow Valuations Ltd, (vi) Maersk Broker K/S, Midtermolen 1, 2100 Copenhagen, Denmark, (vi) Joachim Grieg Shipbrokers, Centric House, 390-391 Strand, London WC2R 1LT, (vii) Intermodal, 17km Ethniki Odos Athens-Lamia, 3 Agrambelis Street, Nea Kifissia, Athens 14564, Greece (viii) WeberSeas (Hellas) SA of 7 Granikou Street, Marousi, Athens  15125, Greece and (ix) Golden Destiny SA, 57 Akti Miaouli, Piraeus 18536, Greece (or in each case any affiliate of such person through which valuations are commonly issued) or such other international, active firm of shipbrokers specialising in the valuation of vessels of the relevant type nominated by the Charterers and approved by the Owners from time to time;

**"Authorisation"** means any authorisation, consent, declaration, licence, permit, exemption, approval or other document, whether imposed by or arising in connection with any law, regulation, custom, contract, security or otherwise howsoever which must be obtained at any time from any person, Government Entity or central bank or other self-regulating or supra-national authority in order to enable Transaction Obligor lawfully and continuously to continue its corporate existence and/or perform all its obligations whatsoever whensoever arising and/or grant security under the Relevant Documents and/or to ensure the continuous validity and enforceability thereof;

**"Banking Day"** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Piraeus, Hamburg and (in relation to payments in dollars only) New York;

**"BWTS"** means, in relation to the Vessel, the Ballast Water Treatment System;

**"Charter"** means the BARECON 2001 Bareboat Charter Party dated _14_ June 2020 between the Owners and the Charterers for the Vessel together with Rider Clauses 32-59;

**"Charterers' Insurance Proceeds Payment"** has the meaning given to it in Clause 44(q);

"**Charter Hire**" has the meaning given to it in Clause 34 (*Charter Hire*);

"**Charter Period**" means the term specified in Clause 2 (*Charter Period*) or, if shorter, the period ending on the date on which the Vessel is acquired by the Charterer pursuant to the Purchase Option;

"**Charterers**" means **Kinaros Special Maritime Enterprise**, a company incorporated and existing under the laws of the Republic of Greece and having its registered office at 62 Iroon Polytechniou, Piraeus, Greece;

"**Charterparty Assignment**" means the specific assignment of the rights of the Charterers under any charter in respect of the Vessel for a duration of more than 366 days (and of any guarantee issued in respect of the performance of the charterer under such a charter) to be executed by the Charterers in favour of the Owners in form and substance acceptable to the Owners and their legal advisors;

"**Collateral Charter**" means each of (i) a bareboat charter (herein, "**Collateral Charter A**") made or to be made by Collateral Owner A as owners and Collateral Charterer A as charterer of Collateral Vessel A and (i) a bareboat charter (herein, "**Collateral Charter B**") made or to be made by Collateral Owner B as owners and Collateral Charterer B as charterer of Collateral Vessel B, and in the plural means both of them;

"**Collateral Charterer**" means each of (i) Kimolos II Special Maritime Enterprise (herein, "**Collateral Charterer A**"), a company incorporated and existing under the laws of the republic of Greece and having its registered office at 62 Iroon Polytechniou, Piraeus, Greece and (i) Kinaros Special Maritime Enterprise (herein, "**Collateral Charterer B**"), a company incorporated and existing under the laws of the republic of Greece and having its registered office at 62 Iroon Polytechniou, Piraeus, Greece, and in the plural means both of them;

"**Collateral Guarantee**" means each guarantee of the Charterers' obligations under this Charter to be given by the Collateral Charterers in such form as the Owners may approve or require and in the plural means both of them;

"**Collateral Outstanding Principal**", "**Collateral Monthly Fixed Hire**" and "**Collateral Trigger Amount**" mean, respectively, the aggregate "Outstanding Principal", the aggregate "Monthly Fixed Hire" and the aggregate "Trigger Amount" as such words are respectively defined in the Collateral Charters;

"**Collateral Owner**" means each of (i) OCM Maritime Yukon LLC (herein, "**Collateral Owner A**") and (ii) OCM Maritime Thames LLC (herein, "**Collateral Owner B**"), each a company incorporated and existing under the laws of the Republic of the Marshall Islands and having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960 and in the plural means both of them;

"**Collateral Vessels**" means together, (i) mv "KIMOLOS" (herein, "**Collateral Vessel A**"), which is to be acquired by Collateral Owner A and registered in its ownership on the Greek flag with the name "KIMOLOS" and to be chartered to Collateral Charterer A under Collateral Charter A and (ii) mv "KASTOS" which is to be acquired by Collateral Owner B and registered in its ownership on the Greek flag with the name "KASTOS" (herein, "**Collateral Vessel B**") and to be chartered to Collateral Charterer B under Collateral Charter B;

"**Completion Date**" has the meaning given to it in Clause 48 (*Purchase Option and Obligation*);

"**control**" of a corporate entity means:

    (i)    the power (whether by way of ownership of shares, proxy, contract, agency or otherwise) to:

        (A)    cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of that corporate entity; or

        (B)    appoint or remove all, or the majority, of the directors or other equivalent officers of that corporate entity; or

        (C)    give directions with respect to the operating and financial policies of that corporate entity with which the directors or other equivalent officers of that corporate entity are obliged to comply; and/or

    (ii)    the holding beneficially of more than 50 per cent. of the issued share capital of that corporate entity (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital);

"**Corporate Guarantee**" means the guarantee of the Charterer's obligations under this Charter to be given by the Corporate Guarantor in such form as the Owners may approve or require;

"**Corporate Guarantor**" means Eletson Holdings Inc, a corporation incorporated in the Republic of Liberia, having its registered office at 80 Broad Street, Monrovia, Liberia;

"**Delivery Date**" has the meaning given to it in Clause 32 (*Delivery*);

"**Document of Compliance**" has the meaning given to it in the ISM Code;

"**dollars**" and "**$**" mean the lawful currency, for the time being, of the United States of America;

"**Earnings**" means, in relation to the Vessel, all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Owners or the Charterers or any Mortgagee and which arise out of the use or operation of the Vessel, including (but not limited to):

(a)    the following, save to the extent that any of them is, with the prior written consent of the Owners, pooled or shared with any other person:

    (i)    all freight, hire and passage moneys;

    (ii)    compensation payable to the Owners or the Charterers or any Mortgagee in the event of requisition of the Vessel for hire;

    (iii)    remuneration for salvage and towage services;

    (iv)    demurrage and detention moneys;

    (v)    damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of the Vessel;

    (vi)    all moneys which are at any time payable under any Insurances for the Vessel in relation to loss of hire;

(vii)    all monies which are at any time payable to the Owners or the Charterers in relation to general average contribution; and

(b)    if and whenever the Vessel is employed on terms whereby any moneys falling within sub-paragraphs (i) to (vi) of paragraph (a) above are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to the Vessel;

"**Environmental Approvals**" means all authorisations, consents, licences, permits, exemptions or other approvals whatsoever required under applicable Environmental Laws;

"**Environmental Claim**" means any claim by any governmental, judicial or regulatory authority or any other person which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law and, for this purpose, "**claim**" means a claim for damages, compensation, contribution, injury, fines, losses and penalties or any other payment of any kind, including in relation to clean-up and removal, whether or not similar to the foregoing which is, or is likely to be, for US$1,000,000 or more in aggregate; an order or direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**" means:

(a)    any release, emission, spill or discharge into the Vessel or into or upon the air, sea, land or soils (including the seabed) or surface water of Environmentally Sensitive Material within or from the Vessel; or

(b)    any incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or surface water from a vessel other than the Vessel and which involves a collision between the Vessel and such other vessel or some other incident of navigation or operation, in either case, in connection with which the Vessel is liable to be arrested, attached, detained or injuncted and/or the Vessel and/or any Transaction Obligor and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c)    any other incident in which Environmentally Sensitive Material is released, emitted, spilled or discharged into or upon the air, sea, land or soils (including the seabed) or surface water otherwise than from the Vessel and in connection with which the Vessel is liable to be arrested and/or where any Transaction Obligor and/or any operator or manager of the Vessel is at fault or allegedly at fault or otherwise liable to any legal or administrative action, other than in accordance with an Environmental Approval;

"**Environmental Law**" means any present or future law relating to pollution or protection of human health or the environment, to conditions in the workplace, to the carriage, generation, handling, storage, use, release or spillage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

"**Environmentally Sensitive Material**" means and includes all contaminants, oil, oil products, toxic substances and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous;

"**Event of Default**" has the meaning given to it in Clause 45 (*Event of Default*) and an Event of Default is "continuing" if such Event of Default has not been remedied by the Charterers or waived by the Owners;

"**Final Option Date**" means the 5th anniversary of the Delivery Date;

"**Finance Document**" means any Loan Agreement and any security document (howsoever described) executed in connection therewith;

"**Finance Party**" means any lender, agent, trustee or other party (other than a borrower or guarantor) to any Loan Agreement;

"**Financial Indebtedness**" means any indebtedness for or in relation to:

(a)   moneys borrowed;

(b)   any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)   any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)   the amount of any liability in relation to any lease or hire purchase contract which would, in accordance with US GAAP, be treated as a finance or capital lease;

(e)   receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)   any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

(g)   any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that derivative transaction, that amount) shall be taken into account);

(h)   any counter-indemnity obligation in relation to a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)   the amount of any liability in relation to any guarantee or indemnity for any of the items referred to in paragraphs (a) to (f) above;

"**Fixed Hire**" means an amount payable on each Hire Payment Date comprising the Monthly Fixed Hire for each month from (and including) the current Hire Payment Date until (but excluding) the next Hire Payment Date;

"**FOURNI**" means mv "**FOURNI**" which is to be acquired by OCM Maritime Autumn and registered in its ownership on the Greek flag with the name "**FOURNI**";

"**General Assignment**" means the general assignment of Earnings, Insurances and any Requisition Compensation of the Vessel executed or to be executed by the Charterers in favour of the Owners in form and substance acceptable to the Owners and their legal advisors;

"**Hire Payment Date**" has the meaning given to it in Clause 34(b);

"**Indemnity Sum**" means the aggregate from time to time of any outstanding indemnity payments payable by the Charterers to the Owners pursuant to Clause 38 (*Indemnity*) or any other provision of this Charter;

"**Insolvency Proceedings**" has means any of the events referred to in Clause 45(g);

"**Insurances**" means, in relation to the Vessel:

(a)     all policies and contracts of insurance, including entries of the Vessel in any protection and indemnity or war risks association, effected in relation to the Vessel, her Earnings or otherwise in relation to the Vessel whether before, on or after the date of this Charter; and

(b)     all rights and other assets relating to, or derived from, any of such policies, contracts or entries, including any rights to a return of premium and any rights in relation to any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Charter;

"**ISM Code**" means the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention (including the guidelines on its implementation), adopted by the International Maritime Organisation, as the same may be amended or supplemented from time to time;

"**ISPS Code**" means the International Ship and Port Facility Security (ISPS) Code as adopted by the International Maritime Organization's (IMO) Diplomatic Conference of December 2002, as the same may be amended or supplemented from time to time;

"**ISSC**" means an International Ship Security Certificate issued under the ISPS Code;

"**Leverage Ratio**" means, at any relevant time (i) the aggregate of the Outstanding Principal and the Outstanding Principal as defined in the respective Collateral Charter (unless the same has been terminated for any reason) divided by (ii) the Aggregate Market Value;

"**LIBOR**" means, in relation to any amount denominated in any currency:

(ii)     the applicable Screen Rate for periods of one month;

(iii)    if no Screen Rate is available for LIBOR for one-month periods, the applicable LIBOR shall be the rate (rounded to the same number of decimal places as the two relevant Screen Rates) which results from interpolating on a linear basis between (i) the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than a month (ii) the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds a month; or

(iv)     if no Screen Rate is available for LIBOR the applicable LIBOR shall be the Reference Bank Rate (and if not all Reference Banks quote, at least two Reference Banks);

in each case, as of 11.00 a.m. (London time) on the Quotation Day for the offering of deposits in the relevant currency and for a period comparable to the relevant period and if any such rate is less than zero (0%) LIBOR will be deemed to be zero (0%) per cent. per annum and subject to the provisions of Clause 35(f) (Unavailability of LIBOR);

"**Loan Agreements**" means any loan agreement entered into by the Owners where its obligations are secured by a Mortgage;

"**Losses**" means all losses, costs, charges, expenses, fees, payments, liabilities, penalties, fines, damages, injuries, claims, demands, awards, judgments or other sanctions of a monetary nature;

"**Major Casualty**" means any casualty to the Vessel in relation to which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $1,000,000 or the equivalent in any other currency;

"**Manager's Undertaking**" means, in relation to the Vessel, any letter of undertaking from the Approved Manager subordinating the rights of the Approved Manager against that Vessel and the Charterers to the rights of the Owners and assigning the rights and interests of the Approved Manager in the Insurances of the Vessel to the Owners in form and substance acceptable to the Owners and their legal advisors;

"**Margin**"means at any relevant time before the first anniversary of the Delivery Date, seven point three per cent (7.30%) per annum and thereafter:

(i) if the Leverage Ratio on the first day of a calendar year is less than 65%, 7.10% per annum for that calendar year; or

(ii) if the Leverage Ratio on the first day of a calendar year exceeds 65% but is less than 70%, 7.30% per annum for that calendar year; or

(iii) if the Leverage Ratio on the first day of a calendar year exceeds 70%, 7.75% per annum for that calendar year;

"**Market Value**" means, in relation to the Vessel, at any date the market value of the Vessel at any time as shown by a valuation, prepared:

(a)     as at a date not more than 14 days previously;

(b)     by an Approved Valuer or any other independent sale and purchase shipbroker which the Owners have approved or appointed for the purpose;

(c)     with or without physical inspection of the Vessel (as the Owners may require); and

(d)     on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment (including this Charter),

(e)     after deducting the estimated amount of the usual expenses which would be incurred in connection with the sale

and calculated:

A) for the purposes of calculating the Trigger Amount, in accordance with Clause 34(g); or

B) for the purposes of calculating the Leverage Ratio, by taking the average of one such valuation from an Approved Broker appointed by the Owners and one such valuation from an Approved Broker appointed by the Charterers, unless such valuations differ by more than 10%, in which case the Owners shall obtain a valuation from a third Approved Broker, and the ":Market Value" shall be the average of the closest two of such three valuations;

**"Material Adverse Effect"** means in the reasonable opinion of the Owners a material adverse effect on:

(a)     the business, operations, property or financial condition of the Charterers which would affect the ability of any Transaction Obligor to perform its obligations under any Relevant Document; or

(b)     the ability of any Transaction Obligor to perform its obligations under any Relevant Document to which it is a party; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or intended to be granted pursuant to any of, the Relevant Documents or the rights or remedies of the Owners under any of the Relevant Documents;

**"Minimum Insured Value"** means the minimum value of the insurances to be effected in respect of the Vessel as set out in Clause 44(c) (*Terms of obligatory insurances*);

**"MOA"** means the memorandum of agreement to be made between the Charterer as seller and the Owners as buyers in respect of the Vessel (as the same may be amended from time to time);

**"Monthly Fixed Hire"** means:

(i) in respect of the first month of the Charter Period, zero;

(ii) in respect of the following 5 months of the Charter Period, $62,500 per month;

(iii) in respect of the following 6 months of the Charter Period, $100,000 per month;

(iv) in respect of the following 12 months of the Charter Period, $110,000 per month;

(v) in respect of the following 12 months of the Charter Period, $115,000 per month;

(vi) in respect of the following 12 months of the Charter Period, $120,000 per month; and

(vii) in respect of the following 12 months of the Charter Period, $125,000 per month

as, in each case, such amount may be varied in accordance with the terms of this Charter;

**"Mortgage"** has the meaning given to it in Clause 39 (*Mortgages*);

**"Mortgagee"** has the meaning given to it in Clause 39 (*Mortgages*) and shall mean a financing bank of the Vessel and shall include any other bank or financial institution replacing such Mortgagee;

**"OCM Maritime Autumn"** means OCM Maritime Autumn LLC, a company incorporated and existing under the laws of the Republic of the Marshall Islands and having its registered office

at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960;

"**Outstanding Principal**" means at any relevant time the amount of up to $14,275,000 paid by the Owners to the Charterers under the MOA less the aggregate Fixed Hire which has at any relevant time been received by the Owners in accordance with this Charter;

"**Owners**" means OCM Maritime Rhine LLC, a limited liability company incorporated and existing under the laws of the Republic of the Marshall Islands and having its registered office at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, The Marshall Islands MH 96960;

"**Permitted Security**" means:

(a)     Security created by the Relevant Documents;

(b)     any netting or set-off arrangement entered into by the Charterers in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)     liens for unpaid master's and crew's wages in accordance with usual maritime practice;

(d)     liens for salvage;

(e)     liens for master's disbursements incurred in the ordinary course of trading; and

(f)     any other lien arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of the Vessel and not as a result of any default or omission by the Charterers and subject, in the case of liens for repair or maintenance, to Clause 36(o) (*Restrictions on chartering, appointment of managers etc*);

"**Principal Amount**" means the Outstanding Principal before any deduction or reduction is made;

"**Purchase Obligation Price**" means at any relevant time the Outstanding Principal;

"**Purchase Option**" has the meaning given to it in Clause 48;

"**Purchase Option Price**" has the meaning given to it in Clause 48;

"**Quotation Day**" means, in relation to any period for which an interest rate is to be determined, the Banking Day before the first day of that period unless market practice differs in the Relevant Interbank Market in which case the Quotation Day will be determined by the Owners in accordance with market practice applying in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days);

"**Receiver**" means a receiver or receiver and manager or administrative receiver of the whole or any part of the Security Assets;

"**Reference Bank Rate**" means the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Owners at its request by the Reference Banks:

(a)      (other than where paragraph (b) below applies) as the rate at which the relevant Reference Bank could borrow funds in the London interbank market in Dollars for the relevant period were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in that currency and for that period; or

(b)      if different, as the rate (if any and applied to the relevant Reference Bank and the relevant currency and period) which contributors to the Screen Rate are asked to submit to the relevant administrator;

"**Reference Banks**" means the principal London offices of HSBC Holdings plc, BNP Paribas, Credit Agricole CIB, Citibank, DNB Bank ASA, DVB Bank SE and Wells Fargo or such other banks as may be appointed by the Owners in consultation with the Charterers;

"**Relevant Documents**" means the Corporate Guarantee, the Collateral Guarantees, the General Assignment, the Charterparty Assignment, the Manager's Undertaking and this Charter and each document to be executed and delivered pursuant to such documents;

"**Relevant Interbank Market**" means the London interbank market;

"**Relevant Jurisdiction**" means, in relation to a Transaction Obligor:

(a)      its jurisdiction of incorporation;

(b)      any jurisdiction where any asset subject to, or intended to be subject to, any of the Transaction Security created, or intended to be created, by it is situated;

(c)      any jurisdiction where it conducts its business; and

(d)      the jurisdiction whose laws govern the perfection of any of the Relevant Documents entered into by it;

"**Requisition**" means in relation to the Vessel:

(a)      any expropriation, confiscation, requisition or acquisition of the Vessel, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding one year without any right to an extension) unless it is within 120 days redelivered to the full control of the Owners; and

(b)      any arrest, capture, seizure or detention of the Vessel (including any hijacking or theft) unless it is within 120 days redelivered to the full control of the Owners;

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any act or event such as is referred to in paragraph (a) of the definition of "Requisition";

"**Restricted Person**" means a person that is (i) listed on, or owned or controlled by a person listed on any Sanctions List; (ii) located in, incorporated under the laws of, or owned or controlled by, or acting on behalf of, a person located in or organised under the laws of a country or territory that is the target of country-wide Sanctions (including, without limitation, at the date of this Charter Crimea region of Ukraine, Cuba, Iran, North Korea, Syria and Sudan); or (iii) otherwise a target of Sanctions;

**"Safety Management Certificate"** has the meaning given to it in the ISM Code;

**"Sanctions"** means any economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by: (i) the United States government; (ii) the United Nations; (iii) the European Union or its Member States; (iv) the United Kingdom; (v) any country to which the Charterers or any affiliate of any of them is bound; or (vi) the respective governmental institutions and agencies of any of the foregoing, including without limitation, the Office of Foreign Assets Control of the US Department of Treasury (**"OFAC"**), the United States Department of State, and Her Majesty's Treasury (**"HMT"**) (together, **"Sanctions Authorities"**);

**"Sanctions List"** means the "Specially Designated Nationals and Blocked Persons" list issued by OFAC, the Sectoral Sanctions Identification list issued by OFAC, the Foreign Sanctions Evader list issued by OFAC, the Consolidated List of Financial Sanctions Targets and Investment Ban List issued by HMT, or any similar list issued or maintained or made public by any of the Sanctions Authorities;

**"Screen Rate"** means, in relation to LIBOR, the London interbank offered rate administered by the ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for the relevant currency and period displayed on the appropriate page of the Reuters screen (currently LIBOR01) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If the agreed page is replaced or the service ceases to be available, the Owners may specify another page or service displaying the appropriate rate after consultation with the Charterers;

**"Security"** means a mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having the effect of conferring security;

**"Security Assets"** means all of the assets of the Transaction Obligors which from time to time are, or are expressed to be, the subject of the Transaction Security;

**"Tax"** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same) and **"Taxes"** shall be construed accordingly;

**"Threshold Amount"** means, in relation to the Corporate Guarantor, at any relevant time, the higher of (i) 5% of the aggregate Financial Indebtedness of the Corporate Guarantor and all companies owned or controlled by it and (ii) US$10,000,000 (or equivalent in any other currency);

**"Total Loss"** means:

(a)      actual, constructive, compromised, agreed or arranged total loss of the Vessel;

(b)      any expropriation, confiscation, requisition or acquisition of the Vessel whether for full consideration, a consideration less than her proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority, excluding a requisition for hire for a fixed period not exceeding one year without any right to an extension;

(c)      any arrest, capture, seizure or detention of the Vessel (including any piracy, hijacking or theft) unless she is within 120 days (or, in the case of piracy, 6 months) redelivered to the full control of the Owners;

"**Total Loss Date**" means, in relation to the Total Loss of the Vessel:

(a)     in the case of an actual loss of the Vessel, the date on which it occurred or, if that is unknown, the date when the Vessel was last heard of;

(b)     in the case of a constructive, compromised, agreed or arranged total loss of the Vessel, the earlier of:

    (i)     the date on which a notice of abandonment is given to the insurers; and

    (ii)     the date of any compromise, arrangement or agreement made by or on behalf of the Owners with the Vessel's insurers in which the insurers agree to treat the Vessel as a total loss; and

(c)     in the case of any other type of total loss, the date (or the most likely date) on which it appears to the Owners that the event constituting the total loss occurred;

"**Transaction Obligor**" means each of the Charterers, the Corporate Guarantor, the Collateral Charterers and any Approved Manager which is in the same control as the Charterers;

"**Transaction Security**" means the Security created or evidenced or expressed to be created or evidenced under the Relevant Documents;

"**Trigger Amount**" means, at any time, 80% of the Aggregate Market Value;

"**US**" means the United States of America;

"**US Tax Obligor**" means:

(a)     a person which is resident for tax purposes in the US; or

(b)     a person some or all of whose payments under the Relevant Documents are from sources within the US for US federal income tax purposes;

"**Variable Hire**" means part of the Charter Hire payable on each Hire Payment Date and determined as an amount equal to 1-month LIBOR (subject as otherwise provided in this Charter) plus the Margin on the Outstanding Principal, for the period from and including the current Hire Payment Date until (but excluding) the next Hire Payment Date; and

"**Vessel**" means the vessel with its particulars set forth at Box 5 to be registered under the Approved Flag.

For and on behalf of Charterers:           For and on behalf of Owners:

......................................        ......................................

Name: *Elena Vandorou*          Name: *Panagiotis Fokas.*
Title: attorney-in-fact             Title: attorney-in-fact

Dated: *24* June 2020